## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
#### (Southern Division)

KARL FEZER
318 LEE STREET
SEATTLE, WA 98109,

VU-TIMOTHY NGUYEN
367 N TEMPLE DR
MILPITAS, CA 95035-4758,

JOHN HOLMES
7549 PARKTRACE LANE SOUTH EAST
OWENS CROSS ROADS, AL 35763,

STEVEN KAY
8492 ISLAND PALM CIRCLE
ORLANDO, FL 32835,

STEWART SIMON MILLION-PEREZ
2138 WILLOW BROOK CIRCLE
ERIE, CO 80516, and

DANIEL ESCAMILLA
5430 GALLEY ROAD
COLORADO SPRINGS, CO 80915,

individually, and as representatives of a class
of participants in and beneficiaries of the
Lockheed Martin Corporation Salaried
Savings Plan, the Lockheed Martin
Corporation Performance Sharing Plan for
Bargaining Employees, and the Lockheed
Martin Corporation Capital Accumulation
Plan, and derivatively for those Plans,

*Plaintiffs*

v.

LOCKHEED MARTIN CORPORATION,
6801 ROCKLEDGE DRIVE
BETHESDA, MD 20817

    Serve on Registered Agent:

Civil Action No.

COMPLAINT – CLASS ACTION

JURY TRIAL DEMANDED

CSC-Lawyers Incorporating Service
Company
7 St. Paul Street, Ste. 820
Baltimore, MD 21202, and

LOCKHEED MARTIN INVESTMENT
MANAGEMENT COMPANY
6801 ROCKLEDGE DRIVE
BETHESDA MD 20817

Serve on Registered Agent:
CSC-Lawyers Incorporating Service
Company
7 St. Paul Street, Ste. 820
Baltimore, MD 21202,

*Defendants.*

## CLASS ACTION COMPLAINT

1.      Defendant Lockheed Martin Corporation ("Lockheed") is the largest defense contractor in the world and has more than 120,000 employees in the United States.  Lockheed sponsors several defined-contribution retirement plans ("401(k) plans") for its employees that are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  Those plans are a key element of Lockheed's bargain with its employees, and they allow employees to save for retirement by making contributions that can be invested in the funds selected as the plans' investment options.

2.      As the 401(k) plans' sponsor, Lockheed's obligations to the participants and beneficiaries of its ERISA plans are the highest known to the law.  ERISA requires Lockheed to make decisions with an eye single to the interests of the participants and beneficiaries.  Prudent selection of the funds that serve as investment options, based solely on the interests of participants and beneficiaries, is a critical duty of 401(k) plan fiduciaries.

3.    But rather than relying on independent investment professionals to fulfill these obligations, defendants Lockheed and its wholly-owned-subsidiary Lockheed Martin Investment Management Company ("LMIMCo") chose a "DIY" approach.  They managed the 401(k) plans that they offered their employees themselves; created home-grown, ineffective private investment funds; selected and maintained those non-listed funds as investment options within their 401(k) plans despite years of under-performance; and paid themselves excessive and unreasonable fees using the 401(k) plans' assets.

4.    This case focuses on target date funds ("TDFs," sometimes called "lifecycle funds") that 401(k) plan sponsors and managers routinely select as investment options.  TDFs purport to provide a one-stop diversified fund with a stated "target" retirement date, which is generally a year stated in the fund's name.  TDFs automatically rebalance; that is, over time, a given TDF will invest increasingly in low-risk assets, like bonds, and decreasingly in high-risk assets, like stocks, as its stated target retirement date approaches.

5.    Defendants thus violated their fiduciary duties of prudence and loyalty to more than 140,000 beneficiaries of their 401(k) retirement plans.  They did so by selecting and maintaining LMIMCo as the 401(k) plans manager, and by selecting, maintaining, and offering LMIMCo's own chronically under-performing, high-cost TDFs (the "In-House TDFs") as investment options in their 401(k) plans.

6.    Defendants' decision to select their In-House TDFs – which had high fees and worse performance than superior TDFs with that same target dates that were offered by major independent investment managers – was unusual.  The TDF market is dominated by multiple investment houses that, through their immense scale, offer strong performance, exemplary

professional services, and reasonable fees.  Prudent fiduciaries generally select a set of TDFs offered by one of these independent companies to ensure their funds' TDFs are not mismanaged.

7.    Despite the plethora of higher-quality services and TDFs offered by reputable 401(k) plan managers like T. Rowe Price, Fidelity, and Vanguard, Lockheed employed its own subsidiary, LMIMCo, to manage its 401(k) plans.

8.    Defendants then selected the In-House TDFs as the only TDFs available as investment options within their 401(k) plans, and made those underperforming TDFs the default investment options for their employees' retirement savings.  They maintained the In-House TDFs within their 401(k) plans despite years of poor performance, and even added more In-House TDFs between March 19, 2019 and today (the "Class Period"), for younger workers with distant target retirement dates (e.g., In-House TDFs with target retirement dates of 2065 and 2070).  Defendants did so despite the long history of the In-House TDFs' underperformance.

9.    Defendants' disloyal and imprudent decisions to offer the In-House TDFs as the only TDF investment options within their 401(k) plans, and to maintain those funds as investment options within their plans, cost those plans' participants and beneficiaries hundreds of millions of dollars between 2019 and today.

10.    To that end, Plaintiffs Karl Fezer, Vu-Timothy Nguyen, John Holmes, Steven Kay, Stewart Simon Million-Perez, and Daniel Escamilla, individually and as representatives of the Class (defined herein) of similarly-situated participants in and beneficiaries of the Lockheed Martin Corporation Salaried Savings Plan ("Salaried Plan"), the Lockheed Martin Corporation Performance Sharing Plan for Bargaining Employees ("Bargaining Plan"), and the Lockheed Martin Corporation Capital Accumulation Plan ("Capital Plan" and collectively, the "Plans"), bring this action under 29 U.S.C. §§ 1132(a)(2) and (3), and to enforce Defendants' personal

liability under 29 U.S.C. § 1109(a) to make good, to the Plans and/or directly to beneficiaries of and participants in the Plans, all losses and unreasonable fees resulting from Defendants' breaches of fiduciary duties and other violations of ERISA, including Defendants' violations of 29 U.S.C. §§ 1104(a) and 1106, and for other appropriate relief.

11.    Because Lockheed has largely abandoned traditional pension plans – known as "defined-benefit plans" – for new employees in recent decades in favor of "defined-contribution" or 401(k) plans, the Plans represent substantially all the employer-sponsored retirement savings for tens of thousands of Lockheed employees. Competent and loyal management of the Plans was critical to the financial security and comfort in retirement for which Plaintiffs worked and saved.

12.    Plaintiffs and other members of the Class are current and former Lockheed employees who contributed to one or more of the Plans in the hope that their contributions would appreciate substantially by the time they needed their savings. The Class also includes non-employee participants, such as surviving spouses and estates of former Lockheed employees.

13.    Plaintiffs and other members of the Class placed their trust in Defendants to properly manage the Plans. But instead of prioritizing the beneficiaries of the Plans, Defendants sought to drive, and successfully drove, Plaintiffs' hard-earned retirement savings into the In-House TDFs, even though those funds were expensive and poor performing.

14.    Defendants steered their employees' retirement savings towards the In-House TDFs in at least two ways. First, Defendants marketed the In-House TDFs to participants in and beneficiaries of the Plans in a range of materials that made the funds sound like the only investment employees needed for retirement. Second, Defendants made the In-House TDFs the "default funds" for participants in the Plans. This means that employees who did not make their own

investment elections, and employees who selected an investment option that Defendants later removed from the Plans, had their retirement savings allocated to the In-House TDFs *by default*.

15.    The In-House TDFs therefore held an outsized share of the Plans' assets.  As of December 31, 2023, the Salaried Plan had approximately $47.267 billion in assets, the Bargaining Plan had approximately $2.171 billion in assets, and the Capital Plan had approximately $267 million in assets.

16.    By early 2019, a loyal and prudent fiduciary would have selected a set of TDFs that had a track record of meeting or exceeding the benchmarks established by comparison to the many available TDFs offered by established, competent fund managers.  Yet Defendants maintained the underperforming In-House TDFs as the Plans' only TDFs.

17.    Lockheed also violated its fiduciary duties by maintaining LMIMCo as the manager of the Plans.  A loyal and prudent fiduciary would have selected a professional fund manager with a track record of success, rather than trusting its nepotistically-selected stepchild, with its history of underperformance.

18.    Defendants' self-interest in the fees generated from the In-House TDFs affected their decision to continue offering those funds.  Yet Defendants provided participants with materials that painted a rosy view of the In-House TDFs as "optimal" investments.  For example, Defendants referred beneficiaries to a Morningstar summary that assured them that the funds were "a one-step approach to saving for retirement,"[1] "a diversified age-appropriate investment mix," and provided "an optimal level of return and risk, based solely on the target date."  Defendants

---

[1] Morningstar is a private, Chicago-based financial services and research firm.  Morningstar charges fees for the rights to use certain of its ratings and products in connection with marketing funds.  In this case, Morningstar's ratings indicate its belief that investors in the In-House TDFs "are likely to receive a less than fair risk-adjusted return."

also marketed the In-House TDFs as offering "a fully-diversified portfolio managed by an experienced portfolio management team" that provided "simple and effective way to invest."

19.     Finally, the fees charged by the In-House TDFs were unreasonable and excessive, considering their chronically poor performance.  For example, the In-House TDFs were two to five times more expensive than the far better-performing TDFs offered by Vanguard.

20.     In essence, contrary to what loyal fiduciaries would have done, Defendants ran a leaching operation that extracted value from Plaintiffs' retirement savings.

21.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of the Class of similarly situated participants in and beneficiaries of the Plans, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation the losses they and the Plans suffered, plus prejudgment interest, and appropriate equitable relief.

## JURISDICTION AND VENUE

22.     **Subject Matter Jurisdiction.**  This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, including because it is an action brought under 29 U.S.C. § 1132(a)(2) and (a)(3).

23.     **Personal Jurisdiction:**  Lockheed is headquartered in this District, and it does business, including business related to each of the subject 401(k) Plans and the conduct described herein, in this District.

24.     LMIMCo is likewise registered to do business, and indeed does business related to each of the Plans, including the conduct described herein, in this District.

25.     Lockheed and LMIMCo operate from the same address in Bethesda, Maryland.

26.     **Article III Standing.**  Plaintiffs have standing to bring this action.  Each has suffered an injury-in-fact in the form of damages traceable to Lockheed and LMIMCo's conduct.

27.     But for Defendants' selection of the underperforming In-House TDFs, Plaintiffs would have greater retirement savings, and thus better odds of a financially secure retirement. Plaintiffs and those similarly situated are also entitled, on a prospective basis, to have the Plans that they participate in managed by a competent fiduciary that makes decisions in accordance with their best interests.

28.     **Venue.**    This District and Division is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is where the subject Plans are administered; where at least one of the alleged breaches took place; and where the Defendants reside and may be found.

## THE PLANS & THE PARTIES

### The Lockheed 401(k) Plans

29.     The Salaried Plan is a defined-contribution plan for salaried Lockheed employees. Eligible employees are automatically enrolled in the Plan when they are hired, unless they affirmatively decline to participate.   Lockheed is the Plan Sponsor and Plan Administrator. LMIMCo is the Plan Manager.

30.     The Bargaining Plan is a defined-contribution plan for bargaining unit employees. Eligible employees are automatically enrolled in the Plan when they are hired, unless they affirmatively decline to participate.   Lockheed is the Plan Sponsor and Plan Administrator. LMIMCo is the Plan Manager.

31.     The Capital Plan is a defined-contribution noncontributory plan covering certain employees of eligible business units of Lockheed.   Lockheed is the Plan Sponsor and Plan Administrator.  LMIMCo is the Plan Manager.

32.     The assets of each Plan are managed on a commingled basis through the Lockheed Martin Corporation Defined Contribution Plans Master Trust (the "Master Trust") pursuant to an agreement between Lockheed and State Street Bank and Trust Company, which received fees for those commingling and custodial services. Defendants' conduct therefore affected each Plaintiff's investment options equally, and their respective returns proportionally to their investment, regardless of the Plan(s) in which each Plaintiff participated.

## **Plaintiffs**

33.     **Plaintiff Karl Fezer** is a resident of Seattle, Washington. Mr. Fezer has been employed by Lockheed from approximately August 2022 through the present, has been a participant in the Salaried Plan, within the meaning of 29 U.S.C. § 1002(7), throughout substantially his entire employment at Lockheed, and remains a participant today.

34.     During substantially all of Mr. Fezer's employment at Lockheed, a portion of his 401(k)-retirement savings was allocated to the In-House TDFs, specifically the In-House TDF 2040 and the In-House TDF 2050. Mr. Fezer was damaged by the poor performance of the In-House TDFs, and by Defendants' use of his retirement savings to pay themselves for their imprudent and disloyal management and oversight of the Salaried Plan.

35.     **Plaintiff Vu-Timothy Nguyen** is a resident of Milpitas, California. Mr. Nguyen was employed by Lockheed from approximately June 2019 to September 2024, was a participant in the Salaried Plan, within the meaning of 29 U.S.C. § 1002(7), throughout substantially his entire employment at Lockheed, and remains a participant today.

36.     During substantially all of Mr. Nguyen's employment at Lockheed, a portion of his 401(k)-retirement savings was allocated to the In-House TDFs, specifically the In-House TDF 2050 and the In-House TDF 2060. Mr. Nguyen was damaged by the poor performance of the In-

House TDFs, and by Defendants' use of his retirement savings to pay themselves for their imprudent and disloyal management and oversight of the Salaried Plan.

37.    **Plaintiff John Holmes** is a resident of Owens Cross Roads, Alabama.  Mr. Holmes has been employed by Lockheed from approximately April 2020 through the present, has been a participant in the Salaried Plan and the Capital Plan, within the meaning of 29 U.S.C. § 1002(7), throughout substantially his entire employment at Lockheed, and remains a participant today.

38.    During substantially all of Mr. Holmes' employment at Lockheed, a portion of his 401(k)-retirement savings was allocated to the In-House TDFs, specifically the In-House TDF 2050, the In-House TDF 2060, and the In-House TDF 2065.  Mr. Holmes was damaged by the poor performance of the In-House TDFs, and by Defendants' use of his retirement savings to pay themselves for their imprudent and disloyal management and oversight of the Salaried and Capital Plans.

39.    **Plaintiff Steven L. Kay** is a resident of Orlando, Florida.  Mr. Kay was employed at Lockheed from approximately February 2020 through October 2024, was a participant in the Salaried Plan, within the meaning of 29 U.S.C. § 1002(7), throughout substantially his entire employment at Lockheed, and remains a participant today.

40.    During substantially all of Mr. Kay's employment at Lockheed, a portion of his 401(k)-retirement savings was allocated to the In-House TDFs, specifically the In-House TDF 2025.  Mr. Kay was damaged by the poor performance of the In-House TDFs, and by Defendants' use of his retirement savings to pay themselves for their imprudent and disloyal management and oversight of the Salaried Plan.

41.    **Plaintiff Stewart Simon Million-Perez** is a resident of Erie, Colorado.  Mr. Million-Perez was employed at Lockheed from approximately April 2023 to January 2025, was a

participant in the Salaried Plan, within the meaning of 29 U.S.C. § 1002(7), throughout substantially his entire employment at Lockheed, and remains a participant today.

42.     During substantially all of Mr. Million-Perez's employment at Lockheed, a portion of his 401(k)-retirement savings was allocated to the In-House TDFs, specifically the In-House TDF 2050. Mr. Million-Perez was damaged by the poor performance of the In-House TDFs, and by Defendants' use of his retirement savings to pay themselves for their imprudent and disloyal management and oversight of the Salaried Plan.

43.     **Plaintiff Daniel Escamilla** is a resident of Colorado Springs, Colorado. Mr. Escamilla was employed at Lockheed from approximately September 2023 through December 2024, was a participant in the Bargaining Plan, within the meaning of 29 U.S.C. § 1002(7), throughout substantially his entire employment at Lockheed, and remains a participant today.

44.     During substantially all of Mr. Escamilla's employment at Lockheed, a portion of his 401(k)-retirement savings was allocated to the In-House TDFs, specifically the In-House TDF 2060. Mr. Escamilla was damaged by the poor performance of the In-House TDFs, and by Defendants' use of his retirement savings to pay themselves for their imprudent and disloyal management and oversight of the Bargaining Plan.

## Defendants

45.     **Defendant Lockheed** is a Maryland corporation headquartered in Bethesda, Maryland. Lockheed has more than 120,000 employees worldwide, and its annual revenue has exceeded $60 billion each year since 2020.

46.     Lockheed is the sponsor of the Plans, and it directed the affairs and actions of its wholly-owned subsidiary, LMIMCo.

47.     Lockheed is a fiduciary within the meaning of 29 U.S.C. §§ 1102 and 1103, and has the authority to appoint, remove, and replace other fiduciaries and third-party service providers to the Plans.  It also is and was a fiduciary to the Plans within the meaning of 29 U.S.C. § 1002(21)(A).

48.     **Defendant LMIMCo** is a Delaware corporation headquartered in Bethesda, Maryland.  LMIMCo is a wholly-owned subsidiary of Lockheed that operates from the same address.

49.     LMIMCo is the manager of the Plans and operates as a component of Lockheed in managing the Plans.

50.     LMIMCo is a fiduciary within the meaning of 29 U.S.C. §§ 1102 and 1103, and has the authority to manage the Plans.  It also is and was a fiduciary to the Plans within the meaning of 29 U.S.C. § 1002(21)(A).

51.     Defendants Lockheed and LMIMCo are members of the same corporate family and had shared interests.  Lockheed appointed the leader of LMIMCo, and was LMIMCo's only meaningful "client" throughout the entire relevant time period.

## BACKGROUND

### Defendants' Duties Under ERISA

52.     ERISA forbids retirement plan fiduciaries from allowing the assets of the Plans to "inure to the benefit of any employer," instead requiring them to use Plan assets "for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."  29 U.S.C. § 1103(c)(1).

53.     ERISA further requires pension fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a).

54.    ERISA's duty of prudence includes a continuing duty to properly monitor investments and to remove imprudent ones.

55.    The duty of loyalty that ERISA requires is absolute. A fiduciary must exclude all selfish interest and all consideration of the interests of third persons in making decisions for ERISA plans, and instead consider only its plans' participants and beneficiaries.

56.    ERISA imposes liability on any fiduciaries, such as Defendants, who "participate[] knowingly in, or knowingly undertake[] to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach"; administer their responsibilities under 29 U.S.C § 1104(a)(1) in a manner that enables another "fiduciary to commit a breach"; and where that fiduciary has knowledge of a breach by another fiduciary, but fails to make "reasonable efforts under the circumstances to remedy the breach."

57.    ERISA also prohibits fiduciaries from causing an ERISA plan to engage in "prohibited transactions," which ERISA classifies as a form of fiduciary breach.  Those are transactions where a "party in interest"—defined at 29 U.S.C. § 1002 to include "any fiduciary . . . , counsel, or employee of such employee benefit plan," "person providing services to such plan," "employer any of whose employees are covered by such plan," etc.—engages in a "sale or exchange, or leasing, of any property [with] the plan," lends "money or other extension of credit [to] the plan," furnishes "goods, services, or facilities [to] the plan," transfers or uses "any assets of the plan," or causes the plan to acquire the employer's securities or property, subject to certain exceptions.  29 U.S.C. § 1106(a).

58.    ERISA further prohibits any fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account," "act[ing] in any transaction involving the plan on behalf of a party (or represent[ing] a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries," and "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

59.    As fiduciaries to the Plans, Lockheed and LMIMCo owed these duties to the Plans and to their participants and beneficiaries.  As further described herein, Defendants violated those duties and breached those duties, causing immense harm to the Plaintiffs.

## The Plans

60.    Lockheed offers certain of its employees, and certain employees of its subsidiaries, the opportunity to participate in the Plans as part of their compensation and benefits.

61.    The Salaried Plan, Bargaining Plan, and Capital Plan are each "defined contribution plan[s]," under 29 U.S.C. § 1002(34).  They are tax-qualified 401(k) plans.

62.    Lockheed benefits from the Plans, because the opportunity to participate in the Plans helps it recruit and retain talented employees, and fosters goodwill among its employees.

63.    Lockheed also benefits from the Plans because the Plans satisfy certain state law requirements to offer retirement savings plans, while simultaneously providing Lockheed with tax savings, because the Plans are an exceptionally tax-efficient mechanism to compensate employees.

64.    Lockheed further benefits from of the Plans as presently managed, because fees and other revenue from the Plans are used to fund expenses of Lockheed's corporate family.

65.    The Plans have also assisted Lockheed in transitioning long-tenured employees away from defined-benefit plans, which Lockheed disfavors.  The reason is simple: defined-benefit

plans require plan sponsors like Lockheed to bear the risk that investments may underperform. By contrast, defined-contribution plans, including the Plans at issue here, shift that risk to employees. Thus, while the interests of an employer who sponsors a defined-benefit plan and holds the liabilities associated with that plan on its own balance sheet are broadly aligned with its employees and beneficiaries, that alignment of interests breaks down when the risks of underperformance are borne exclusively by employees, particularly where, as here, certain of the expenses of defined-contribution plans are used to fund the sponsor or its corporate affiliates.

66.    Under the terms of the Salaried Plan and the Bargaining Plan, qualified employees may contribute a percentage of their before-tax and/or after-tax earnings to the Plans. Lockheed matches a portion of employees' contributions, up to a certain percentage of their eligible compensation.

67.    Each participant's account is credited with the participant's contributions, the participant's share of matching contributions, and their earnings from investments.

68.    The Capital Plan is an ERISA-governed non-contributory plan, meaning that its assets are comprised of contributions made by Lockheed for its employees, but just like the Salaried and Bargaining Plans, the Capital Plan is an ERISA-governed defined-contribution plan.

69.    As fiduciaries of the Plans, Lockheed and LMIMCo control the selection of funds available for participants and beneficiaries.

70.    As of 2023, participants could invest in twenty-two funds, including the thirteen In-House TDFs that Defendants selected. The In-House TDFs are the only TDFs that Defendants selected as investment options within the Plans in the last decade. Other investment options include an employee stock ownership plan that was dedicated to Lockheed's own stock. Although the funds offered to participants have changed minimally over time (most notably with the

elimination of certain funds in 2021, and the addition of the LMIMCo Target-Date Fund 2065 in 2020 and the LMIMCo Target-Date Fund 2070 in 2025), the In-House TDFs were offered throughout the last six years.

### The In-House TDFs

71.    The In-House TDFs have constituted at least a substantial plurality of the funds selected by Defendants as investment options for the Plans for more than a decade, and they currently account for a majority of the Plans' investment options.

72.    For participants who accumulated balances in their 401(k) accounts but did not make investment elections, Defendants allocated those balances by default to the In-House TDFs corresponding with the year in which the participant would turn 65.

73.    Similarly, when participants had accumulated an investment balance in a fund that Defendants had previously selected but then removed from the Plans' investment options, such as the funds Defendants eliminated in 2021, Defendants cashed out those investments and reinvested the proceeds in the In-House TDFs by default, unless a participant affirmatively made a different election.

74.    The In-House TDFs are presently a set of thirteen funds that allocate investments along a "glide path." Twelve of the funds are associated with a five-year increment from 2015 to 2070 (e.g., the In-House TDF 2015, In-House TDF 2020 etc.). Fifteen years after an In-House TDF reaches its target retirement date, the fund is rolled into the dateless "LMIMCo Target-Date Retirement Fund" (e.g., the former In-House TDF 2010, was rolled into the dateless In-House TDF on or about January 1, 2025, whereas the In-House TDF 2005 was rolled into the dateless In-House TDF on or about January 1, 2020).

75.    The In-House TDFs are "through retirement" funds that continue on the glidepath for the 15-year period following the target retirement year.

76.    Especially for younger savers, the investment mix supplied by the current glide path is aggressive and exposes participants to substantial market risk.  For example, for employees who are 35 or younger, the current glide path allocates more than 90% of their LMIMCo In-House TDF investment to equities (i.e., stocks).  Conversely, before a participant's early 50s, the current glide path allocates less than 10% of participants' investment toward bonds.

77.    Defendants told participants and beneficiaries that the In-House TDFs offered "a one-step approach to saving for retirement," designed to provide a diversified age-appropriate investment mix with the goal of producing sufficient returns to meet retirement goals for the average participant.

78.    Defendants' marketing materials acknowledged that they were the fiduciaries of the plans and pitched the In-House TDFs as beneficial because they left "most ongoing investment decisions to investment professionals," ensuring a "a fully-diversified portfolio managed by an experienced portfolio management team," and providing a "simple and effective way to invest."

79.    Instead of making detailed prospectuses available online, Defendants regularly directed employees to a statement provided by Morningstar, which explained that the funds aimed "to provide investors with an optimal level of return and risk, based solely on the target date. Management adjusts the allocation among asset classes to more-conservative mixes as the target date approaches, following a preset glide path."

80.    The In-House TDFs were all managed in accordance with a singular strategy.  For example, the investment mix in the LMIMCo In-House TDF 2050 today will, over the next five

years, shift to align with the present mix in the LMIMCo In-House TDF 2045, and so on, unless the strategy is modified.

81.     Although Defendants told beneficiaries that the In-House TDFs were targeted towards the optimal balance of return and risk, they in fact knew that the In-House TDFs were chronic underperformers that failed to provide the promised "optimal balance."

82.     Investment funds are routinely benchmarked against major comparable funds or an average of the returns achieved by several comparable funds.

83.     Defendants maintained that the appropriate benchmark for the In-House TDFs are other TDFs with the same "target date" or "vintage."  Specifically, Defendants told participants that "[t]he benchmarks for the LMIMCo Target-Date Funds are the corresponding S&P Target Date Indices."  As Defendants put it, "the corresponding S&P Target Date Indices" are "industry-standard representatives for target-date funds and glidepath management."  But for every LMIMCo In-House TDF that has been available for at least six years, the S&P Target Date Index with the same target date has a long history of outperforming the comparable LMIMCo In-House TDF.

84.     The S&P Target Date Indices indeed provide widely accepted metrics for this comparison.  *See* Standard and Poor's, S&P Dow Jones Indices: S&P Target Date Index Series Methodology,     https://www.spglobal.com/spdji/es/documents/methodologies/methodology-sp-target-date.pdf.  Such an index is a conservative benchmark because it incorporates the subpar returns achieved by mismanaged funds like the In-House TDFs, though Lockheed has asserted that it is the sole proper benchmark for the funds.

85.     Additionally, indices like the S&P Target Date Indices incorporate returns on widely held TDFs that are structured as mutual funds or exchange-traded funds.  Such TDFs can be transferred to and traded at major brokerage firms.  This access to the deep liquidity provided

by the robust national financial markets is a benefit to investors that reduces risk. Conversely, the In-House TDFs were organized and managed through a private trust that subjected participants to increased risk.

86. Participants in the In-House TDFs could manage their TDF investments only through services that Defendants selected, making Plaintiffs truly captive investors who bore unique risks. The In-House TDFs' private structure made them inherently less valuable than comparable publicly-listed TDFs that otherwise provided an apples-to-apples benchmark. This difference renders the S&P Target Date Indices, which Defendant concede are an appropriate benchmark, an even more conservative measure for judging the In-House TDFs' relative performance. That is because investors generally must pay an investment premium (i.e., a higher price and expect lower returns) for highly liquid investment vehicles, and investors generally demand a discount (i.e., a lower price and higher returns) for less liquid private, non-portable funds like the In-House TDFs.

87. Defendants selected the In-House TDFs even though there was no sound reason to expect a superior investment return relative to comparable funds. As discussed below, the In-House TDFs indeed provided lower returns than Defendants' chosen benchmark indicates should have been achieved or exceeded. This cannot have come as a surprise to Defendants, especially given that they utilized Morningstar, which predicted that the In-House TDFs would "receive a less than fair risk-adjusted return."

88. Figure 1 shows the In-House TDFs' performance relative to the S&P Indices that Defendants said were the appropriate benchmarks for measuring the In-House TDFs' performance for the last decade as 12/31/2024.

**Figure 1: In-House TDFs' Performance Relative to S&P Target Date Indices**

| Vintage | S&P Target Date Index Annualized 10-Year Return | LMIMCo In-House TDF Annualized 10-Year Return | LMIMCo In-House TDF Difference |
|---|---|---|---|
| 2015 | 5.11 | 4.65 | **-0.46** |
| 2020 | 5.51 | 5.17 | **-0.34** |
| 2025 | 6.14 | 5.71 | **-0.43** |
| 2030 | 6.86 | 6.23 | **-0.63** |
| 2035 | 7.60 | 6.84 | **-0.76** |
| 2040 | 8.19 | 7.39 | **-0.80** |
| 2045 | 8.53 | 7.71 | **-0.82** |
| 2050 | 8.77 | 7.77 | **-1.00** |
| 2055 | 8.84 | 7.75 | **-1.09** |
| 2060 | 8.90 | 7.93 | **-0.97** |

89.    Figure 2 shows the disparity between the annualized net returns of the In-House TDFs and the annualized net returns provided by professionally-managed, comparable TDFs offered by Vanguard, Fidelity, and T. Rowe Price as of December 2024.  These funds are examples of the superior, readily available independently managed TDFs that a loyal fiduciary could have selected.

**Figure 2: Annualized 10-Year Net Returns (percentage points per year) and Performance Difference Relative to In-House TDFs of TDFs Offered by Major Fund Managers**

| Vintage | LMIMCo In-House TDF | Vanguard TDFs (Target Retirement Fund) | | Fidelity TDFs (Fidelity Freedom) | | T. Rowe Price TDFs (Retirement Strategies) | |
|---|---|---|---|---|---|---|---|
| | Annualized Return (%) | Annualized Return (%) | LMIMCo Difference | Annualized Return (%) | LMIMCo Difference | Annualized Return (%) | LMIMCo Difference |
| **2015** | 4.65 | -- | | 5.14 | **-0.49** | 5.92 | **-1.27** |
| **2020** | 5.17 | 5.58 | **-0.41** | 5.66 | **-0.49** | 6.44 | **-1.27** |
| **2025** | 5.71 | 6.32 | **-0.61** | 6.17 | **-0.46** | 7.01 | **-1.30** |
| **2030** | 6.23 | 6.92 | **-0.69** | 6.92 | **-0.69** | 7.64 | **-1.41** |
| **2035** | 6.84 | 7.51 | **-0.67** | 7.95 | **-1.11** | 8.20 | **-1.36** |
| **2040** | 7.39 | 8.08 | **-0.69** | 8.76 | **-1.37** | 8.72 | **-1.33** |
| **2045** | 7.71 | 8.57 | **-0.86** | 8.87 | **-1.16** | 9.05 | **-1.34** |
| **2050** | 7.77 | 8.72 | **-0.95** | 8.89 | **-1.12** | 9.09 | **-1.32** |
| **2055** | 7.75 | 8.70 | **-0.95** | 9.62 | **-1.87** | 9.11 | **-1.36** |
| **2060** | 7.93 | 8.70 | **-0.77** | 9.61 | **-1.68** | 9.09 | **-1.16** |

90.     As Figure 2 shows, every one of the comparable TDFs offered by Vanguard, Fidelity, and T. Rowe Price provided a superior performance relative to the In-House TDFs with the same vintage, with the superior performance varying between 0.41% per year and 1.37% per year over the last ten years, after fees.

91.     Figures 1-3 show that the In-House TDFs have provided sub-benchmark performance over the last decade.  This deficient performance is a long-running phenomenon.  The below-benchmark returns realized and reasonably expected for the In-House TDFs was apparent by early 2019, and a loyal fiduciary would have jettisoned LMIMCo and the In-House TDFs at least by that time.

92.     While a superior performance of around 1.00% per year might sound small, those returns compound such that they become very significant.  A hypothetical employee with a $500,000 retirement nest egg who earned a return of 7.93% per year, as the In-House TDF 2060 did, rather than a superior hypothetical return of 8.93% per year, would lose more than $100,000 in returns over 10 years, and more than $870,000 over 25 years.  Those disparities would be even greater if the employee made contributions to that nest egg during this time.

93.     Not surprisingly, the LMIMCo TDFs' poor performance and high costs resulted in hundreds of millions in lost investment returns for the Class between 2019 and 2025.  That poor performance was caused both by below-benchmark investment returns and fees that were high, particularly considering the In-House TDFs' deficient performance.

94.     Figure 3 shows the expense ratios for the In-House TDFs and the Vanguard TDFs with the same target dates.  Vanguard's TDFs are a reasonable comparator that a loyal fiduciary, dutifully attempting to reduce expenses, could have selected.  Vanguard has been the largest provider of TDFs throughout the relevant period; its funds are widely considered a TDF market

leader; and they may be considered a "benchmark" standing alone.  Defendants could have saved the Class hundreds of millions of dollars by selecting these funds, which had both lower fees and superior performance.  Instead, Defendants offered in-house, inferior investment options that had higher fees.

95.    The In-House TDFs also had substantially higher expense ratios than every non-LMIMCo-branded fund that Defendants selected as an investment options.  For example, the Plans offered generic funds named the "US Large-Cap Equity Index Fund / Large Blend," " US Small & Mid-Cap Equity Index Fund / Small Mid-Cap Blend," the "Global Ex-US Equity Index Fund / Foreign Large Blend," and the "Broad Market Bond Index Fund / Fixed Income"—though Defendants didn't offer those cheaper options by default.  These non-LMIMCo funds had expense ratios of 0.04%, 0.04%, 0.07%, 0.06%, respectively, all of which were substantially less expensive than the In-House TDFs.  Yet Defendants endeavored to drive Plaintiffs' retirement savings into their higher-cost in-house funds.

96.    Although  some actively managed TDFs had higher fees than the In-House TDFs, those independently managed TDFs generally offered a track record of superior investment performance to compensate for the fees they charged.  The LMIMCo funds forced high fees on Plaintiffs while failing to offer even the middling investment returns provided by low-cost funds. Figure 3 compares the fees charged by the most prominent low-cost TDFs, offered by Vanguard, to the fees charged by the In-House TDFs.

**Figure 3: LMIMCo In-House TDFs Annual Expenses**

| Vintage | LMIMCo In-House TDF Annualized 10-Year Net Return (%) | In-House TDF Expense Ratio (bps)[2] | Vanguard TDF Expense[3] Ratio (bps) | Vanguard TDFs Annualized 10-Year Net Return (%) |
|---|---|---|---|---|
| **2020** | 5.17 | 20 | 8 | 5.58 |
| **2025** | 5.71 | 26 | 8 | 6.32 |
| **2030** | 6.23 | 30 | 8 | 6.92 |
| **2035** | 6.84 | 35 | 8 | 7.51 |
| **2040** | 7.39 | 41 | 8 | 8.08 |
| **2045** | 7.71 | 45 | 8 | 8.57 |
| **2050** | 7.77 | 47 | 8 | 8.72 |
| **2055** | 7.75 | 48 | 8 | 8.70 |
| **2060** | 7.93 | 48 | 8 | 8.70 |

97.     Although difference in fees of just a few tenths of a percentage point may sound small, those fees add up and compound, such that they become very significant.  The SEC has published an illustration of just how much cutting fees from 0.50% to 0.25% can save an employee.

**Figure 4:  SEC's Chart "How Fees and Expenses Affect Your Investment Portfolio"**



Portfolio Value From Investing $100,000 Over 20 Years

In 20 years, 0.50% annual fees reduce portfolio value (red line) by $10,000 compared to a portfolio with a 0.25% annual fee (blue line).

In 20 years, 1.00% annual fees reduce portfolio value (green line) by nearly $30,000, compared to a portfolio with a 0.25% annual fee (blue line).

— 4% annual return less 0.25% annual fee
— 4% annual return less 0.50% annual fee
— 4% annual return less 1.00% annual fee

98.     Although Defendants disclosed the comparably high expense ratios associated with each of the In-House TDFs and provided ranges showing the anticipated division between

---

[2] "Bps" is an abbreviation for basis points.  Each basic point is 0.01 percentage points.

[3] Vanguard's referenced funds are the "Vanguard Retirement" series.

spending on investment management fees and administrative expenses, they concealed what portion of Plaintiffs' fees and investment returns funded Defendants' *own* expenses, as opposed to external vendors and external investment managers.

### Defendants Failed to Replace LMIMCo and the In-House TDFs and Instead Tried to Drive Employees' Retirement Savings into the In-House TDFs

99.     By at least early 2019, a prudent and loyal fiduciary would have replaced the expensive and underperforming In-House TDFs with better performing target date funds. Yet Defendants failed to act.

100.     The In-House TDF 2065 and In-House TDF 2070 were selected as additional investment options during the Class Period, as employees targeting retirement dates forty-five years in the future joined the workforce. Defendants selected those funds even though the In-House TDF strategy had proved deficient. A loyal and prudent fiduciary would not have continued adding new In-House TDFs as investment options.

101.     Defendants knew that their LMIMCo investment options were underperforming by at least January 2019. In that month, Defendants began a review of the funds they had selected for the Plans. The review was purportedly carried out by LMIMCo, but Defendants took no significant action as a result of the review for more than two years.

102.     Then, in 2021, Defendants attempted to adjust the glide path that allocated retirees' balances in the In-House TDFs to make those funds more competitive. The adjustment failed to achieve the desired improvement, and the underperformance continued. A loyal and prudent fiduciary would have simply jettisoned LMIMCo and its underperforming In-House TDFs, and would have done so by at least early 2019.

103.     Defendants maintained the In-House TDFs as the default investment funds within the Plans. Upon information and belief, they did so because the fees paid to LMIMCo funded

Defendants' operations – notwithstanding that the funds had historically performed poorly and at high cost, and thus unsurprisingly also failed to properly consider alternative TDFs.

104.    Lockheed had long known that LMIMCo's management was deficient.  It was sued in 2006 in connection with LMIMCo's selection of overpriced funds, and discovery showed that LMIMCo knew that cheaper products and lower fees were available, yet failed to investigate lower cost alternatives.

105.    In 2015, Lockheed reached a $62 million settlement to resolve the claims concerning it and LMIMCo's management of the 401(k) plans.  At the time, that settlement was among the largest 401(k) settlements ever reached.  A prudent fiduciary would have diligently searched for new plan management, yet Lockheed kept LMIMCo on as plan manager.

106.    Upon information and belief, Lockheed failed to evaluate and/or actually consider alternative superior investment managers between 2019 and the present.

107.    Plaintiffs would have been far better served by an investment manager who sought to keep fees down, or who selected an independent set of TDFs with a long history of superior performance.  Defendants, however, had an incentive to increase the fees associated with the Plans, because much of that money flowed to LMIMCo and could be allocated by Defendants towards in-house expenses or favored counterparties.

108.    As explained above, the fees associated with the In-House TDFs were substantially higher than comparable, but better-performing funds -- in some cases as much as 400% higher. Those higher fees provided no appreciable benefit to Plaintiffs or the Class.  In fact, the beneficiaries were paying more for less.

109.    Lockheed asserted that it would "deduct fees" "for services required to administer the Plan."  But rather than charging Plaintiffs a transparent fee, Defendants charged "most

expenses," including those for "investment oversight and other administrative costs," as "operating expenses of the Plan's investment options."  According to Defendants, such fees were "not included in the Administrative Fees displayed on your statement, instead they are reflected as a reduction to overall fund returns."  This opaque language had the effect of concealing the fees Defendants were paying themselves, and thereby prevented Plaintiffs from discovering Defendants' breaches and violations.

110.    Between 2019 and today, Defendants paid themselves more than $150,000,000 in compensation from the commingled Master Trust that held, and continues to hold, the Plans' assets, including the assets of the In-House TDFs.  In their IRS form 5500 filings, Defendants amalgamated their names and purported to be "Other Service Providers" named "LOCKHEED MARTIN CORPORATION LMIMCO."  Defendants paid themselves the amounts shown in Figure 4.

**Figure 4:  Compensation Defendants Paid Themselves as "Other Service Providers" By Year**

| | |
|---|---|
| 2019 | $42,050,219 |
| 2020 | $22,271,017 |
| 2021 | $33,865,711 |
| 2022 | $32,201,424 |
| 2023 | $36,453,869 |
| 2024 | [Not Yet Available] |
| Total 2019-2023 | **$166,842,240** |

111.    Lockheed also extended credit to the Plans.  It disclosed in a 2023 IRS Form 5500, filed on July 24, 2024, for the Salaried Plan that "[t]he Master Trust owed the Corporation $5.8 million and $6.0 million as of December 31, 2023 and 2022, respectively for certain expenses paid by the Corporation in providing services to the Plan and certain other plans."  The filing defined Lockheed Martin Corporation as "the Corporation."  A 2022 IRS Form 5500, filed on July 27, 2023, for the Salaried Plan similarly disclosed that the commingled Master Trust owed the Corporation $5.9 million as of December 31, 2021.

112.    In addition to being fiduciaries of the Plans, Defendants were each a "party in interest" within the meaning of 29 USC § 1002(14), including because they were fiduciaries of the Plans, provided services to the Plan, and had employees who were covered by the Plans.

113.    Between early 2019 and the present, LMIMCo also used fees charged to investors in its In-House TDFs to pursue a range of "active management" and "complex fee arrangements," including fees and expenses associated with private equity investments and the use of comparably expensive managers that provided little, if any, benefit to Plaintiffs.  Upon information and belief, those expenses were not reasonable in light of either the value expected or received, but spending the fees on favored expenses and counterparties benefited Defendants.

114.    Upon information and belief, the conflicted transactions that Defendants engaged in on behalf of the Plans were not within the exceptions enumerated by 29 U.S.C. § 1108.

## PLAINTIFF CLASS

115.    Plaintiffs bring this action pursuant to ERISA and Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated participants and beneficiaries. They seek certification of the following Class of participants in the Plans:

> **Class:**  All participants in or beneficiaries of the Lockheed Martin Corporation Salaried Savings Plan, the Lockheed Martin Corporation Performance Sharing Plan for Bargaining Employees, or the Lockheed Martin Corporation Capital Accumulation Plan, at any time from March 19, 2019 through the date of judgment, excluding Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary or participant.

116.    Certification of the Class is proper under Rule 23(a) because all prerequisites are satisfied.

> A.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable.  Although Plaintiffs do not know the exact number of Class members as of the date of filing, as of the end of 2023,

there were 145,641 participants who had balances in the Salaried Plan, 20,934 participants who had balances in the Bargaining Plan, and 14,132 participants who had balances in the Capital Plan.

B.    **Commonality.**  Common issues of fact and law predominate over any issues unique to individual class members. Issues that are common to all members of the Class include, but are not limited to, whether Defendants:

i.    Breached their fiduciary duties, including the duty of loyalty and/or the duty of prudence, by selecting and maintaining the In-House TDFs as funds available within the Plans;

ii.    Breached their fiduciary duties, including the duty of loyalty and/or the duty of prudence, by selecting and maintaining the In-House TDFs as the default funds within the Plans;

iii.    Breached their fiduciary duties, including the duty of loyalty and/or the duty of prudence, by continuing to engage LMIMCo as the manager of the Plans notwithstanding its self-interested and substandard conduct;

iv.    Failed to prudently oversee the performance of the investment options in the Plans, including by continuing to offer and failing to modify the In-House TDFs to ensure they offered appropriate long-term retirement returns for participants and beneficiaries;

v.    Failed to prudently limit the fees and expenses paid by the Plans, and to ensure such fees and expenses were reasonable and incurred

solely for the benefit of the participants and beneficiaries of the Plans, including by considering LMIMCo's performance;

vi.     Engaged in conflicted transactions using the assets of the Plans;

vii.    Failed to devote sufficient time to the oversight, administration, and management of the Plans in order to timely make necessary changes to the Plans;

viii.   Otherwise breached, by the conduct described in this Complaint, revealed in discovery, and to be proven at trial, ERISA-imposed obligations to the Plans and the Plans' participants and beneficiaries, including all members of the Class;

ix.     Caused damages to Plaintiffs and members of the Class through the conduct described herein;

x.      Are liable to the Plans and the Class for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations; and

xi.     Are liable to the Plans and the Class, including for breaches of the duties of loyalty and prudence, such that class-wide equitable relief is appropriate.

C.      **Typicality.**  The claims brought by the Plaintiffs are typical of those of the absent class members because:

i.      The Defendants owed the same ERISA-based obligations to each participant in the Plans and each member of the Class;

ii.       Defendants' breaches of those obligations constitute a breach to each participant and each member of the Class;

iii.      Plaintiffs, like every member of the Class, were entitled to loyal and prudent fiduciaries that incurred fees only in a manner consistent with the Class's interests in the Plans.

iv.      Plaintiffs held investment in the In-House TDFs during the Class Period and were, like other members of the Class, harmed by Defendants' selection and maintenance of LMIMCo as the manager of the Plans, Defendants' selection of the In-House TDFs as funds offered within the Plans, and Defendants' imposition of fees for fiduciary services that were not consistent with their duties of loyalty and prudence.

v.      To the extent that there are any differences among class members' damages, such differences would be a product of simple math based upon their balances in the funds over time. Such minimal differences are no impediment to class certification.

D.    **Adequacy of Representation.** Plaintiffs are more than adequate representatives of the absent class members and will protect such absent class members' interests in this litigation. Plaintiffs have no interests antagonistic to other class members, nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class's claims. Plaintiffs have retained competent counsel who are experienced in ERISA, class actions, and complex litigation generally.

117.    Class certification is also appropriate under Rule 23(b) and each subpart thereof because:

      A.    Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

      B.    Pursuant to Rule 23(b)(1)(B), because to the extent equitable relief is granted, as a practical matter that relief would be dispositive of the interests of the other members not parties to the individual adjudications.

      C.    Pursuant to Rule 23(b)(2), Defendants have acted on grounds generally applicable to each class as a whole;

      D.    Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

118.    Additionally, 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of one of the Plans to bring an action individually on behalf of their Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).  Thus, for relief sought for the Plans pursuant to 29 U.S.C. § 1132(a)(2), certification of the Class is also proper pursuant to ERISA.

## COUNT I
### Breach of Fiduciary Duties Against Lockheed and LMIMCo for Selection and Retention of the In-House TDFs
### 29 U.S.C. § 1104(a)

119.    Plaintiffs, for themselves and the Class, restate and incorporate the allegations contained in paragraphs 1 through 118 as though fully set forth here.

120.    This Count alleges breaches of fiduciary duties against Lockheed and LMIMCo.

121.    Lockheed and LMIMCo each acted and act as a "fiduciary" as defined by ERISA with respect to each of the Plans.

122.    The scope of the fiduciary duties and responsibilities of each Defendant includes discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, the participants in and beneficiaries of the Plans, defraying reasonable expenses administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

123.    Defendants were and are directly responsible for selecting prudent investment options for the Plans, evaluating and monitoring the Plans' investment options on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets were invested prudently.

124.    Lockheed and LMIMCo acted in their own interest, rather than "solely in the interest of the participants and beneficiaries," i.e., Plaintiffs and members of the Class, when they selected and maintained the In-House TDFs as investment options within the Plans. *See* 29 U.S.C. § 1104(a)(1)(A).

125.    Lockheed and LMIMCo selected and maintained the In-House TDFs as the only TDFs offered as investment options in the Plans, even though superior TDFs were readily available, and such a superior set of TDFs should have been selected in place of the In-House TDFs.  This breach is continuing.

126.    Total losses of the Plans will be determined at trial after complete discovery in this case and are continuing.

127.    Lockheed and LMIMCo are each liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

128.    Lockheed and LMIMCo knowingly participated in each other's breach, knowing that such acts were a breach, enabled each other to commit a breach by failing to lawfully discharge their own fiduciary duties, and knew of the breach by each other but failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

129.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation payment for lost investment returns, disgorgement of all profits and unreasonable expenses, and other just and proper relief, consistent with 29 U.S.C. § 1132(a)(2) and (3).

## COUNT II
**Breach of Fiduciary Duties of Loyalty and Prudence Against Lockheed and LMIMCo for Selecting, Failing to Monitor, and Retaining LMIMCo as Manager of the Plans**
**29 U.S.C. § 1104(a)**

130.    Plaintiffs, for themselves and the Class, restate and incorporate the allegations contained in paragraphs 1 through 118 as though fully set forth here.

131.    This Count alleges breach of fiduciary duties against Lockheed and LMIMCo.

132.    Lockheed and LMIMCo each acted and act as a "fiduciary" as defined by ERISA with respect to each of the Plans.

133.    The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, the participants in and beneficiaries of the Plans, defraying reasonable expenses administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

134.    Lockheed acted in its own interest, rather than "solely in the interest of the participants and beneficiaries," i.e., Plaintiffs and members of the Class, when it selected and maintained LMIMCo as the manager of the Plans.  *See* 29 U.S.C. § 1104(a)(1)(A).

135.    Lockheed selected and maintained LMIMCo as the manager of the Plans, even though superior and less expensive managers were readily available, and such a superior manager should have been selected.

136.    Upon information and belief, Lockheed failed to evaluate and/or reasonably consider alternative superior managers, and thereby failed to discharge its duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

137.    Lockheed and LMIMCo are each liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

138.    Lockheed and LMIMCo knowingly participated in each other's breach, knowing that such acts were a breach, enabled each other to commit a breach by failing to lawfully discharge their own fiduciary duties, and knew of the breach by each other but failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

139.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation payment for lost investment returns, disgorgement of all profits and unreasonable expenses, and other just and proper relief, consistent with 29 U.S.C. §§ 1132(a)(2) and (3).

## COUNT III
**Breach of Fiduciary Duties of Loyalty and Prudence Against Lockheed
and LMIMCo for Unreasonable Fees
29 U.S.C. § 1104(a)**

140.    Plaintiffs, for themselves and the Class, restate and incorporate the allegations contained in paragraphs 1 through 118 as though fully set forth here.

141.    This Count alleges breach of fiduciary duties against Lockheed and LMIMCo.

142.    Lockheed and LMIMCo each acted and act as a "fiduciary" as defined by ERISA with respect to each of the Plans, including when they paid themselves the unreasonable fees identified.

143.    The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, the Plans' participants and beneficiaries and defraying reasonable expenses administering the plan, and acting with the care, skill, prudence, and diligence required by ERISA.

144.    Lockheed and LMIMCo acted in their own interest, rather than "solely in the interest of the participants and beneficiaries," when they paid themselves tens of millions of dollars in connection with services they purported to provide to the Plans.  They did so even though lower-cost and superior providers of management services were readily available.

145.    Lockheed and LMIMCo are each liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

146.    Lockheed and LMIMCo knowingly participated in each other's breach, knowing that such acts were a breach, enabled each other to commit a breach by failing to lawfully discharge their own fiduciary duties, and knew of the breach by each other but failed to make any reasonable

effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

147.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation payment for lost investment returns, disgorgement of all profits and unreasonable expenses, and other just and proper relief, consistent with 29 U.S.C. § 1132(a)(2) and (3).

## COUNT IV
## Prohibited Transactions
## 29 U.S.C. § 1106(a)

148.    Plaintiffs, for themselves and the Class, restate and incorporate the allegations contained in paragraphs 1 through 118 as though fully set forth here.

149.    This Count alleges prohibited transactions against Lockheed and LMIMCo.

150.    Lockheed and LMIMCo each acted as a "fiduciary" of the Plans and a "party in interest" with respect to the transactions at issue.

151.    Lockheed and LMIMCo each acted in transactions in which they were adverse to the interest of the Plans, in violation of 29 U.S.C. § 1106(a)(1)(B), when they caused each Plan through the commingled Master Trust, on the one hand, to accept credit from Lockheed, on the other hand.  This extension of credit is shown by the more than $5 million that Lockheed purported to be owed by Plans as of December 31, 2021, 2022, and 2023.  Upon information and belief, Lockheed also extended credit to the Plans at other times during the Class period.

152.    Lockheed and LMIMCo each caused the Plan to engage in prohibited transactions, in violation of 29 U.S.C. § 1106(a)(1)(C), when they caused each Plan, through the combined Master Trust, to pay "LOCKHEED MARTIN CORPORATION LMIMCO" for deficient and disloyal management of each Plan.

153.    Lockheed and LMIMCo each acted in transactions in which they were adverse to the interest of the Plans in violation of 29 U.S.C. § 1106(a)(1)(D), when they caused each Plan, through the combined Master Trust, to pay "LOCKHEED MARTIN CORPORATION LMIMCO" for deficient and disloyal management of each Plan.

154.    Plaintiffs and other members of the Class were damaged by having fees charged to their investments, and their retirement savings depleted, for these prohibited transactions.

155.    Under 29 U.S.C. § 1109(a), Lockheed and LMIMCo are liable, without limitation, to restore all losses suffered by the Plan as a result of these prohibited transactions and to disgorge or provide restitution of all revenues received by the commingled Master Trust as the trustee of the assets of the Plans, as well as other appropriate equitable or remedial relief, consistent with 29 U.S.C. § 1132(a)(2) and (3).

**COUNT V**
**Prohibited Transactions**
**29 U.S.C. § 1106(b)**

156.    Plaintiffs, for themselves and the Class, restate and incorporate the allegations contained in paragraphs 1 through 118 as though fully set forth here.

157.    This Count alleges prohibited transactions against Lockheed and LMIMCo.

158.    Lockheed and LMIMCo each acted and act as a "fiduciary" as defined by ERISA with respect to the Plans and transactions at issue.

159.    Lockheed and LMIMCo each dealt in transactions for their own account, in violation of 29 U.S.C. § 1106(b)(1), when:

    A.    They caused each Plan, through the combined Master Trust, to pay "LOCKHEED MARTIN CORPORATION LMIMCO" for deficient and disloyal management of each Plan; and

B.  They caused each Plan through the commingled Master Trust, on the one hand, to accept credit from Lockheed, on the other hand.  This extension of credit is shown by the more than $5 million that Lockheed purported to be owed by Plans as of December 31, 2021, 2022, and 2023.  Upon information and belief, Lockheed also extended credit to the Plans at other times during the Class Period.

160.  Lockheed and LMIMCo each acted in transactions in which they were adverse to the interest of the Plans in violation of 29 U.S.C. § 1106(b)(2), when:

A.  They caused each Plan, through the combined Master Trust, to pay "LOCKHEED MARTIN CORPORATION LMIMCO" for deficient and disloyal management of each Plan; and

B.  They caused each Plan through the commingled Master Trust, on the one hand, to accept credit from Lockheed, on the other hand.  This extension of credit is shown by the more than $5 million that Lockheed purported to be owed by Plans as of December 31, 2021, 2022, and 2023.  Upon information and belief, Lockheed also extended credit to the Plans at other times during the Class Period.

161.  Lockheed and LMIMCo each received consideration for their own personal account from a party dealing with each Plan in connection with a transaction involving the assets of each plan in violation of 29 U.S.C. § 1106(b)(3), when:

A.  They caused each Plan, through the combined Master Trust, which was held by trustee SSBT, to pay "LOCKHEED MARTIN CORPORATION LMIMCO" for deficient and disloyal management of each Plan.

B.  They caused each Plan, through the combined Master Trust, which was held by trustee SSBT, to repay debt that Lockheed had extended to the Plans.  This debt is

shown by the more than $5 million that Lockheed purported to be owed by Plans as of December 31, 2021, 2022, and 2023.   Upon information and belief, Defendants also caused the Plans to be indebted to Lockheed to and repay that debt at other times during the Class Period.

162.    Plaintiffs and other members of the Class were damaged by having fees charged to their investments, and their retirement savings depleted, for these prohibited transactions.

163.    Under 29 U.S.C. § 1109(a), Lockheed and LMIMCo are liable, without limitation, to restore all losses suffered by the Plan as a result of these prohibited transactions and to disgorge or provide restitution of all revenues received by the commingled Master Trust as the trustee of the assets of the Plans, as well as other appropriate equitable or remedial relief, consistent with 29 U.S.C. § 1132(a)(2) and (3).

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury and alternatively an advisory jury.[4]

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed Class of similarly situated participants and beneficiaries of the Plans, respectfully request that this Court:

1.    Find and declare that Defendants have breached their fiduciary duty of loyalty as described above;

2.    Find and declare that Defendants have breached their fiduciary duty to exercise the care, skill, prudence, and diligence required as described above;

---

[4] Plaintiffs assert this jury trial demand to preserve their arguments for a jury trial under the Seventh Amendment, while recognizing that a number of courts have found claims under ERISA, and particularly claims brought pursuant to 29 U.S.C. § 1132(a)(3), equitable in nature.

3.      Find and declare that Defendants have caused the prohibited transactions described above;

4.      Find Defendants liable to the extent of Plaintiffs' unreasonable fees and lost investment returns, and award damages on that basis;

5.      Order disgorgement of all sums derived from the improper transactions;

6.      Order disgorgement of all profits accumulated from Defendants' breaches of their duties;

7.      Certify the Proposed Class, appoint each Plaintiff as a Class Representative, and appoint Zuckerman Spaeder LLP and Don Bivens PLLC as Class Counsel;
        Award to Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

8.      Order all relief that is necessary to conform Defendants' conduct with their fiduciary obligations to Plaintiffs going forward;

9.      Order the payment of interest to the extent allowed by law; and

10.     Grant any and all other relief as the Court deems just and proper.

March 19, 2025

*/s/ Cyril V. Smith*
Cyril V. Smith (Bar No. 07332)
Aaron S.J. Zelinsky*
ZUCKERMAN SPAEDER
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1009
Phone: (410) 949-1145
csmith@zuckerman.com
azelinsky@zuckerman.com

Jason S. Cowart*
ZUCKERMAN SPAEDER
485 Madison Avenue
19th Floor
New York, NY 10022-5862
Phone: (646) 746-8840
JCowart@zuckerman.com

Christopher R. MacColl*
ZUCKERMAN SPAEDER
2100 L Street
Suite 400
Washington, DC 20037-1525
Phone: (202) 778-1849
CMacColl@zuckerman.com

Don Bivens*
Teresita T. Mercado*
DON BIVENS PLLC
15169 N Scottsdale Rd Suite 205
Scottsdale, AZ 85254
Don@donbivens.com
Teresita@donbivens.com
(602) 762 2661

* application for admission or direct
appearance forthcoming