**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| KARL FEZER, *et al.*,<br><br>              Plaintiffs,<br>v.<br><br>LOCKHEED MARTIN CORP. and<br>LOCKHEED MARTIN INVESTMENT<br>MANAGEMENT CO.,<br><br>              Defendants. | Case No. 8:25-cv-00908-TDC |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED**
**CLASS ACTION COMPLAINT AND TO STRIKE JURY DEMAND**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARDS ....................................................................................................... 6

ARGUMENT ....................................................................................................................... 6

    I.   The First Amended Complaint Fails to State a Claim for Breach of Fiduciary Duty. ....... 6

        A.    Plaintiffs Have Not Plausibly Alleged that Lockheed Martin Is a Fiduciary. ............7

        B.    Plaintiffs Fail to State a Claim for Breach of the Duty of Prudence.........................10

            1.    Plaintiffs' Hindsight-Based Performance Review Is Insufficient to Support an Imprudence Claim. ........................................................................................... 11

            2.    Alternatively, Plaintiffs Fail to Support Their Imprudence Claim with Allegations Providing a "Meaningful Benchmark" for the LMIMCo TDFs. ........... 16

            3.    Plaintiffs' Allegations Regarding the LMIMCo TDFs' Fees Are Insufficient to Support an Imprudence Claim. ................................................................................. 18

        C.    The First Amended Complaint Fails to State a Claim for Breach of the Duty of Loyalty. ...........................................................................................................................20

    II.  The First Amended Complaint Fails to State a Prohibited Transaction Claim................ 22

        A.    Plaintiffs Bear the Burden to Establish that Section 408(c)(2) Does Not Apply......22

        B.    Plaintiffs Fail to Plead that Section 408(c)(2) Does Not Apply. .............................24

        C.    Plaintiffs Fail to State a Plausible Section 406(a) Prohibited Transaction. ..............24

            1.    Plaintiffs Fail to Allege a Prohibited Loan or Extension of Credit Under Section 406(a)(1)(B)................................................................................................ 25

            2.    Plaintiffs Fail to State a Claim Under Section 406(a)(1)(C). ......................... 26

            3.    Plaintiffs Do Not Allege a Prohibited Transfer Under Section 406(a)(1)(D). 27

        D.    Plaintiffs Fail to State a Plausible Section 406(b) Prohibited Transaction...............28

    III. ERISA Does Not Allow Jury Trials on Plaintiffs' Claims. ............................................ 29

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

Cases

*Abel v. CMFG Life Ins. Co.*,
   No. 22-cv-449, 2024 WL 307489 (W.D. Wis. Jan. 26, 2024) ...................................... 12, 17, 19

*Acosta v. Calderon*,
   No. ADC-16-0964, 2017 WL 4011962 (D. Md. Sept. 11, 2017) ............................................. 7

*Albert v. Oshkosh Corporation*,
   47 F.4th 570 (7th Cir. 2022) ........................................................................................ 11, 20

*Anderson v. Intel Corp. Invest,ent Committee*,
   137 F. 4th 1015 (9th Cir. 2022) ................................................................................ 16, 17, 19

*Anderson v. Intel Corp. Invest,ent Committee*,
   579 F. Supp. 3d 1133 (N.D. Cal. 2024) .................................................................................. 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................................... 6

*Anderson v. Intel Corp.*,
   No. 19-CV-04618-LHK, 2021 WL 229235 (N.D. Cal. Jan. 21, 2021) ................................... 19

*Baird v. Steel Dynamics, Inc.*,
   No. 1:23-cv-356, 2024 WL 3983741 (N.D. Ind. Aug. 29, 2024) ........................................... 12

*Bekker v. Neuberger Berman Grp. LLC*,
   No. 16-cv-6123, 2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018) ............................................ 12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................................... 6

*Bracalente v. Cisco Sys., Inc.*,
   No. 22-cv-04417, 2024 WL 2274523 (N.D. Cal. May 20, 2024) ............................................ 17

*Clark v. BASF Corp.*,
   142 F. App'x 659 (4th Cir. 2005) ............................................................................................. 4

Coyer v. Univar Sols. USA, Inc.,
   No. 1:22-cv-362, 2022 WL 4534791 (N.D. Ill. Sept. 28, 2022) ............................................. 15

*Coyne & Delany Co. v. Selman*,
   98 F.3d 1457 (4th Cir. 1996) ...................................................................................................... 8

*Cunningham v. Cornell University*,
604 U.S. 693 (2025)................................................................................ 23, 26

*Danza v. Fid. Mgmt. Tr. Co.*,
533 F. App'x 120 (3d Cir. 2013)....................................................................... 28

*Davis v. Salesforce.com, Inc.*,
2020 WL 5893405 (N.D. Cal. Oct. 5, 2020)........................................................ 14

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ................................................................. 16, 17, 20

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ................................................................... 10, 12

*Dorman v. Charles Schwab Corp.*,
No. 17-cv-285, 2019 WL 580785 (N.D. Cal. Feb. 8, 2019)..................................... 14

*Enstrom v. SAS Inst.*,
No. 5:24-CV-105, 2025 WL 685219 (E.D.N.C. Mar. 3, 2025)........................... passim

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)................................................................................. 6, 30

*First Tex. Sav. Ass'n v. Reliance Ins. Co.*,
950 F.2d 1171 (5th Cir. 1992) ........................................................................ 25

*Fitzpatrick v. Neb. Methodist Health Sys Inc.*,
No. 8:23-cv-27, 2023 WL 5105362 (D. Neb. Aug. 9, 2023).................................... 18

*Forman v. TriHealth, Inc.*,
563 F. Supp. 3d 753 (S.D. Ohio 2021) .............................................................. 12

*Gonzalez v. Northwell Health, Inc.*,
632 F. Supp. 3d 148 (E.D.N.Y. 2022) ............................................................... 12

*Hall v. Cap. One Fin. Corp.*,
No. 1:22-cv-857, 2023 WL 2333304 (E.D. Va. Mar. 1, 2023).......................... passim

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ........................................................................... 9

*Hooker v. Tunnell Gov't Servs., Inc.*,
447 F. Supp. 3d 384 (D. Md. 2020) ................................................................... 4

*Hughes v. Nw. Univ.*,
   595 U.S. 170 (2022) ............................................................................... 6, 16

*In re Bellanca Aircraft Corp.*,
   850 F.2d 1275 (8th Cir. 1988) .................................................................... 25

*In re Constellation Energy Grp., Inc.*,
   738 F. Supp. 2d 602 (D. Md. 2010) ............................................................... 9

*Januski v. Mortell Co.*, No. 84 C,
   3827, 1985 WL 3749 (N.D. Ill. Nov. 8, 1985) ........................................... 25

*Juric v. USALCO, LLC*,
   659 F. Supp. 3d 619 (D. Md. 2023) .............................................................. 4

*Lockheed Corp. v. Spink*,
   517 U.S. 882 (1996) .................................................................................. 8, 27

*Lockheed Martin Inv. Mgmt. Co.*,
   *S.E.C. No-Action Letter*, 2006 WL 1624232 (June 5, 2006) ......... 2, 21, 22

*Lora v. United States*,
   599 U.S. 453 (2023) ................................................................................... 23

*Luckett v. Wintrust Fin. Corp.*,
   No. 22-cv-3968, 2024 WL 3823175 (N.D. Ill. Aug. 14, 2024) ........... 12, 13, 17, 18

*Matney v. Barrick Gold of North America*,
   80 F.4th 1136 (10th Cir. 2023) .................................................................. 19

*Matousek v. MidAm. Energy Co.*,
   51 F.4th 274 (8th Cir. 2022) ............................................................... passim

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) .................................................................... 11

*Palmer v. Land O'Lakes, Inc.*,
   518 F. Supp. 3d 1293 (D. Minn. 2021) ..................................................... 17

*Patterson v. Morgan Stanley*,
   No. 16-cv-6568, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .................. 14

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ..................................................................................... 7

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013) ............................................................................................. 6, 10

*Perez v. Silva*,
185 F. Supp. 3d 698 (D. Md. 2016) ........................................................................................ 30

*Phelps v. C.T. Enters., Inc.*,
394 F.3d 213 (4th Cir. 2005) ................................................................................................. 29

*Phillips v. Cobham Adv. Elects. Solutions,* 23-cv-3785,
2025 WL 2689268 (N.D. Cal. Sept. 19, 2025) ........................................................ 12, 15, 20

*Probst v. Eli Lilly and Co.*,
No. 1:22-cv-1106-JMS-MKK, 2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) ......................... 28

*Reed v. MedStar Health, Inc.*,
No. JKB-20-1984, 2023 WL 5154507 (D. Md. Aug. 10, 2023) ....................................... 29, 30

*Reich v. Compton*,
57 F.3d 270 (3d Cir.1995) ...................................................................................................... 28

*Renfro v. Unisys Corp.*,
671 F.3d 314 (3d Cir. 2011) ..................................................................................................... 9

*Santomenno v. Transamerica Life Ins. Co.*,
883 F.3d 833 (9th Cir. 2018) .................................................................................................... 9

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ......................................................................................... passim

*Tatum v. RJR Pension Inv. Comm.*,
761 F.3d 346 (4th Cir. 2014) ................................................................................................. 10

Tullgren v. Booz Allen Hamilton, Inc., No
No. 1:22-cv-856, 2023 WL 2307615 (E.D. Va. Mar. 1, 2023) ......................................... passim

*Wehner v. Genentech, Inc.*,
No. 20-cv-06894, 2021 WL 2417098 (N.D. Cal. June 14, 2021) ........................................... 18

*White v. Chevron Corp.*,
No. 16-cv-793, 2017 WL 2352137 ......................................................................................... 11

*Wilcox v. Georgetown Univ.*,
No. 18-422, 2019 WL 132281 (D.D.C8, 2019) ................................................................ 17, 18

*Williams v. Centerra Grp., LLC,*
    579 F. Supp. 3d 778 (D.S.C. 2022)...................................................... 30

*Yates v. United States,*
    574 U.S. 528 (2015).................................................................... 23

<u>Statutes</u>

29 U.S.C. § 1104(a)(1)..................................................................... 20

29 U.S.C. § 1104(a)(1)(B) ................................................................. 10

29 U.S.C. § 1106(a)(1)(B) ................................................................. 25

29 U.S.C. § 1106(a)(1)(C) ................................................................. 26

29 U.S.C. § 1106(a)(1)(D) ................................................................. 27

29 U.S.C. § 1106(b)(1) ..................................................................... 28

29 U.S.C. § 1106(b)(2), (3) ............................................................... 29

29 U.S.C. § 1108(c)(2)............................................................. 21, 22, 24

<u>Regulations</u>

29 C.F.R. § 2550.404a-5(d)(1)(iii)........................................................ 13

29 C.F.R. § 2550.408c-2(b)(3)............................................................ 22

## INTRODUCTION

This case is the latest salvo in a barrage of lawsuits attacking the fees and performance of a common 401(k) investment option: target date funds ("TDFs"). Courts have rejected identical hindsight-driven critiques of investment performance and simplistic fee comparisons between dissimilar investment options. Aware of their core theory's weakness, Plaintiffs embellish it with a tangle of complex allegations, hoping to distinguish the First Amended Complaint from the many others just like it that have failed.

Plaintiffs theorize that Defendants—Lockheed Martin Investment Management Company ("LMIMCo") and Lockheed Martin Corporation ("Lockheed Martin")—engineered a self-serving scheme to enrich themselves by including overpriced, underperforming custom TDFs designed by LMIMCo ("LMIMCo TDFs") among the menu of investment options available to participants in three defined contribution plans sponsored by Lockheed Martin.[1] The tale continues that Defendants then steered participants into the LMIMCo TDFs by designating them as the Plans' default investment option. Plaintiffs initially alleged the scheme netted more than $160 million in compensation between 2019 and 2023. *See* Dkt. 1 ¶ 110. But, as Defendants explained, that allegation was wrong—it related to Lockheed Martin's defined *benefit* (i.e., pension) plans, which are not at issue here. *See* Dkt. 27-1 at 18-19.

Unchastened by their mistake, Plaintiffs recycle the allegation, admitting that it reflects compensation tied to unrelated pension plans but using it anyway to prop up their conspiracy theory that Lockheed Martin "fail[ed] to jettison LMIMCo and its [i]n-[h]ouse TDFs" because of their "substantial financial dependance [sic]." Dkt. 31, First Amended Complaint ("FAC") ¶ 115.

---

[1] Specifically, the (1) Lockheed Martin Corporation Salaried Savings Plan, (2) Lockheed Martin Corporation Performance Sharing Plan for Bargaining Employees, and (3) Lockheed Martin Corporation Capital Accumulation Plan. FAC ¶ 10 (collectively, the "Plans").

And even their revised allegation—about $20 million in compensation over five years—is wrong because it sweeps in reimbursements unrelated to the LMIMCo TDFs offered in the Plans.

Plaintiffs cling to the $160 million fiction because, without it, their conspiracy theory falls apart. LMIMCo is a wholly-owned subsidiary of Lockheed Martin "that was established . . . for the sole purpose of providing investment advisory services" exclusively to Lockheed Martin's retirement plans. *Lockheed Martin Inv. Mgmt. Co., S.E.C. No-Action Letter*, 2006 WL 1624232, at *1–2 (June 5, 2006). LMIMCo "does not hold itself out to the public as an investment adviser," and the only monies "received by Lockheed and LMIMCo in connection with the LMC Plans are reimbursements" for Defendants' direct expenses "that are subject to the restrictions imposed by ERISA[.]" *Id.* at *2. In other words, LMIMCo has no profit motive: it cannot generate advisory fees, solicit business, or pocket revenues. Its sole compensation is the ERISA-compliant reimbursement of direct costs incurred in administering the retirement plans sponsored by Lockheed Martin. LMIMCo thus lacks any incentive to pursue the profit-maximizing strategy at the heart of Plaintiffs' conspiracy theory.

The other strands of Plaintiffs' conspiracy theory similarly unravel. Department of Labor ("DOL") guidance encourages fiduciaries to consider custom TDFs such as those at issue to better align with a plan's participant demographics. The same guidance acknowledges that designating those custom TDFs as a plan's default investment option is consistent with ERISA and is common practice. Indeed, many retirement plans designate TDFs as default investment options precisely because they offer diversified exposure and a simple, automated option for participants who prefer not to actively manage their retirement accounts. *See* Delany Decl. Ex. A, GAO, *401(k) Retirement Plans* 2 (Mar. 2024), https://www.gao.gov/assets/gao-24-105364.pdf. And while LMIMCo was reimbursed about $20 million for direct expenses related to Lockheed Martin's defined

contribution plans over 5 years—less than 0.01% annually of the more than $45 billion in defined contribution assets under management, and far from the $160 million Plaintiffs first alleged—Plaintiffs support their claim that this amount was "excessive and unreasonable," FAC ¶ 3, with nothing but their own say-so.

Stripped of these conspiracy theories, what remains are garden-variety claims of modest underperformance and modestly higher fees—the same claims courts across the country have repeatedly dismissed. To survive a motion to dismiss, Plaintiffs must do more than recite labels or conclusions. They must plausibly allege that the LMIMCo TDFs materially underperformed "meaningful benchmarks"—apples-to-apples comparators that share the challenged funds' risk profile, investment strategy, and management approach. Courts routinely dismiss complaints that fail this standard because, while factual allegations are accepted as true, "threadbare recitals" and "naked assertions" are not. Here, Plaintiffs do not plausibly plead comparability at all; they merely assert it. FAC ¶¶ 88–89, 92. That kind of ipse dixit cannot carry Plaintiffs' burden.

Even if Plaintiffs' benchmarks were meaningful comparators—which they are not—Plaintiffs must also allege sustained and material underperformance. They cannot. The performance gaps they identify are roughly one percent, often less, and tied to a cherry-picked timeframe selected with the benefit of hindsight. Such minimal and transitory variances fall well short of what courts require to infer an imprudent process under ERISA.

Nearly all similar lawsuits have been dismissed at the pleading stage. This one should share that fate. The Court should dismiss the First Amended Complaint with prejudice.

## **BACKGROUND**

Lockheed Martin is a global security and aerospace company based in Bethesda, Maryland, that employs approximately 121,000 people worldwide. *See* Lockheed Martin, *About Us*, https://www.lockheedmartin.com/en-us/who-we-are.html (last visited Sept. 21, 2025). To help its

employees save for retirement, Lockheed Martin sponsors various retirement plans, including the Plans at issue here. The Plans' assets are "managed on a commingled basis through the Lockheed Martin Corporation Defined Contribution Plans Master Trust" (the 'Master Trust')." FAC ¶ 34. As expressly stated in the Plan documents, LMIMCo is the named investment fiduciary for each of the Plans and has the sole discretion and authority to manage the Plans' investments, which it does primarily through the use of third-party investment managers.[2] *See* Ex. B, Salaried Plan Document at 106; Ex. C, Bargain Plan Document at 74; Ex. D, Capital Plan Document at 45.

The Plans are defined contribution plans, meaning that each participant directs the assets in his or her retirement account into one or more investment options available in the Plans. FAC ¶¶ 63, 72. Lockheed Martin voluntarily contributes generously to each participant's account—in the Salaried Plan and the Bargaining Plan, Lockheed Martin matches participant contributions up to a certain percentage, while in the Capital Plan, participants' accounts are funded solely through Lockheed Martin's contributions. *Id.* ¶¶ 68, 70.

During the relevant period, the Plans made available a suite of investment options, one of which was the LMIMCo TDFs. *Id.* ¶ 72. A "TDF" is "a one-stop diversified fund with a stated 'target' retirement date, which is generally a year stated in the fund's name." *Id.* ¶ 4. As the TDF approaches the target retirement date, it will "automatically rebalance" to "invest increasingly in low-risk assets, like bonds, and decreasingly in high-risk assets, like stocks." *Id.*

The DOL recognizes that "there are considerable differences among TDFs offered by different providers, even among TDFs with the same target date. *See* Ex. E, U.S. Dep't of Labor,

---

[2] The Court may consider the relevant Plan documents without converting Defendants' Motion to Dismiss into a motion for summary judgment. *See, e.g.*, *Juric v. USALCO, LLC*, 659 F. Supp. 3d 619, 626–27 n. 4 (D. Md. 2023); *Hooker v. Tunnell Gov't Servs., Inc.*, 447 F. Supp. 3d 384, 391 (D. Md. 2020) (citing *Clark v. BASF Corp.*, 142 F. App'x 659, 661 (4th Cir. 2005)).

*Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries* 1 (Feb. 2013), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds-erisa-plan-fiduciaries-tips.pdf ("TDF Tips"). For example, TDFs can differ in the investment strategy they pursue—either an "actively managed" strategy, where investment managers select assets in an attempt to outperform the market, or a "passively managed" strategy, where the investment strategy is designed to track a designated market benchmark like the S&P 500 Index. *See id.* Another major differentiator among TDFs is their "glide path," or how the manager adjusts the TDFs' underlying asset allocation to grow more conservative over time. *Id.* A TDF that uses a "to retirement" glide path will reach its most conservative asset mix at the target retirement date, while a TDF that uses a "through retirement" glide path will continue to invest in a more aggressive asset mix until a fixed point after the target retirement date. *Id.* The LMIMCo TDFs use a "through retirement" glide path that reaches its most conservative asset mix fifteen years after the target retirement date. FAC ¶ 77. A third major differentiator is the risk-return characteristics and tradeoffs adopted by different TDFs.

In the First Amended Complaint, Plaintiffs assert five interrelated ERISA claims concerning the LMIMCo TDFs that can be separated into two buckets:

- Bucket 1 (Counts I, II, and III)—Plaintiffs claim that Defendants breached their fiduciary duties of prudence and loyalty by:

  o Count I—Selecting and retaining the LMIMCo TDFs as part of the Plans' investment lineups;

  o Count II—Selecting and retaining LMIMCo as the Plans' investment manager; and

  o Count III—Charging excessive fees to participants who select the LMIMCo TDFs as part of their plan accounts.

- Bucket 2 (Counts IV and V)—Plaintiffs claim that payments from the Master Trust to Defendants related to the LMIMCo TDFs constitute transactions prohibited by ERISA sections 406(a)(1)(B), (C), and (D) (Count IV) and 406(b)(1), (2), and (3) (Count V).

To survive a motion to dismiss, a complaint must plead "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when it includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations and "[n]aked assertions devoid of further factual enhancement" are not enough. *Id.* (internal quotation marks omitted); *Twombly*, 550 U.S. at 555.

These standards apply with particular force in the ERISA context. Courts must take "particular care" when evaluating ERISA claims at the pleading stage because "the prospect of discovery" in a putative class action can be "ominous" and lead to coercive settlements based on largely groundless claims. *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716, 718–19 (2d Cir. 2013) ("*St. Vincent*"); *Enstrom v. SAS Inst.*, No. 5:24-CV-105, 2025 WL 685219, at *3 (E.D.N.C. Mar. 3, 2025).

The Supreme Court has likewise directed lower courts to apply "careful, context-sensitive scrutiny of a complaint's allegations" in ERISA fiduciary breach cases to "divide the plausible sheep from the meritless goats." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). Courts must recognize that fiduciaries often face "difficult tradeoffs," and must give "due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

**ARGUMENT**

I.     **The First Amended Complaint Fails to State a Claim for Breach of Fiduciary Duty.**

As discussed below, the fiduciary breach claims in Bucket 1 fail against the only proper defendant—LMIMCo. Plaintiffs' claims rest on the LMIMCo TDFs' alleged underperformance, but such allegations cannot support an inference of imprudence absent (1) material

underperformance and (2) a meaningful benchmark. Plaintiffs show neither. Plaintiffs present two views of the LMIMCo TDFs' performance: a single snapshot as of December 2024 (FAC ¶¶ 91, 93), and trailing 3-year average returns as of January 1 in 2017, 2018, 2019, and 2020 (*id.* ¶ 94). Neither view suffices. A snapshot says nothing about performance at other points in time, and the trailing returns show modest underperformance over a short period (looking at performance over three years for an investment product with a life of fifty years) against an artificial benchmark (the "average" performance of the selected comparators) over a period that arbitrarily ends in 2020. Their backup allegations that the LMIMCo TDFs' fees are excessive as compared to one of their chosen comparators fare no better.

Before even reaching those issues, however, Plaintiffs stumble at the threshold question in every ERISA fiduciary breach case: Were the defendants acting as fiduciaries with respect to the conduct at issue? For Lockheed Martin, the answer is no—Plan documents confirm it played no fiduciary role over any alleged conduct at issue in Bucket 1. Lockheed Martin should therefore be dismissed from the lawsuit. Nor was LMIMCo acting as a fiduciary with respect to its own appointment, the central allegation in Count II. That claim likewise should be dismissed. As these deficiencies are incurable and fatal, the Court should dismiss these claims with prejudice.

## A.      Plaintiffs Have Not Plausibly Alleged that Lockheed Martin Is a Fiduciary.

The fiduciary breach claims in Bucket 1 fail at the outset because, at least with respect to Lockheed Martin, Plaintiffs have sued the wrong party. A defendant cannot be liable for breach of fiduciary duty under ERISA unless it was acting as a fiduciary with respect to the specific conduct at issue. *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *Acosta v. Calderon*, No. ADC-16-0964, 2017 WL 4011962, at *4 (D. Md. Sept. 11, 2017). Plaintiffs allege that Lockheed Martin breached fiduciary duties by appointing LMIMCo as the Plans' investment manager and by including the LMIMCo TDFs in the Plans' investment lineup. *See* FAC ¶¶ 129–30, 139–40, 149. But the Plan

documents—which the Court may consider on a motion to dismiss—make clear that Lockheed Martin was not acting as a fiduciary when taking those actions.

*First*, Lockheed Martin appointed LMIMCo in its *settlor* capacity, not as a fiduciary. Under settled law, when plan sponsors adopt or amend plans, they act as settlors, not fiduciaries. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996). The Plan documents confirm that LMIMCo's role as the named fiduciary responsible for investment management was established as part of the original plan structure. Lockheed Martin therefore cannot be liable under ERISA for appointing LMIMCo because it was not acting in a fiduciary capacity when making that decision.

*Second*, Lockheed Martin had no fiduciary role in selecting, monitoring, or removing investment options. Each Plan's document names LMIMCo as the named fiduciary "responsible for Plan investments," and grants LMIMCo "sole and absolute discretion" to appoint, retain, or replace investment managers. *See* Ex. B at 106; Ex. C at 74; Ex. D at 45. These terms vest LMIMCo, not Lockheed Martin, with exclusive authority over investment decisions. Since Lockheed Martin lacked discretionary authority over the Plans' investment lineups, it cannot be deemed a fiduciary for the purposes of Plaintiffs' claims.

Fourth Circuit precedent does not compel a different result. In *Coyne & Delany Co. v. Selman*, the court considered whether a plan sponsor had standing under ERISA to sue the fiduciaries it had appointed. 98 F.3d 1457, 1463–64 (4th Cir. 1996). As the defendants argued, the plan sponsor's decision to appoint them as plan administrator was a settlor function, and thus did not make the sponsor a "fiduciary" entitled to sue under ERISA § 502. The court disagreed, reasoning that to hold otherwise would "unnecessarily constrict[]" the sponsor's "oversight authority" over appointees to whom it delegated fiduciary responsibility. *Id.* at 1466. That narrow holding has no application here. Lockheed Martin is not attempting to enforce fiduciary duties

against its appointees; it is a defendant being sued by participants seeking to expand fiduciary liability to cover activities that are quintessentially settlor in nature. *Coyne* stands for preserving a plan sponsor's ability to police its appointed fiduciaries—not for converting routine settlor functions into fiduciary conduct.

Because Lockheed Martin was not acting as a fiduciary with respect to the conduct Plaintiffs challenge, the fiduciary breach claims in Bucket 1 must be dismissed with prejudice as to Lockheed Martin.

Plaintiffs' claim in Count II that LMIMCo is liable as a co-fiduciary for Lockheed Martin's fiduciary breach in appointing LMIMCo, *see* FAC ¶¶ 137–38, similarly fails. Co-fiduciary liability claims are derivative and cannot succeed in the absence of an underlying breach of fiduciary duty. *See In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010). Because there was no underlying breach by Lockheed Martin, Plaintiffs' co-fiduciary claim against LMIMCo must fail.[3]

Even assuming that an underlying breach occurred, LMIMCo still cannot be held liable as a co-fiduciary. That is because courts have consistently held that service providers ordinarily lack discretionary authority over—and thus are not fiduciaries to—their own appointment. *See, e.g.*, *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 837–38 (9th Cir. 2018); *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009), *reh'g denied*, 569 F.3d 708 (7th Cir. 2009). In short, LMIMCo's fiduciary obligations arose

---

[3] To the extent the Court finds that Lockheed Martin acted as a fiduciary in appointing LMIMCo, then Plaintiffs' claim that Lockheed Martin breached the duty to monitor LMIMCo also fails in the absence of any underlying breach of fiduciary duty by LMIMCo. *See Enstrom*, 2025 WL 685219, at *3.

only *after* its appointment—over which it had no discretionary authority—so Count II must be dismissed with prejudice as to LMIMCo.

## B. Plaintiffs Fail to State a Claim for Breach of the Duty of Prudence.

Plaintiffs' imprudence claims against LMIMCo fail because they do not plausibly allege that LMIMCo engaged in a flawed investment process. To state an imprudence claim under ERISA, plaintiffs must allege facts showing that the fiduciary failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent fiduciary would exercise. 29 U.S.C. § 1104(a)(1)(B). Courts assess prudence by focusing on process—not outcomes—and ask whether fiduciaries used appropriate methods "at the time" of their decision-making. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007); *see also Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014).

Without any direct allegations about LMIMCo's process, Plaintiffs must rely on circumstantial facts to raise a "reasonable inference" of a flawed decision-making process. *St. Vincent*, 712 F.3d at 718–19; *Hall v. Cap. One Fin. Corp.*, No. 1:22-cv-857, 2023 WL 2333304, at *6 (E.D. Va. Mar. 1, 2023). Mere underperformance or higher fees, without more, is not enough. That is because "whether a fiduciary's actions are prudent cannot be measured in hindsight[.]" *DiFelice*, 497 F.3d at 424. As multiple circuits have recognized, plaintiffs cannot state a prudence claim simply by alleging that "costs are too high, or returns are too low." *See, e.g., Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022). Rather, they must provide a "sound basis for comparison"—a "meaningful benchmark" with similar investment strategy, asset allocation, and risk profile.[4] *See id.* at 278–81.

---

[4] *See also Hall*, 2023 WL 2333304, at *6 (citing *Matousek* and *Smith* in adopting "meaningful benchmark" standard); *Tullgren v. Booz Allen Hamilton, Inc.*, No. 1:22-cv-856, 2023 WL 2307615, at *6 (E.D. Va. Mar. 1, 2023) (same); *Enstrom*, 2025 WL 685219, at *3 ("To show an

Plaintiffs' imprudence theory rests on two weak pillars: (1) a hindsight comparison of the LMIMCo TDFs' performance to that of three other TDF suites available in the market, and (2) a comparison of the LMIMCo TDFs' expenses to one of those funds. Neither is sufficient.

### 1. Plaintiffs' Hindsight-Based Performance Review Is Insufficient to Support an Imprudence Claim.

Plaintiffs' core theory—that LMIMCo's process must have been flawed because the LMIMCo TDFs allegedly underperformed supposed comparators—contradicts settled law. Courts have consistently rejected the notion that poor outcomes alone can show imprudence. As the Seventh Circuit has emphasized, "the ultimate outcome of an investment is not proof of imprudence." *Albert*, 47 F.4th at 578–79; *see also Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("No authority requires a fiduciary to pick the best performing fund."); *White v. Chevron Corp.*, No. 16-cv-793, 2017 WL 2352137, at*20 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453, 455 (9th Cir. 2018) (allegations that fiduciaries "could have chosen different vehicles" do not support a plausible inference of imprudence); *Hall*, 2023 WL 2333304, at *5 (quoting *Smith* and explaining that a "claim of imprudence cannot 'come down to simply pointing to a fund with better performance'"); *Tullgren*, 2023 WL 2307615, at *6 (same).

Yet outcomes are all that Plaintiffs allege. Boiled to its essence, their theory is that the LMIMCo TDFs' inclusion in the Plans was imprudent because later returns were allegedly subpar. But that is classic Monday-morning quarterbacking, and that defect alone dooms their claim.[5] *See*

---

inference that a prudent fiduciary . . . would have made a different decision, plaintiffs must provide a 'meaningful benchmark.'").

[5] In any event, Plaintiffs' own allegations show that every vintage of the LMIMCo TDFs earned positive returns. FAC ¶¶ 92–93. Courts have rejected imprudence claims where the challenged investment delivered positive long-term returns, even if plaintiffs point to some undefined set of

*DiFelice*, 497 F.3d at 424 ("[P]ruden[ce] cannot be measured in hindsight . . . [as] an investment's diminution in value is neither necessary, nor sufficient, to demonstrate a violation of a fiduciary's ERISA duties."); *Hall*, 2023 WL 2333304, at *6 (holding that hindsight-based performance allegations do not provide "factual allegations from which the Court may reasonably infer that the choice of the BlackRock TDFs was imprudent"); *Tullgren*, 2023 WL 2307615, at *6 (same).

Even if hindsight-based performance data could support an inference of imprudence—and it cannot—only *material* underperformance can nudge allegations of a fiduciary process breach from possible to plausible. Courts routinely hold that underperformance of the magnitude Plaintiffs allege is too slight to support an inference of imprudence. *See, e.g.*,

- *Enstrom*, 2025 WL 685219, at *5 (underperformance of 1–4% insufficient to state a claim);
- *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 164 (E.D.N.Y. 2022) (underperformance between 0.32% and 2.57% does not support imprudence claim);
- *Luckett v. Wintrust Fin. Corp.*, No. 22-cv-3968, 2024 WL 3823175, at *5 (N.D. Ill. Aug. 14, 2024) (underperformance under 3% insufficient to state claim);
- *Abel v. CMFG Life Ins. Co.*, No. 22-cv-449, 2024 WL 307489, at *5 (W.D. Wis. Jan. 26, 2024) (underperformance less than 5% per year insufficient to state claim);
- *Baird v. Steel Dynamics, Inc.*, No. 1:23-cv-356, 2024 WL 3983741, at *4 (N.D. Ind. Aug. 29, 2024) (underperformance less than 5% not "persistent and material");
- *Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 753, 764 (S.D. Ohio 2021), *aff'd in part, rev'd in part*, 40 F.4th 443 (6th Cir. 2022) (1–2% underperformance insufficient to plausibly infer imprudence);
- *Bekker v. Neuberger Berman Grp. LLC*, No. 16-cv-6123, 2018 WL 4636841, at *2, *7 (S.D.N.Y. Sept. 27, 2018) (4.5% underperformance over ten years to state claim).

Here, Plaintiffs' own allegations confirm that the LMIMCo TDFs did not materially underperform. Their Figure 2 purports to compare a snapshot of the LMIMCo TDFs' performance

---

funds with unknown strategies that happened to perform better. *Phillips v. Cobham Adv. Elects. Solutions,*23-cv-3785, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025).

at a single point of time—December 2024—against three publicly available TDF suites: Capital Group, Fidelity, and T. Rowe Price ("Comparator TDFs").[6] *See* FAC ¶¶ 92-93. Plaintiffs allege that the differences in returns "var[ied] between 0.41% per year and 1.87% per year." *Id.* But as noted above, courts have repeatedly held that underperformance of this magnitude—even gaps of 3–5%, several times larger than Plaintiffs' own allegations—is insufficient to support an inference of a flawed fiduciary process. *See supra* at 12.

Plaintiffs also invoke the S&P Target Date Index referenced in participant disclosures, claiming Defendants endorsed it as the appropriate benchmark for the LMIMCo TDFs. *See* FAC ¶¶ 85, 91. Plaintiffs are wrong. This index appears in participant disclosures because DOL regulations require fiduciaries to show "[the] returns of an appropriate broad-based securities market index." 29 C.F.R. § 2550.404a-5(d)(1)(iii). Its inclusion is a legal mandate, not an acknowledgment of comparability. That is why courts have rejected reliance on the S&P Target Date Index as a meaningful benchmark. *See, e.g.*, *Luckett*, 2024 WL 3823175, at *4 n.2 (rejecting the S&P Target Date Index as a meaningful benchmark despite its inclusion in the investment policy statement).

In any event, the LMIMCo TDFs closely tracked the S&P Target Date Index, as Plaintiffs' own allegations show. Plaintiffs' chart indicates that the LMIMCo TDFs underperformed the S&P

---

[6] That Plaintiffs' comparison is of annualized ten-year returns does not make it any less of a point-in-time snapshot. *Smith*, 37 F.4th at 1166 (describing five-year performance window of fund that is "supposed to grow for fifty years" as a "snapshot"). That is because annualized returns fluctuate daily as a fund's oldest performance data is replaced by newer results. The same snapshot taken one day, month, or year later will yield different results.

Target Date Index by between .34% and 1.09%. *See* FAC ¶ 91 (Figure 1). That is insufficient to raise an inference of imprudence.[7] *See supra* at 12.

Plaintiffs try to prop up their claim with charts comparing the LMIMCo TDFs' three-year trailing returns from 2017 to 2020 to those of their chosen comparators. *See* FAC ¶ 94 (Figures 3, 4). But courts have repeatedly held that short-term returns—even over three or five years—cannot support an inference of imprudence. *Dorman v. Charles Schwab Corp.*, No. 17-cv-285, 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019) ("[T]hree to five years . . . [is] still considered [a] relatively short period[] of underperformance."); *Davis v. Salesforce.com, Inc*., 2020 WL 5893405, at *4 (N.D. Cal. Oct. 5, 2020), at *2 n.1 (9th Cir. Apr. 8, 2022). Even ten years of underperformance is not enough to support a claim unless the shortfall was "substantial." *Patterson v. Morgan Stanley*, No. 16-cv-6568, 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019). That rule applies with special force to TDFs, which are "supposed to grow for fifty years" and cannot prudently be judged by short-term market fluctuations. *Smith*, 37 F.4th at 1166.

Regardless, Plaintiffs' allegations here miss the mark in several respects. Unlike their ten-year comparison, Plaintiffs do not provide the actual returns for the LMIMCo TDFs or their comparators. *See* FAC ¶ 94 (Figures 3, 4). Instead, Plaintiffs depict the difference between the LMIMCo TDFs and the S&P Target Date Index (Figure 3) and an average of their three chosen comparators. (Figure 4) By omitting the underlying returns, Plaintiffs deprive the Court of the context needed to evaluate LMIMCo's performance—or even to verify the accuracy of their

---

[7] The "10-year loss" column in Table 1 adds nothing. Plaintiffs compound alleged underperformance over a decade by assuming: (i) the same performance gap would persist unchanged; and (ii) the LMIMCo TDFs' asset allocation would never shift. Both assumptions are wrong. *See* FAC ¶ 4 ("TDFs automatically rebalance . . . over time[.]"); ¶ 91 (Table 1) (showing LMIMCo TDFs outperformed the S&P Target Date Index in 2020).

claimed differences. These comparisons are not just unhelpful; they are meaningless and should be rejected out of hand.[8]

Figure 4 compounds this flaw. Instead of showing how the LMIMCo TDFs performed against each comparator individually, Plaintiffs average the three Comparator TDFs together. That masks whether LMIMCo underperformed one, two, or all three comparators. A simple analogy makes the point: if Student A scores 85, while Students B, C, and D score 100, 84, and 80, Student A ranks second. But comparing Student A only to the average score of 88 makes it falsely appear that Student A performed worst. So too here. By relying on averages, Plaintiffs conceal how LMIMCo actually ranked against each comparator. That is why courts consistently reject comparisons to the "average" performance of a peer group. *See, e.g.*, *Anderson*, 579 F. Supp. 3d at 1150-51 (rejecting performance comparison to the "average" of the funds in the Morningstar peer group); *Phillips v. Cobham Adv. Elects. Solutions,* 23-cv-3785, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025) (same). Figure 4 therefore cannot plausibly support an inference of imprudence and should be disregarded.

Requiring allegations of material underperformance is not just doctrinal—it is essential to preserve ERISA's process-based standard for prudence. Allowing claims to proceed based on minor differences in returns would force fiduciaries to chase last year's top performer, undermining long-term investment discipline. As courts have explained, ERISA does not permit hindsight-based second-guessing. *See Coyer v. Univar Sols. USA, Inc.*, No. 1:22-cv-362, 2022 WL 4534791, at *6 (N.D. Ill. Sept. 28, 2022) (courts cannot "infer imprudence every time a fiduciary

---

[8] Even if these comparisons were meaningful, Figure 3 undercuts Plaintiffs' theory of imprudence. During the only years in the class period (2019–2020), its comparison to the S&P Target Date Index shows just 0.19–2.76% underperformance—far too little to plausibly support an inference of imprudence—and even indicates that two LMIMCo TDF vintages outperformed this index in 2020.

retains a fund that fails to turn in best-in-class performance for any specific period"). Treating even slightly below-average short-term results as material would mean nearly every actively managed fund is an ERISA violation—an outcome that would "lead to the disappearance of this option in ERISA plans." *Smith*, 37 F.4th at 1166.

At bottom, Plaintiffs must allege facts showing that LMIMCo's investment process in designing, implementing, and monitoring the LMIMCo TDFs fell outside the "range of reasonable judgments" a prudent fiduciary could have made. *Hughes*, 595 U.S. at 177. Allegations of slight underperformance over short timeframes are not enough. Accordingly, Count I must be dismissed with prejudice.

> **2. Alternatively, Plaintiffs Fail to Support Their Imprudence Claim with Allegations Providing a "Meaningful Benchmark" for the LMIMCo TDFs.**

Even if Plaintiffs had plausibly alleged that the LMIMCo TDFs materially underperformed—and they have not—their claims still fail because they do not plausibly allege that the Comparator TDFs or the S&P Target Date Index are *meaningful benchmarks* for the LMIMCo TDFs. To satisfy this requirement, Plaintiffs must plead facts showing that the proposed benchmarks "hold similar securities, have similar investment strategies, and reflect [] similar risk profile[s]" as the challenged funds. *Matousek*, 51 F.4th 274, 281 (8th Cir. 2022); *see also Smith*, 37 F.4th at 1167; *Anderson*, 137 F. 4th at 1025 (explaining that "the district court had to assess the similarities and differences between [the] chosen comparators and the [challenged] funds so that it could determine whether they were appropriate comparators"); *Hall*, 2023 WL 2333304, at *6; *Tullgren*, 2023 WL 2307615, at *6; *Enstrom*, 2025 WL 685219, at *3.

Courts stress that an imprudence claim cannot be based on an "apples and oranges" comparison between funds with "different aims, different risks, and different potential rewards that cater to different investors." *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir.

2020). Alleging that a fund underperformed relative to a different investment product is not enough—plaintiffs must provide facts making that comparison meaningful. Absent such allegations, a complaint fails as a matter of law. *Matousek*, 51 F.4th at 281.

Plaintiffs have not met that burden. They allege no facts about the Comparator TDFs' investment strategy, glide path, or asset allocation. Instead, they assert in a single paragraph that each Comparator TDF "incorporates active management, has a through retirement glidepath, and seeks to invest in an optimal mix of investments for investors aiming to retire around the stated vintage year." FAC ¶ 92. That kind of label-based, take-my-word-for-it pleading is insufficient. *See Anderson v. Intel Corp.*, No. 19-CV-04618, 2021 WL 229235, at *8 (N.D. Cal. Jan. 21, 2021) ("[S]imply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks."), *aff'd sub nom. Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015 (9th Cir. 2025).

Indeed, Plaintiffs fail at each step of the "meaningful benchmark" analysis:

- Glide path—Courts have consistently held that TDFs with different glide paths are not comparable. *See Luckett*, 2024 WL 3823175, at *3; *Bracalente v. Cisco Sys., Inc.*, No. 22-cv-04417, 2024 WL 2274523, at *8 (N.D. Cal. May 20, 2024). Plaintiffs allege that the LMIMCo TDFs use an "aggressive" glide path, FAC ¶¶ 76–77, but plead nothing about the Comparator TDFs' glide paths or when they reach their most conservative allocation. Those omissions are fatal.

- Investment strategy—Plaintiffs' conclusory allegation that each Comparator TDF is actively managed is also deficient. Indeed, publicly available information suggests that at least one of the Comparator TDFs (the Fidelity Freedom TDFs) is passively managed, unlike the LMIMCo TDFs. *See Abel*, 2024 WL 307489, at *2. That difference is fatal, as courts consistently reject comparisons between actively managed funds and passive ones. *Smith*, 37 F.4th at 1167; *Davis*, 960 F.3d at 485.

- Asset allocation—Plaintiffs' claim that each Comparator TDF "seeks to invest in an optimal mix" is meaningless boilerplate. What matters is whether the funds invest similarly in terms of, for example, equity-to-bond ratios, use of emerging markets vs. domestic equities, and inclusion of other diversifiers. Without facts showing comparable asset allocations, performance comparisons are meaningless. *Matousek*, 51 F.4th at 281; *see also Palmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306 (D. Minn. 2021) (rejecting comparators with "different concentrations of bonds"); *Wilcox v. Georgetown Univ.*, No.

18-422, 2019 WL 132281, at *10-11 (D.D.C8, 2019) (same because of differences in allocation of domestic and foreign equities).

- Risk profile—Plaintiffs plead nothing about the risk profiles of the LMIMCo or Comparator TDFs. Because funds with different risk and volatility levels perform differently under varying conditions, that omission too is fatal. *Id.*; *Fitzpatrick v. Neb. Methodist Health Sys Inc.*, No. 8:23-cv-27, 2023 WL 5105362, at *8 (D. Neb. Aug. 9, 2023), *amended on recons.*, 2024 WL 361195 (D. Neb. Jan. 31, 2024).

These pleading failures have doomed similar claims at the Rule 12 stage. In *Hall* and *Tullgren*, for example, the court rejected claims that BlackRock TDFs underperformed other TDFs where the plaintiffs failed to allege key comparability details—such as glide path type, management style, and asset allocation. *Hall*, 2023 WL 2333304, at *6; *Tullgren*, 2023 WL 2307615, at *6. Plaintiffs' claims suffer from the same defects.

Nor does Plaintiffs' reliance on the S&P Target Date Index save their case. Courts have roundly rejected this index as a meaningful benchmark because it is not an investable alternative but an amalgam of diverse investment strategies and styles. *Hall*, 2023 WL 2333304, at *7; *Tullgren*, 2023 WL 2307615, at *7; *Wehner v. Genentech, Inc.*, No. 20-cv-06894, 2021 WL 2417098, at *8 (N.D. Cal. June 14, 2021); *Fitzpatrick*, 2023 WL 5105362, at *2, *7–8; *Luckett*, 2024 WL 3823175, at *4.

In sum, Plaintiffs have not provided the factual context necessary to "nudg[e] an inference of imprudence from possible to plausible." *Matousek*, 51 F.4th at 278. Without plausible allegations that the Comparator TDFs or the S&P Target Date Index are meaningful benchmarks for the LMIMCo TDFs, Plaintiffs' imprudence claim fails as a matter of law. Count I should be dismissed with prejudice.

### 3. Plaintiffs' Allegations Regarding the LMIMCo TDFs' Fees Are Insufficient to Support an Imprudence Claim.

Perhaps recognizing the weakness of their performance allegations, Plaintiffs pivot in Count III to attack the LMIMCo TDFs' "substantially higher expense ratios." *See* FAC ¶¶ 99–100.

Yet these fee allegations are no stronger than their performance claims. Both rest on the same fundamental defect: the absence of any valid benchmark showing that LMIMCo's choices fell outside the range of reasonable fiduciary judgment.

Just as with performance comparisons, a court cannot infer imprudence from allegations that a fund is "too expensive" without comparison to a *meaningful benchmark. See Matousek*, 51 F.4th at 281–82; *Matney*, 80 F.4th at 1148 ("[W]hen it comes to comparing investment management fees, a meaningful comparison will be supported by facts alleging, for example, the alternative investment options have similar investment strategies, similar investment objectives, or similar risk profiles to the plan's funds."); *Anderson*, 137 F.4th at 1023. Here, Plaintiffs rely solely on the Vanguard TDFs as a fee comparator. *See* FAC ¶ 100 (Figure 5). Yet they offer no facts showing why the Vanguard TDFs are a meaningful benchmark, other than that they "are widely considered a TDF market leader." *See* FAC ¶ 98. Courts routinely reject this "because I said so" approach. *See, e.g.*, *Anderson*, 2021 WL 229235, at *9 (holding it insufficient to label funds "comparable" without showing similar aims, risks, or rewards).

The omission is telling. The LMIMCo TDFs are actively managed, but the Vanguard TDFs are passively managed. *See Abel*, 2024 WL 307489, at *2, *5 (describing Vanguard TDFs as passively managed); *see also* Vanguard, *VTTVX, Vanguard Target Retirement 2025 Fund*, https://investor.vanguard.com/investment-products/mutual-funds/profile/vttvx (visited Sept. 21, 2025) (showing that the Vanguard TDFs invest exclusively in index-based funds). Active and passive funds have fundamentally different cost structures that reflect their fundamentally different investment strategies, which is why courts consistently reject comparisons between them as "apples and oranges." *Smith*, 37 F.4th at 1163 ("Little surprise, actively managed funds, which require considerable judgment and expertise, charge more than passively managed funds, which

require little judgment and expertise."); *Davis*, 960 F.3d at 485 (noting different aims, risks, and potential rewards between active and passive options). And in amending the Complaint, Plaintiffs dropped the Vanguard TDFs from the set of benchmarks they initially used to illustrate the LMIMCo TDFs' alleged underperformance—an implicit concession that they are not an appropriate comparator.

Plaintiffs' expense allegations fail out of the gate—their lack of a meaningful fee benchmark spells the end of their imprudence claim.[9] Count III should be dismissed with prejudice.

## C. The First Amended Complaint Fails to State a Claim for Breach of the Duty of Loyalty.

Aside from their imprudence claims, Plaintiffs also assert that LMIMCo's selection of the LMIMCo TDFs breached the duty of loyalty. *See* FAC ¶¶ 129, 139. The duty of loyalty requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). To state a plausible claim, Plaintiffs must allege that LMIMCo "engaged in self-dealing at the expense of the Plan[s]." *Albert*, 47 F.4th at 583. The First Amended Complaint contains no such allegations.

Despite two bites at the apple, Plaintiffs still mischaracterize reimbursements from Plan assets relating to the LMIMCo TDFs. Whereas they previously (and wrongly) alleged Defendants paid themselves $160 million over five years, they now allege the figure was $20 million. That allegation is also inaccurate, as the publicly available Master Trust Forms 5500 make clear.

The reason is straightforward: the Master Trust covers all eight defined contribution plans that Lockheed Martin sponsors, not just the three Plans at issue here. *See, e.g.*, Ex. F, Lockheed

---

[9] Even if the Vanguard TDFs were a proper benchmark, alleging that one fund charged lower fees does not show the LMIMCo TDFs' fees were unreasonable. *See Phillips*, 2025 WL 2689268 ("The fact that some other funds charged lower fees does not support a plausible inference that the American Century TDFs charged unreasonable fees.").

Martin Corp. Master Retirement Trust 2019 Form 5500 at 60. Likewise, the payments disclosed in Schedule C represent reimbursements for LMIMCo's management of *all* investment options across those eight plans, not just the LMIMCo TDFs. In other words, Plaintiffs exaggerate the total reimbursement amount by counting payments from other Lockheed Martin plans for investment options not at issue here. Focusing just on reimbursements relating to LMIMCo TDFs offered in the relevant Plans, the total is about $4 million over five years, or roughly one-fifth of what Plaintiffs allege.

Plaintiffs' exaggeration masks the legal flaws in their disloyalty claim. The payments they challenge are nothing more than reimbursements to LMIMCo for expenses incurred in managing the Plans—an arrangement ERISA expressly permits. *See* 29 U.S.C. § 1108(c)(2) (allowing fiduciaries to receive "reimbursement of expenses properly and actually incurred"); *Lockheed Martin Inv. Mgmt. Co.*, 2006 WL 1624232, at *2. LMIMCo, as the Plans' named fiduciary, designed and manages the LMIMCo TDFs exclusively for Lockheed Martin's retirement plans, offers them to no one else, and charges participants no fees—recovering only properly accrued expenses.

Plaintiffs' other disloyalty allegations similarly fail. Plaintiffs argue Lockheed Martin should have replaced LMIMCo with an outside manager, FAC ¶ 17, but that decision is a settlor act, not a fiduciary one. *See supra* at 8. And any claim that merely offering custom TDFs is disloyal contradicts DOL guidance encouraging fiduciaries to consider custom designs tailored to plan participant demographics. *See* TDF Tips at 2

Similarly, Plaintiffs fault LMIMCo for designating the LMIMCo TDFs as the Plans' qualified default investment alternative ("QDIA"). FAC ¶ 107. But fiduciaries often choose TDFs

as QDIAs because, as DOL notes, their automatic rebalancing suits participants who do not actively select or monitor their 401(k) investments. *See TDF Tips* at 1.

In sum, Plaintiffs' legally flawed allegations fail to state a plausible duty of loyalty claim. The Court should dismiss the disloyalty claims in Counts I and III with prejudice.

## II.     The First Amended Complaint Fails to State a Prohibited Transaction Claim.

Bucket 2 (Counts IV and V) asserts prohibited-transaction claims under ERISA §§ 406(a) and (b), based only on (1) $20 million in payments from the Master Trust to Defendants and (2) alleged extensions of credit. FAC ¶¶ 113–16. But those were routine reimbursements of LMIMCo's direct expenses, which ERISA expressly permits. *See* 29 U.S.C. § 1108(c)(2). That statutory safe harbor defeats Plaintiffs' claims, and in any event, the allegations do not plausibly state a violation of §§ 406(a) or (b). The Court should dismiss Counts IV and V with prejudice.[10] The Court should dismiss Counts IV and V in their entirety with prejudice.

### A.     Plaintiffs Bear the Burden to Establish that Section 408(c)(2) Does Not Apply.

Plaintiffs contend that the payments between the Master Trust and Defendants constitute prohibited transactions under ERISA sections 406(a) and (b), which bar certain transactions between a plan and a "party in interest" or a "fiduciary." *See* 29 U.S.C. § 1106(a), (b). Section 408(c)(2) makes clear, however, that "[n]othing in section 1106 . . . shall be construed to prohibit any fiduciary from . . . receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan[.]" 29 U.S.C. § 1108(c)(2). As the Supreme Court recently emphasized in

---

[10] Generally, direct expenses are those that would not have been incurred but for the provision of services to the plan. *See* 29 C.F.R. § 2550.408c-2(b)(3); *see also Lockheed Martin Inv. Mgmt. Co.*, 2006 WL 1624232, at *1. Examples range from salaries paid to LMIMCo's employees (all of whom have been hired solely to administer and manage Lockheed Martin's retirement plan assets) to postage for mailings sent to participants.

*Cunningham v. Cornell University*, 604 U.S. 693 (2025), statutory headings and structure are critical tools in determining the scope and effect of ERISA's exemptions. Although *Cunningham* concerned section 408(b)(2)—which is one among twenty-one specific exemptions enumerated under section 408(b)—the Court's analysis suggests that section 408(c) operates differently.

In *Cunningham*, the Court held that section 408(b)'s exemptions function as affirmative defenses, not elements plaintiffs must negate. *Id.* at 1029. The Court relied on the section heading—"Enumeration of transactions exempted from section 1106 prohibitions"—to conclude that Congress intended section 408(b) to carve out *exceptions* to otherwise prohibited conduct. *Id.* at 1028–29; *see also Yates v. United States*, 574 U.S. 528, 540 (2015) (titles and headings are valid interpretive tools).

In contrast, section 408(c) is titled "Fiduciary benefits and compensation not prohibited by section [4]06," signaling that the types of payments described—such as reimbursements for expenses—*do not fall within the scope of the prohibitions in the first place*. 29 U.S.C. § 1108(c). In other words, while section 408(b) provides *exceptions*, section 408(c) clarifies that certain conduct falls outside section 406's scope and therefore requires no exception. This distinction is reinforced by standard interpretive canons: where Congress uses different language in neighboring provisions, courts must give effect to that distinction. *See Lora v. United States*, 599 U.S. 453, 463 (2023) (emphasizing Congress's choice to place a provision outside a more general subsection); B. Garner & A. Scalia, *Reading Law: The Interpretation of Legal Texts* 183 (2012) (specific provisions control over general ones).

Had Congress intended the "benefits and compensation" in section 408(c)(2) to be treated as affirmative defenses, it could have included them in section 408(b)(2). Its decision not to do so confirms that these are not exemptions from otherwise impermissible conduct but clarifications of

what is *not prohibited* in the first instance. Thus, under the interpretive framework adopted in *Cunningham*, Plaintiffs bear the burden of pleading facts showing that the challenged payments fall outside the scope of section 408(c)(2). They have not done so, and their prohibited transaction claims fail as a matter of law.

**B.      Plaintiffs Fail to Plead that Section 408(c)(2) Does Not Apply.**

Plaintiffs have not plausibly alleged that the conduct challenged in Claims IV and V does not amount to the "benefits and compensation" enumerated in section 408(c)(2).

As Plaintiffs recognize, the challenged "compensation" relates to "services" LMIMCo provided to the Plans. *See* FAC ¶ 114 (alleging that Defendants "paid themselves more than $20,000,000 in compensation); *id.* at ¶ 116 (alleging that "[t]he Master Trust owed the Corporation $5.8 million and $6.0 million . . . for certain expenses paid by the Corporation *in providing services to* the Plan and certain other plans" (emphasis added)). The plain language of Plaintiffs' allegations directly implicates section 408(c)(2), and Plaintiffs bear the burden to plausibly allege that the challenged payments do not constitute "reasonable compensation for services rendered, or . . . the reimbursement of expenses properly and actually incurred, in the performance of [Defendants'] duties with the plan[.]" 29 U.S.C. § 1108(c)(2). Because they have not done so, they have not stated a plausible prohibited transaction claim, and the Court should dismiss Counts IV and V in their entirety with prejudice.

**C.      Plaintiffs Fail to State a Plausible Section 406(a) Prohibited Transaction.**

Putting aside the applicability of ERISA section 408(c)(2), Plaintiffs' allegations do not come close to plausibly stating a prohibited transaction claim under ERISA sections 406(a)(1)(B), (C), or (D).

1.      **Plaintiffs Fail to Allege a Prohibited Loan or Extension of Credit Under Section 406(a)(1)(B).**

Section 406(a)(1)(B) prohibits a fiduciary from causing a plan to engage in a transaction that the fiduciary knows or should know constitutes a "direct or indirect . . . lending of money or other extension of credit between the plan and a party in interest[.]" 29 U.S.C. § 1106(a)(1)(B). Courts and the DOL have consistently held that an "extension of credit" requires a debtor-creditor relationship characterized by the transfer or use of assets with an obligation to repay.

The DOL has explained that the mere fact that one party has an obligation to make payments over time is insufficient to establish an extension of credit. For example, in *DOL Adv. Op. 79-47A* (July 24, 1979), the DOL found that an employer's agreement to make installment payments to a plan over ten years did not create a debtor relationship and therefore did not constitute a prohibited loan. Similarly, *DOL Adv. Op. 93-14A* (May 5, 1993) confirmed that the establishment of a funding policy—even one involving scheduled future payments—does not amount to an extension of credit under section 406(a)(1)(B).

Courts interpreting section 406(a)(1)(B) have likewise required evidence of a debtor relationship. In *Januski v. Mortell Co.*, No. 84 C 3827, 1985 WL 3749 (N.D. Ill. Nov. 8, 1985), the court emphasized that a "loan" must involve the "creation of debt by the lender's payment of or agreement to pay money to the debtor." *Id.* at *10–11. The court denied relief where the alleged obligation was not enforceable, finding that "[t]he crucial question . . . is whether the purchase of the shares by the [plan] created a debtor relationship." *Id.* Other courts are in accord. *See, e.g.*, *First Tex. Sav. Ass'n v. Reliance Ins. Co.*, 950 F.2d 1171, 1175 (5th Cir. 1992) (defining a loan as "a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows"); *In re Bellanca Aircraft Corp.*, 850 F.2d

1275, 1277 (8th Cir. 1988) (explaining that "an absolute right to repayment of funds advanced" is "the hallmark of a loan").

Here, Plaintiffs plead no facts establishing a debtor-creditor relationship. Their only allegation is that "[t]he Master Trust owed the Corporation $5.8 million and $6.0 million as of December 31, 2023 and 2022, respectively, for certain expenses paid by the Corporation in providing services to the Plan and certain other plans." FAC ¶ 116. But this describes ordinary reimbursement of plan-related expenses, not a loan or extension of credit. That Defendants first incurred the expenses and were later reimbursed does not mean plan assets were loaned or made available for Defendants' use. The Form 5500s instead show routine post-service invoicing— precisely the "settlor-paid then reimbursed" arrangement the DOL has said is not prohibited. *See* DOL Adv. Op. 97-19A (Aug. 28, 1997) (reimbursement of direct expenses does not "constitute an act described in ERISA section 406(b)").

Plaintiffs' section 406(a)(1)(B) claim must therefore be dismissed with prejudice.

## 2. Plaintiffs Fail to State a Claim Under Section 406(a)(1)(C).

Section 406(a)(1)(C) prohibits fiduciaries from causing the plan to engage in a transaction that constitutes the "direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest[.]" 29 U.S.C. § 1106(a)(1)(C). But not every provision of services by a party in interest gives rise to liability under this section. To state a claim, a plaintiff must allege that the fiduciary caused the plan to enter into a transaction with a party in interest for services in a manner not permitted by ERISA, such as for unreasonable compensation or without proper fiduciary oversight. *See Cunningham*, 604 U.S. at 700.

There are no factual allegations that Defendants caused the Plans to enter into any new agreement for services, much less one involving unreasonable fees or conflicted arrangements. Instead, the Plan documents confirm that LMIMCo was named as the Plans' investment fiduciary

and service provider by Lockheed Martin in its settlor (non-fiduciary) capacity. *See* Ex. B at 106; Ex. C at 74; Ex. D at 45. The Plan documents require LMIMCo to provide investment-related services to the Plans. Thus, LMIMCo's provision of services pursuant to its fiduciary responsibilities does not reflect a discretionary transaction on the part of a fiduciary to engage a service provider—it is a legal obligation imposed on a named fiduciary under the governing plan documents.

Moreover, even where services are provided by a party in interest, ERISA section 408(c)(2) explicitly permits the provision of services to the plan by fiduciaries or related parties, so long as any compensation received is reasonable. Plaintiffs do not allege that the amounts at issue were unreasonable, nor do they challenge the process by which reimbursements were reviewed or approved. Count IV therefore fails to state a claim under section 406(a)(1)(C).

### 3. Plaintiffs Do Not Allege a Prohibited Transfer Under Section 406(a)(1)(D).

Section 406(a)(1)(D) prohibits fiduciaries from causing a plan to engage in a transaction that the fiduciary knows or should know constitutes a "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106(a)(1)(D). But as the Supreme Court explained in *Lockheed Corp. v. Spink*, 517 U.S. 882, 892–93 (1996), not every transfer of plan assets is prohibited. The statute targets "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Id.*

Here, Plaintiffs point to the same reimbursement amounts referenced in the Form 5500s. But they do not allege that the payments were made to benefit Lockheed Martin or LMIMCo outside the context of their roles in plan administration. Nor do Plaintiffs allege that the reimbursements were excessive or unauthorized. On the contrary, the Form 5500 language— expenses "paid by the Corporation in providing services to the Plan"—demonstrates that these

were routine administrative reimbursements tied to services required under the Plan. Courts consistently hold that such transfers are not prohibited transactions absent allegations of self-dealing, excessive compensation, or a breakdown in fiduciary oversight. *See, e.g.*, *Reich v. Compton*, 57 F.3d 270, 278–79 (3d Cir.1995) (ERISA section 406(a)(1)(D) "requires proof of a subjective intent to benefit a party in interest"). In short, there is no plausible allegation that a "transaction" occurred under section 406(a)(1)(D), much less a non-arm's length transfer that benefitted a party in interest at the expense of the Plans.

Because Plaintiffs fail to allege facts plausibly supporting the existence of a loan, a prohibited service arrangement, or a self-dealing transfer of plan assets, Count IV fails as a matter of law under ERISA sections 406(a)(1)(B), (C), and (D). The Court should dismiss Count IV in its entirety with prejudice.

### D. Plaintiffs Fail to State a Plausible Section 406(b) Prohibited Transaction.

Plaintiffs similarly fail to state a plausible section 406(b)(1), (2), or (3) prohibited transaction claim.

Section 406(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account[.]" 29 U.S.C. § 1106(b)(1). For the reasons discussed above, the amounts Plaintiffs allege Defendants received from the Plans were all reimbursements for LMIMCo's direct expenses related to the services it provided to the Plans. *See supra* at 24. Without plausibly alleging that the amounts reflected in the correct Form 5500s were anything other than reimbursements for direct expenses, Plaintiffs cannot plausibly allege a section 406(b)(1) claim. *Probst v. Eli Lilly and Co.*, No. 1:22-cv-1106-JMS-MKK, 2023 WL 1782611, at *14 (S.D. Ind. Feb. 3, 2023) ("Section 406(b)(1) prohibits a fiduciary from deal[ing] with the assets of the plan in his own interest or for his own account. It does not prohibit a plan from paying a plan sponsor for services the plan sponsor provided." (Citation modified); *Danza v. Fid. Mgmt. Tr. Co.*, 533 F.

App'x 120, 126 (3d Cir. 2013) ("Section 406(b)'s purpose is to prohibit transactions that might involve self-dealing by a fiduciary, not to prevent fiduciaries from being paid for their work.").

Nor have Plaintiffs plausibly stated prohibited transaction claims under sections 406(b)(2) and (3). These sections prohibit a fiduciary from "act[ing] in any transaction involving the plan on behalf of a party (or represent[ing] a party) whose interests are adverse to the interests of the plan," or "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(2), (3). As the plain language of these provisions makes clear, a section 406(b)(2) or (3) transaction can occur only if the challenged transaction involves a third party transacting with the plan (and not just a transaction between a fiduciary and a plan). *See id.*

In summary, Counts IV and V are based on Plaintiffs' erroneous attempt to describe ordinary reimbursements by the Plans of expenses paid by Defendants as prohibited transactions under ERISA, when such reimbursements are expressly permitted under ERISA. Therefore, the Court should dismiss Counts IV and V with prejudice.

### III.   ERISA Does Not Allow Jury Trials on Plaintiffs' Claims.

Finally, the Court should strike Plaintiffs' demand for a jury trial. *See* FAC at 39. As Plaintiffs themselves acknowledge, virtually all courts—including those within the Fourth Circuit—have repeatedly held that there is no right to a jury trial for claims brought under ERISA section 502(a)(2) or (a)(3). *See id.* at 39 n.4; *see also Phelps v. C.T. Enters., Inc.*, 394 F.3d 213, 222 (4th Cir. 2005) (holding that there is no jury trial right under section 1132(a)(2)); *Reed v. MedStar Health, Inc.*, No. JKB-20-1984, 2023 WL 5154507, at *7 (D. Md. Aug. 10, 2023) (same, for section 502(a)(2) and (a)(3)).

That is because claims under sections 502(a)(2) and (a)(3) are equitable in nature. Courts uniformly analyze such claims under traditional trust law principles, and the remedies Plaintiffs seek—such as declaratory relief, equitable restitution, and disgorgement—are all equitable, not legal. *See Reed*, 2023 WL 5154507, at \*7 (explaining that claims under ERISA §§ 502(a)(2) and (a)(3) are "inherently equitable"); *Perez v. Silva*, 185 F. Supp. 3d 698, 705 (D. Md. 2016) (holding there is no jury right for equitable disgorgement). As a result, courts routinely strike jury demands in ERISA cases brought under these provisions. *See Reed*, 2023 WL 5154507, at \*7; *Perez*, 185 F. Supp. 3d at 704–05; *Williams v. Centerra Grp., LLC*, 579 F. Supp. 3d 778, 785 (D.S.C. 2022).

There is no reason to depart from that rule here. Plaintiffs expressly bring claims under sections 1132(a)(2) and (a)(3). *See* FAC ¶ 10. And their Prayer for Relief seeks declaratory relief, fiduciary removal, and disgorgement of ill-gotten gains—remedies firmly grounded in equity. *See id.* at 39. Therefore, the Court should strike their jury demand from the First Amended Complaint.

## <u>CONCLUSION</u>

In sum, Plaintiffs have not plausibly alleged any ERISA violation. Their core theory—that the LMIMCo TDFs were expensive and underperforming—cannot survive the "careful, context-sensitive scrutiny" required under *Dudenhoeffer*. 573 U.S. at 425. Both their performance and fee allegations rest on inapt comparators that fail to show material underperformance or unreasonable expenses. Their conspiracy theory likewise collapses under public information confirming that LMIMCo was reimbursed only for properly incurred plan expenses—an arrangement ERISA expressly permits. Simply put, the LMIMCo TDFs are a thoughtful custom investment product managed through a careful, deliberate process. The Court should dismiss the First Amended Complaint in its entirety, with prejudice.

Dated:  September 23, 2025

Respectfully submitted,

By:  */s/ William J. Delany*
William J. Delany (*pro hac vice*)
Ross P. McSweeney (*pro hac vice*)
Richard A. Smith Jr., Bar No. 30313
Chidera Onyeoziri (*pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 861-5412
Fax: (202) 659-4503
wdelany@groom.com
rmcsweeney@groom.com
rsmithjr@groom.com
conyeoziri@groom.com

**ATTORNEYS FOR DEFENDANTS**