**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

KARL FEZER *et al.*,

               *Plaintiffs*,

v.

LOCKHEED MARTIN CORP. *et al.*,

               *Defendants.*

Case No. 8:25-cv-00908-TDC

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS AND TO STRIKE JURY DEMAND</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES............................................................................................... ii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

LEGAL STANDARD ..........................................................................................................5

ARGUMENT ......................................................................................................................5

I.      The Complaint States Claims For Breaches Of Fiduciary Duties .......................5

        A.      The Complaint Properly States Claims for Breaches of the Duty of Prudence ...... 6

                i.       The Complaint Alleges Sustained and Material Underperformance
                         and Excessive Fees ..................................................................................8

                ii.      The Complaint More Than Adequately Sets Out Meaningful
                         Benchmarks............................................................................................13

        B.      The Complaint Properly States Claims for Breaches of the Duty of Loyalty ...... 15

        C.      The Complaint Names the Right Entities ............................................................ 17

                i.       Lockheed Owed Fiduciary Duties to The Beneficiaries of Its Plans .........18

                ii.      Defendants Are Responsible for Retaining LMIMCo Despite Its
                         Poor Performance..................................................................................21

II.     Defendants Engaged in Prohibited Transactions ...............................................22

        A.      The Complaint States Plausible Claims............................................................. 22

                i.       Defendants Lent Money to the Plans in Violation of
                         § 1106(a)(1)(B) .....................................................................................23

                ii.      Defendants Furnished Services to the Plans in Violation of
                         § 1106(a)(1)(C) .....................................................................................24

                iii.     Defendants Used the Plans' Assets for Their Benefit in Violation of
                         § 1106(a)(1)(D) .....................................................................................25

                iv.      Defendants Acted Adversely to the Plans in Violation of § 1106(b) .........25

        B.      Section 1108(c)(2) Does Not Allow Defendants to Avoid Responsibility............ 26

                i.       Section 1108 (c)(2) Is an Affirmative Defense, Not An Underlying
                         Element of the Claim. .............................................................................26

                ii.      In Any Case, Section 1108(c)(2) Does Not Apply ....................................29

III.    THE JURY DEMAND IS PROPER ......................................................................29

Conclusion ......................................................................................................................30

**TABLE OF AUTHORITIES**

**CASES**

*Abel v. CMFG Life Ins. Co.*,
No. 22-cv-449, 2024 WL 307489 (W.D. Wis. Jan 26, 2024)................................................. 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................................. 5

*Baird v. Steel Dynamics, Inc.*,
No. 1:23-cv-00356, 2024 WL 3983741 (N.D. Ind. Aug. 29, 2024)....................................... 12

*Bekker v. Neuberger Berman Grp. LLC*,
No. 16-cv-6123, 2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018).............................................. 12

*Berkelhammer v. Automatic Data Processing, Inc.*,
No. 20-cv-5696, 2022 WL 3593975 (D.N.J. Aug. 23, 2022) ........................................... 28, 29

*Bokma v. Performance Food Grp., Inc.*,
783 F.Supp.3d 882 (E.D. Va. 2025) ...................................................................................... 19

*Brundle v. Wilmington Tr. N.A.*,
241 F.Supp.3d 610 (E.D. Va. 2017) ...................................................................................... 28

*Canada Life Assur. Co. v. Est. of Lebowitz*,
185 F.3d 231 (4th Cir. 1999)................................................................................................. 19

*Carter v. Sentara Healthcare Fiduciary Comm.*,
No. 2:25-cv-0016, 2025 WL 2427614 (E.D. Va. Aug. 11, 2025) .............................. 8, 9, 10, 15

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*,
494 U.S. 558 (1990)............................................................................................................. 29

*Coan v. Kaufman*,
333 F.Supp.2d 14 (D. Conn. 2004) ...................................................................................... 30

*Coyne & Delany Co. v. Selman*,
98 F.3d 1457 (4th Cir. 1996).................................................................................... 18, 20, 21

*Cunningham v. Cornell Univ.*,
604 U.S. 693 (2025)............................................................................................ 22, 26, 27, 28

*Dearing v. IQVIA Inc.*,
No. 1:20-cv-0574, 2021 WL 4291171 (M.D.N.C. Sept. 21, 2021) ................................... 10, 15

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ..................................................................................... 3, 6, 16, 17

*Enstrom v. SAS Institute*,
No 5:24-CV-105-D, 2025 WL 685219 (E.D.N.C. 2025) ..........................................................11

*Feinberg v. T. Rowe Price Grp., Inc.*,
No. 17-cv-0427-MJG, 2018 WL 3970470 (D. Md. Aug. 20, 2018) ......................................... 22

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ....................................................................................................5, 6, 11

*First Texas Sav. Ass'n v. Reliance Ins. Co.*,
950 F.2d 1171 (5th Cir. 1992) ............................................................................................ 24

*Forman v. TriHealth, Inc.*,
563 F. Supp. 3d 753 (S.D. Ohio 2021) ............................................................................... 12

*Garnick v. Wake Forest Univ. Baptist Med. Ctr.*,
629 F.Supp.3d 352 (M.D.N.C. 2022) ............................................................................. 14, 15

*Gonzalez v. Northwell Health, Inc.*,
632 F. Supp. 3d 148 (E.D.N.Y. 2022) ................................................................................. 12

*Hall v. Cap. One Fin. Corp.*,
No. 1:22-cv-00857-MSN-JFA, 2023 WL 2333304 (E.D. Va. Mar. 1, 2023), *appeal dismissed*,
No. 25-1357, 2023 WL 36388629 (4th Cir. May 12, 2023) .................................................... 15

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022) ........................................................................................................... 5

*In re Beacon Assocs. Litig.*,
818 F.Supp.2d 697 (S.D.N.Y. 2011) ................................................................................... 29

*In re Bellanca Aircraft Corp.*,
850 F.2d 1275 (8th Cir. 1988) ............................................................................................ 24

*In re MedStar ERISA Litig.*,
No. 20-cv-1984-RDB, 2021 WL 391701 (D. Md. Feb. 4, 2021) ................................. 10, 14, 21

*Januski v. Mortell Co.*,
No. 84-cv-3827, 1985 WL 3749 (N.D. Ill. Nov. 8, 1985) ......................................................... 24

*Kendall v. Pharm. Prod. Dev., LLC*,
No. 7:20-cv-71-D, 2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) ..................................... 16, 17

*Lamberty v. Premier Millwork & Lumber Co., Inc.*,
329 F.Supp.2d 737 (E.D. Va. 2004) ................................................................................... 30

*Leigh v. Engle*,
727 F.2d 113 (7th Cir. 1984), *cert. denied*, 489 U.S. 1078 (1989) .......................................... 21

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) ................................................................................ 20

*Lowen v. Tower Asset Mgmt., Inc.*,
829 F.2d 1209 (2d Cir. 1987) .................................................................. 28

*Luckett v. Wintrust Fin. Corp.*,
No. 22-cv-03968, 2024 WL 3823175 (N.D. Ill. Aug 14, 2024) ............... 12

*Mass. Mut Life Ins. Co. v. Russell*,
473 U.S. 134 (1985) ................................................................................ 20

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ................................................................... 15

*McDonald v. Lab'y Corp. of Am. Holdings*,
No. 1:22-cv-680, 2023 WL 4850693 (M.D.N.C. July 28, 2023) .............. 15

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993) ................................................................................ 30

*Moler v. Univ. of Maryland Med. Sys.*,
No. 1:21-cv-01824-JRR, 2022 WL 2756290 (D. Md. July 13, 2022) ........... 8, 10, 13

*Nagy v. CEP Am., LLC*,
No. 23-cv-05648, 2024 WL 2808648 (N.D. Cal. May 30, 2024) ........... 28, 29

*Nat'l Sec. Sys., Inc. v. Iola*,
700 F.3d 65 (3d Cir. 2012) ..................................................................... 29

*Reetz v. Aon Hewitt Inv. Consulting, Inc.*,
74 F.4th 171 (4th Cir. 2023) ................................................................... 16

*Rozo v. Principal Life Ins. Co.*,
No. 4:14-cv-00463, 2021 WL 1837539 (S.D. Iowa Apr. 8, 2021), *aff'd*,
48 F.4th 589 (8th Cir. 2022) ................................................................... 28

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015), *cert. denied*, 579 U.S. 917 (2016) ........... 5, 13

*Sec. & Exch. Comm'n v. Jarkesy*,
603 U.S. 109 (2024) ................................................................................ 30

*Sec'y of Dep't of Lab. v. United Transportation Union*,
No. 1:17-cv-923, 2020 WL 1611789 (N.D. Ohio Mar. 30, 2020) ............ 29

*Stegemann v. Gannett Co., Inc.*,
970 F.3d 465 (4th Cir. 2020), *cert. denied sub nom*, *Gannett Co., Inc. v. Quatrone*,
142 S. Ct. 707 (2021) ............................................................................................ 3, 6

*Tatum v. RJR Pension Inv. Comm.*,
761 F.3d 346 (4th Cir. 2014), *cert. denied*, 576 U.S. 1054 (2015) ........................... 6

*Tibble v. Edison Int'l*,
575 U.S. 523 (2015) ............................................................................................ 8, 9

*Trauernicht v. Genworth Fin. Inc.*,
No. 3:22-cv-532, 2023 WL 5961651 (E.D. Va. Sept. 13, 2023) ......................... 11, 15

*Wood v. Comm'r*,
955 F.2d 908 (4th Cir. 1992), *cert. dismissed*, 505 U.S. 1231 (1992) ..................... 22

**STATUTES**

29 U.S.C. § 1002(21)(A) .......................................................................................... 18

29 U.S.C. § 1104(a)(1)(A)(i) .................................................................................... 16

29 U.S.C. § 1106 ...................................................................................... 22, 23, 27

29 U.S.C. § 1106(a)(1)(B) ........................................................................... 22, 23

29 U.S.C. § 1106(a)(1)(C) ........................................................................... 22, 24, 27

29 U.S.C. § 1106(a)(1)(D) ........................................................................... 22, 25

29 U.S.C. § 1106(b) ...................................................................................... 23, 25

29 U.S.C. § 1106(b)(2) .............................................................................................. 26

29 U.S.C. § 1106(b)(3) .............................................................................................. 26

29 U.S.C. § 1108 ...................................................................................... 26, 27, 28

29 U.S.C. § 1108(b)(2) .............................................................................................. 27

29 U.S.C. § 1108(b)(2)(A) ........................................................................................ 27

29 U.S.C. § 1108(c)(2) ................................................................................ 26, 27, 28, 29

29 U.S.C. § 1132(a)(3) .............................................................................................. 30

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 17

**REGULATIONS**

29 C.F.R. § 2550.404a-5(d)(1)(iii) ............................................................................... 14

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. VII ............................................................................................... 29

**LEGISLATIVE MATERIALS**

Employee Retirement Income Security Act of 1974, H.R. 2, 93d Cong. (1974) ......................... 2

**OTHER AUTHORITIES**

DEPT. OF LABOR, ADVISORY OPINION 1993-14A, 2510.3-101 (May 5, 1993) ............................ 24

*Lockheed Martin Names Paul Colonna as President and Chief Investment Officer of Lockheed Martin Investment Management Company* (Dec. 17, 2018), https://perma.cc/9YQD-ZKML. 19

# **INTRODUCTION**

Lockheed Martin chose to set up its own internal investment group, LMIMCo, to manage its retirement plans. Then, rather than follow the standard practice of selecting target date funds ("TDFs") from competent outside providers, Defendants made the highly unusual decision to create their own In-House TDFs. With LMIMCo at the wheel, these In-House TDFs then uniformly and chronically underperformed comparable, off-the-shelf funds for at least ten years – as well as the very benchmark Lockheed asked its employees to use to judge the TDFs' performance. To make matters worse, LMIMCo charged their employees fees far higher than other TDFs. These issues were apparent to Defendants by at least 2019.

What did Defendants do in response? Basically, nothing. They kept the In-House TDFs, rather than switching to one of the many available off-the-shelf, higher performing, and cheaper options. They kept LMIMCo in charge, rather than switching to any of a multitude of professional outside managers. By keeping things in house, Defendants maintained a multi-million-dollar revenue stream that they used to pay their own executives. They then went further, burdening their employees' retirement plans with millions of dollars of debt to Lockheed itself.

As a result, Lockheed's employees suffered. Defendants' years-long failure to replace LMIMCo or select properly managed TDFs cost Lockheed plan beneficiaries, including Plaintiffs here, hundreds of millions of dollars they could have relied on in their retirement.

These are not the actions of a prudent and loyal fiduciary. Faced with evidence of sustained underperformance and high fees, Defendants stuck with their failed internal strategy because it benefited them. That is a straightforward breach of fiduciary duties. There is nothing "complex" about this narrative. *Contra* Memorandum In Support of Motion to Dismiss (Mem.) 1, ECF No. 36-1.

Defendants now attempt evade liability by disputing facts in isolation, while disregarding both facts that Defendants find inconvenient and the broader context and story these facts tell together. Defendants fault the Complaint for not tackling Defendants' affirmative defenses and factual arguments, instead of focusing on the Complaint's allegations. They rely on a patchwork of cases from across the country, while ignoring on-point cases in this District and Circuit. And they introduce a competing factual narrative that is for summary judgment, not now.

The allegations in the Complaint taken as a whole set out a clear entitlement to relief. The Complaint states plausible claims that Defendants violated their fiduciary duties and legal obligations under ERISA by maintaining LMIMCo as the manager of the Plans; selecting and maintaining the chronically underperforming In-House TDFs as investment options; charging excessive fees; and engaging in prohibited transactions. This case should proceed.

## BACKGROUND

Defendant Lockheed Martin Corporation ("Lockheed") is the largest defense contractor in the world and has more than 120,000 employees in the United States. First Amended Complaint ("FAC" or "Complaint") ¶ 1, ECF No. 35. Lockheed sponsors several defined-contribution 401(k) retirement plans for its employees, including those the Plaintiffs invested in (the "Plans").[1] These Plans are target date funds – which are diversified funds with a stated "target" retirement date, generally a year stated in the fund's name. These funds automatically rebalance over time so that, as its stated target date approaches, a given TDF will invest increasingly in low-risk assets, like bonds, and decreasingly in high-risk assets, like stocks. FAC ¶ 4. The Plans are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), and are a key element of

---

[1] The Plans are the Lockheed Martin Corporation Salaried Savings Plan, the Lockheed Martin Corporation Performance Sharing Plan for Bargaining Employees, and the Lockheed Martin Corporation Capital Accumulation Plan.

Lockheed's bargain with its employees. FAC ¶ 1. These Plans allow employees to save for retirement by making contributions that can be invested in the funds Defendants select. *Id.*

Lockheed, as the Plans' sponsor and administrator, and Lockheed Martin Investment Management Company ("LMIMCo"), as the Plans' manager, had obligations to the participants and beneficiaries of Lockheed's Plans that are the "highest known to the law." *Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 469 (4th Cir. 2020). ERISA requires Lockheed and LMIMCo to make decisions with "an eye single to the interests of the participants and beneficiaries." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 419 (4th Cir. 2007) (citation omitted). As fiduciaries, Lockheed had a critical duty to prudently select and oversee the Plans' manager and the investment options, based solely on the interests of participants and beneficiaries. FAC ¶ 2.

Defendants made an unorthodox decision: rather than use off-the-shelf TDFs, as is the practice of most prudent fiduciaries, they chose for their employees TDFs that they themselves created. FAC ¶¶ 4-6. This decision was unusual because a variety of reputable, professional 401(k) managers offered a plethora of high-quality TDFs and services, and prudent fiduciaries generally select TDFs offered by one of these well-regarded, independent companies to ensure that the funds are not mismanaged. FAC ¶¶ 6-7, 92. But Defendants did not make any of those investment options available. Instead, they chose their In-House TDFs as the *only* TDF investment options available within the Plans and then steered participants toward these TDFs, telling them that an In-House TDF was the only investment they needed for retirement. FAC ¶ 14. And Defendants then selected their own In-House TDFs as the default investment allocation, automatically enrolling participants if they did not affirmatively select other non-TDF investment options. *Id.*

This approach harmed beneficiaries. Compared with the plans offered by the outside

401(k) managers, Defendants' In-House TDFs chronically underperformed.  Every Lockheed TDF underperformed the comparable TDFs from the Capital Group, Fidelity, and T. Rowe Price.  FAC ¶¶ 92-95.  They even underperformed Lockheed's own chosen benchmark for each TDF, the S&P Target Date Indices – a comparatively conservative average of an array of TDFs.  FAC ¶ 91.

As a result, Lockheed's employees lost hundreds of millions of dollars for retirement.  Over the last decade, hard-working beneficiaries who took Defendants' advice and invested their savings in the In-House TDFs, or whose earnings were automatically placed in that default option chosen by Defendants, have seen their 401(k)s sapped of between 3.5% and 11.5% of their nest eggs' would-be value relative to comparable funds used to compile S&P's Target Date Index.  *See* FAC ¶ 91.  Had Defendants instead replaced the In-House TDFs with comparable funds offered by Capital Group, Fidelity, or T. Rowe Price, many individual beneficiaries would have seen hundreds of thousands more dollars in their account when they hit retirement.  FAC ¶¶ 93, 96.

But even after seeing this underperformance, Defendants still did not replace the In-House TDFs with better-performing TDFs.  FAC ¶¶ 105-107.  Nor did they terminate LMIMCO's role managing the funds.  FAC ¶ 109.  Rather, Defendants maintained LMIMCo as Plan manager for years after it became clear that LMIMCo was underperforming, and that the In-House TDFs were several times more expensive than better-performing TDFs offered by outside providers.  FAC ¶¶ 19, 100.

While participants lost, Defendants profited.  By keeping their In-House TDFs with LMIMCo at the helm, Defendants received millions of dollars in direct compensation.  FAC ¶ 114.  They also used their position to extend millions of dollars of credit to their own plans, resulting in debts owed by Lockheed's employees' retirement savings to Lockheed itself.  FAC ¶ 116.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In assessing ERISA fiduciary-breach claims, courts apply this standard evaluating a complaint's allegations "as a whole." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). "Because the content of the duty of prudence turns on the circumstances," courts do not look at allegations in isolation: "the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). And, as always, in evaluating a motion to dismiss, courts "accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff]." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

## ARGUMENT

### I.     THE COMPLAINT STATES CLAIMS FOR BREACHES OF FIDUCIARY DUTIES

By 2019, Defendants knew that their In-House TDFs were underperforming. And they knew that they charged participants many multiples of fees charged by better performing, off-the-shelf options. But Defendants nevertheless made no changes. Instead of switching to a fund with higher returns and lower fees, they stuck with their In-House TDFs and LMIMCo as the fund manager. Defendants were like a baseball team owner who, year after year, fields a team batting .200, which is also managed by the owner's son-in-law. Even though the team consistently finishes in the cellar, they never trade any players, hire a new general manager, or even adjust their starting lineup. Then, they act surprised when they keep losing. Except here, instead of baseball games, losing means hundreds of millions of dollars out of the pockets of tens of thousands of hardworking Lockheed employees, all while the Defendants reaped financial benefits.

These actions fall short of the duties Defendants owe to their employees – duties "that are the highest known to the law." *Stegemann*, 970 F.3d at 469.  By keeping the status quo in the face of evidence of underperformance and high fees, Defendants violated the duty of prudence.  And by failing to act solely in the interest of their plan participants, they violated the duty of loyalty.

A.      **The Complaint Properly States Claims for Breaches of the Duty of Prudence**

It is well-settled that fiduciaries "must exercise prudence in selecting and retaining available investment options." *DiFelice*, 497 F.3d at 418.  Plaintiffs will prevail in this case if – as the Complaint alleges – Defendants: (1) engaged in an imprudent process in maintaining LMIMCo as manager and/or the In-House TDFs as investment options; and (2) Defendants' imprudence caused the Plaintiffs' loss.  *See Fifth Third Bancorp*, 573 U.S. at 419.  The requisite inquiry must "necessarily be context specific" and based on the "character and aim of the particular plan and decision at issue and the circumstances prevailing at the time." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 367 (4th Cir. 2014) (citation omitted).

The Complaint more than makes that showing.  First, it shows a consistent pattern of underperformance, stretching back years.  The Capital Group, Fidelity, and T. Rowe Price all offer TDFs that are comparable to the In-House TDFs.  FAC ¶ 92.  And these professionally-managed funds consistently outperformed the In-House TDFs.  Comparing the average trailing 3-year returns of these funds with the In-House TDFs for 2017, 2018, 2019, and 2020 yields a remarkable result: *Every* vintage of the In-House Funds, in *every* year, underperformed the average of those professionally managed funds by between 2.87% and 7.16%.  FAC ¶ 94.  Looking at the professionally managed funds individually yields the same result.  *Every* vintage of the In-House TDFs underperformed *every* single one of these professionally managed funds over an annualized 10-year net return.  FAC ¶ 93.  This is a remarkable string of consistently poor performance across what Defendants told employees were the only option they needed for retirement.  FAC ¶ 14.

If Defendants take issue with those comparisons, consider what Defendants told their own plan participants was the proper way to judge the performance of the In-House TDFs: "[t]he benchmarks for the LMIMCo Target-Date Funds are the corresponding S&P Target Date Indices." FAC ¶ 85. And, over a ten-year period, *every* vintage of the In-House TDFs underperformed the corresponding S&P Index, resulting in 10-year losses as a percentage of total retirement savings of between 3.5% and 11.5%. FAC ¶ 91. In other words, every one of the Defendant's funds underperformed the very comparator Defendants told employees was appropriate.

Maybe some of this underperformance could be understood if Defendants, by keeping things in house, were able to manage a fund with far lower expenses than outside options. But just the opposite occurred: the annual expense ratios of the In-House TDFs were between 250% and 600% *higher* than another professionally managed and widely available fund. FAC ¶ 100. The In-House TDF expense ratios ranged from 20 to 48 basis points. *Id.* Vanguard's TDFs charge just eight. *Id.* And what is more, Vanguard's funds outperformed the In-House TDFs for every vintage, by between 41 and 95 basis points. *Id.* In other words, beneficiaries were paying more but getting less.

And yet, Defendants wrongly doubled down on the In-House TDFs with LMIMCo in charge. As the Complaint explains, "[b]y early 2019," when the "long-running phenomenon" of the "In-House TDFs . . . sub-benchmark performance" was clear, "a loyal and prudent fiduciary would have selected a set of TDFs that had a track record of meeting or exceeding the benchmarks." FAC ¶¶ 16, 95. Yet Defendants made no changes, and "Lockheed failed to evaluate and/or actually consider alternative superior investment managers between 2019 and the present." FAC ¶ 110. Some say that insanity is doing the same thing over and over and expecting a different result. That may not be the clinical definition of insanity, but it does breach the duty of prudence.

Defendants offer two general retorts. First, they contend that the underperformance here is either categorically insufficient or not large enough. Second, they take issue with the benchmarks that show this underperformance. Neither contention holds up on this motion to dismiss.

### i. The Complaint Alleges Sustained and Material Underperformance and Excessive Fees

1. Defendants start with the categorical form of their argument: They suggest that "subpar" performance can never "support an inference of imprudence" because it is inherently based on "hindsight." Mem. 11-12.

But that is neither Plaintiffs' allegation, nor the law. The Supreme Court has recognized that a fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). The DOL guidance Defendants cite makes this exact point: "Plan fiduciaries are required to periodically review the plan's investment options to ensure that they should continue to be offered," a review that must consider changes in "performance (investment returns)." Mem. Ex. E at 2. Maintaining a bad investment is thus a breach of the duty of prudence, because an allegation of long-term underperformance reflects "that Defendants were aware of the funds' underperformance at the time and chose to ignore it." *Moler v. Univ. of Maryland Med. Sys.*, No. 1:21-cv-01824-JRR, 2022 WL 2756290, at *4 (D. Md. July 13, 2022). For that reason, this is not an allegation "that Defendants should have acted differently in hindsight"; "long-term underperformance is categorically different." *Id.*; *see also Carter v. Sentara Healthcare Fiduciary Comm.*, No. 2:25-cv-0016, 2025 WL 2427614, at *5 (E.D. Va. Aug. 11, 2025) ("The Fourth Circuit has not ruled that underperformance alone is insufficient to sustain an ERISA claim."). Failing to remove a fund that chronically underperforms thus reflects a process failure that amounts to a breach of the duty of prudence. *Moler*, 2022 WL 2756290, at *4.

As explained above, that is what the Complaint alleges. "By early 2019," the "chronic pattern of underperformance was readily apparent," but Defendants nevertheless "maintained the In-House TDFs . . . despite the long history of the In-House TDFs' underperformance." FAC ¶¶ 8, 16, 85. The Complaint shows that *every* In-House TDF underperformed comparable funds over a *10-year* return period on an annualized basis relative to both comparable funds and a conservative benchmark that Defendants themselves used, that this phenomenon was "long running," and that a prudent fiduciary would have jettisoned LMIMCo as early as 2015. *See* FAC ¶¶ 91-95, 109. Defendants failed in their duty to "monitor[] the Plans' investment options on an ongoing basis and eliminat[e] imprudent ones." FAC ¶ 126; *accord Tibble*, 575 U.S. at 529 (noting a duty to "monitor trust investments and remove imprudent ones"). This shows a pattern of underperformance across every single TDF, driven by the fees that LMIMCo was charging and by its deficient management.

2. Likely recognizing the issue with the categorical version of their argument, Defendants resort to the weaker form: That the "magnitude" of underperformance is "too slight" to state a claim. Mem. 12-13. In support of their rule, Defendants pick out a handful of decisions from courts in other parts of the country. Mem. 12. But they largely ignore decisions in this Circuit. For good reason. "[T]he Fourth Circuit has not" adopted the rule Defendants' advocate – i.e., that underperformance "between one and four percent of a benchmark []fails to state a plausible ERISA claim." *Carter*, 2025 WL 2427614, at *5. Rather, Fourth Circuit law holds that the inquiry is context-specific, which "run[s] counter to the idea that the Fourth Circuit would create a firm boundary beyond which underperformance could not plausibly give rise to a duty to intervene." *Id.* at *5 n.6. In fact, "this kind of bright-line rule seems inappropriate at the motion-to-dismiss stage, when the Court must make all reasonable inferences in the plaintiffs' favor." *Id.* at *5.

9

For that reason, courts in *this* District and *this* Circuit routinely find that allegations of far lower underperformance than that alleged here – which is as high as 7.16% (FAC ¶ 94) – suffice at the motion to dismiss stage. These courts have held that "1.36% is sufficient underperformance for the [Defendant] to intervene and choose a different fund rather than continue with the" existing one. *Carter*, 2025 WL 2427614, at *5. They have found underperformance of between 0.99% and 1.97% sufficient to state a claim. *In re MedStar ERISA Litig.*, No. 20-cv-1984-RDB, 2021 WL 391701, at *4 (D. Md. Feb. 4, 2021). And, most notably, they have often found no need to probe the *level* of underperformance at the motion to dismiss stage at all, finding that allegations of underperformance without a percentage figure attached are sufficient to "support the inference that Defendants failed to monitor and remove these historically underperforming funds." *Moler*, 2022 WL 2756290, at *5; *see also Dearing v. IQVIA Inc.*, No. 1:20-cv-0574, 2021 WL 4291171, at *4 (M.D.N.C. Sept. 21, 2021) (finding an underperformance "comparison sufficient at this preliminary juncture," without probing the percentage of underperformance). Similarly, while Defendants suggest that underperformance over three-to-five years is too "short-term," Mem. 14, courts in this District have found underperformance "on a trailing three- and five-year basis" sufficient. *In re MedStar ERISA Litig.*, 2021 WL 391701, at *3. And here, the Complaint not only provides three-year trailing data for several years, it also includes annualized ten-year returns. FAC ¶¶ 91-94.

There is good reason for the Fourth Circuit's approach. Compounded over time, a loss of just a percentage point or two will become immense for beneficiaries, reaching hundreds of thousands of dollars (in some cases) for an individual and hundreds of millions in the aggregate. FAC ¶¶ 9, 97. That is especially true over the decades-long horizon that the In-House TDFs were designed to address. For many, these losses may be the difference of a home, a college education

for their children, or a planned retirement. Underperformance of 1-2% is thus anything but inconsequential. *See Trauernicht v. Genworth Fin. Inc.*, No. 3:22-cv-532, 2023 WL 5961651, at *12 (E.D. Va. Sept. 13, 2023) (the argument that "losses over $100 million" are "insignificant … lacks merit"). Further compounding matters, the underperformance here, between 2.87% and 7.16%, is far greater than 1-2% in *Trauernicht*. FAC ¶ 94.

To argue against the approach taken by courts in this Circuit, Defendants mainly point to cases from outside this Circuit. Mem. 12. They cite just one case from this Circuit – a case from the Eastern District of North Carolina, *Enstrom v. SAS Institute*, No. 5:24-CV-105-D, 2025 WL 685219 (E.D.N.C. 2025), which Defendants say stands for the principle that underperformance between "one and four percent of a benchmark fails to state a plausible ERISA claim." Mem. 12. But the type of underperformance there was different. In *Enstrom*, plaintiffs relied on "a suite of exotic performance metrics" to allege underperformance, while "[p]laintiffs' own graphs show that the JPM funds *kept pace with* … the Morningstar Lifetime Mod Index benchmark based on three-year and five-year rolling returns." *Id.* at *4-5 (emphasis added). That is the opposite of this case. No In-House TDF *ever* had a trailing three-year average return that exceeded the average return of the comparator funds. FAC ¶ 94. In addition, *Enstrom* made clear that the underperformance at issue in that case existed in a vacuum with no other allegations. 2025 WL 685219, at *4. In contrast, the Complaint sets out additional claims aside from just underperformance: higher fees, self-dealing, Lockheed's relationship to LMIMCo, and Defendants' receipt of millions of dollars from their beneficiaries' hard-earned retirement savings. FAC ¶¶ 100-01, 112-118. These claims provide a "context specific" backdrop for the claims the Supreme Court has instructed is essential to ERISA analysis. *Fifth Third Bancorp*, 573 U.S. at 425.

Defendants' out-of-circuit cases are no more availing. *Gonzalez v. Northwell Health, Inc.*,

632 F. Supp. 3d 148 (E.D.N.Y. 2022), supports Plaintiffs' case. The central issue in *Gonzalez* was the use of five-year return comparators instead of a ten-year comparators. *Id.* at 163. Plaintiffs here focus on exactly the type of ten-year data that *Gonzalez* noted was the "traditional hallmark of viable claims." *Id.; see also* FAC ¶¶ 91-93 (comparing the "Annualized 10-year net returns"). Other cases similarly alleged only underperformance and over shorter time periods. *See Luckett v. Wintrust Fin. Corp.*, No. 22-cv-03968, 2024 WL 3823175, at * 5 (N.D. Ill. Aug 14, 2024) ("three and five-year horizons"); *Abel v. CMFG Life Ins. Co.*, No. 22-cv-449, 2024 WL 307489, at *5 (W.D. Wis. Jan 26, 2024) (same); *Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 753 (S.D. Ohio 2021). As for *Baird v. Steel Dynamics, Inc.*, No. 1:23-cv-00356, 2024 WL 3983741 (N.D. Ind. Aug. 29, 2024), that was a case where the fund did not consistently underperform, as happened here. *Id.* at *4. Lastly, in *Bekker v. Neuberger Berman Grp. LLC*, No. 16-cv-6123, 2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018), plaintiffs provided no comparators that were actively-managed funds, as opposed to the three comparators provided here. *Id.* at *6-7.

In sum, Defendants point to no case like this one: where a ten-year annualized return for three comparator TDFs showed consistent underperformance for every TDF from every vintage, and (as described further below), where additional factors indicate a breach of fiduciary obligation.

3. Defendants nitpicking continues apace. In addition to a table in the Complaint that shows the magnitude of underperformance, Defendants would like a table that shows the specific annual returns used to derive the underperformance, so they can "verify the accuracy" of the calculation. Mem. 14-15. In addition to showing underperformance compared to an average for comparable funds, Defendants would like to see a comparison to each subcomponent of that average. Mem. 15. Defendants worry that, maybe, they really outperformed two of those three benchmarks (Mem. 15) – despite the fact that the Complaint shows, in a different table, that the

In-House TDFs underperformed all three funds individually.  FAC ¶ 94.

This is not the time to "verify the accuracy" of the Complaint's factual allegations. Defendants will, and should, have every opportunity to test these allegations and perform their own calculations.  That process is discovery.  Defendants may also want to draw inferences to their side.  But at this stage, this Court accepts as true all well-pleaded facts and all reasonable factual inferences are drawn in favor of the plaintiff.  *SD3*, 801 F.3d at 422.  As another court explained when presented with similar contentions, "[t]hese arguments proffered by Defendants are fact-based merits defenses not properly resolved on a motion to dismiss." *Moler*, 2022 WL 2756290, at *5.  Plaintiffs have alleged underperformance with the specificity required for this stage, consistent with what courts routinely allow.

4.  One omission from Defendants' brief is telling.  They do not appear to take issue with the sufficiency of the In-House TDFs' excessive fees to state a claim for a violation of the duty of prudence.  That is perhaps unsurprising, given that In-House TDFs charged fees 250% to 600% more than a comparable fund.  FAC ¶ 100.  As the DOL guidance Defendants cite makes clear, excessive fees – even a "difference of just one percentage point" – "dramatically affect[] overall returns."  Mem. Ex. E at 2 n.2.  Defendants only take issue with the chosen fee benchmark.  Mem. 19-20.  That contention is addressed below.

### ii.  *The Complaint More Than Adequately Sets Out Meaningful Benchmarks*

To calculate the In-House TDFs' performance, the Complaint uses three different professionally-managed TDFs as comparators: the Capital Group, Fidelity, and T. Rowe Price. FAC ¶¶ 92-94.  It also compares the In-House TDFs with the S&P Target Date Indices, which incorporate returns on widely held TDFs.  FAC ¶¶ 86-87, 91.

Defendants take issue with these benchmarks, suggesting that they are not "meaningful"

comparators. Mem. 16-18. But as the Complaint makes clear, they are. Like the In-House TDFs, the Capital Group, Fidelity, and T. Rowe Price TDFs all "incorporate[] active management." FAC ¶ 92. Like the In-House TDFs, they all use a "through retirement glidepath." *Id.* And, like the In-House TDFs, they all "seek[] to invest in an optimal mix of investments for investors aiming to retire around the stated vintage year." *Id.*

As for the S&P Target Date Fund Indices, that is the comparator Defendants *themselves* held out to plan participants as the appropriate benchmark. In their own words, "[t]he benchmarks for the LMIMCo Target-Date Funds are the corresponding S&P Target Date Indices." FAC ¶ 85. The S&P funds, they said, "are industry-standard representatives for target-date funds and glidepath management." *Id.* In their motion, Defendants suggest they made this statement because they are required by DOL regulations to show the "returns of an appropriate broad-based securities market index." Mem. 13 (quoting 29 C.F.R. § 2550.404a-5(d)(1)(iii)). It is unclear how this helps them. Defendants identified *this* index because they believed it was an "appropriate" one on which to "benchmark" their own funds. That is precisely how the Complaint uses it. Defendants cannot run away from the very benchmark they chose and promoted to employees, and against which they consistently claimed they should be judged.

If Defendants are not satisfied with these benchmarks and have further quibbles, this is not the time to resolve them. As Judge Bennett explained a similar case just a few years ago: "Courts have specifically held that the determination of the appropriate benchmark for a fund is not a question properly resolved at the motion to dismiss stage." *In re MedStar ERISA Litig.*, 2021 WL 391701, at *6. That is because the existence of comparable benchmarks is a factual allegation accepted "as true in determining whether Defendants were imprudent." *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 629 F. Supp. 3d 352, 365 (M.D.N.C. 2022). Courts in this Circuit are

nearly unanimous.  They have found that defendants' argument about an "apples and oranges" comparison – exactly what Defendants do here (Mem. 16) – "is premature" at the "preliminary juncture" of a motion to dismiss.  *Dearing*, 2021 WL 4291171, at *4; *see also Carter*, 2025 WL 2427614, at *6 ("[A]ny disagreement about which funds should be used as benchmarks is more appropriate for summary judgment."); *Trauernicht*, 2023 WL 5961651, at *10 (holding that the argument that "Comparator TDFs are not 'meaningful benchmarks'" reflects "factual disputes that cannot be resolved at the motion to dismiss stage"); *Garnick*, 629 F. Supp. 3d at 364 ("[T]his court declines to determine whether Fidelity is an appropriate benchmark to suggest imprudence at this early stage of the proceedings."); *McDonald v. Lab'y Corp. of Am. Holdings*, No. 1:22-cv-680, 2023 WL 4850693, at *6 (M.D.N.C. July 28, 2023) (similar).

In arguing otherwise, Defendants again focus mostly on out-of-circuit cases, or the occasional in-Circuit case that itself relies on those out-of-circuit cases.  *See, e.g.*, *Hall v. Cap. One Fin. Corp.*, No. 1:22-cv-00857, 2023 WL 2333304, at *6 (E.D. Va. Mar. 1, 2023) (subsequent history omitted) (relying on *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022)).  And in any event, this case is not comparable to *Matousek* (cited by *Hall*), where the Plaintiffs provided "no explanation of what types of funds are in each group," or (in one case) did not even "identify a peer group" for one challenged investment option. 51 F.4th at 281.

The same is true of Defendants' worry that Vanguard is not a meaningful benchmark for the excessive fees charged by the In-House TDFs.  Mem. 19-20.  That claim can surely "be considered as the case progresses," but it does "not bear on the legal sufficiency of the" Complaint. *Trauernicht*, 2023 WL 5961651, at *10.  Once again, Defendants advance arguments about the merits of the case that are properly considered at summary judgment, not at this stage.

**B.      The Complaint Properly States Claims for Breaches of the Duty of Loyalty**

The Complaint alleges that Defendants kept the In-House TDFs, with LMIMCo as the fund

manager, because Defendants benefitted from that arrangement, even if participants suffered. That action breached the duty of loyalty. ERISA provides that a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). Under this standard, fiduciaries have the obligation to "scrupulously adhere" to their duty to make decisions with "an eye single to the interests of the participants and beneficiaries." *DiFelice*, 497 F.3d at 418–19 . "The duty is absolute, … meaning the fiduciary must exclude all selfish interest." *Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171, 181 (4th Cir. 2023) (citation omitted). For that reason, there is "no balancing of interests." *Id.* (citation omitted). "To state a claim for breach of the duty of loyalty, plaintiffs must plausibly allege that the [defendant] acted with the purpose of benefitting itself or a third party." *Kendall v. Pharm. Prod. Dev., LLC*, No. 7:20-cv-71, 2021 WL 1231415, at *11 (E.D.N.C. Mar. 31, 2021).

The Complaint makes that showing. By at least early 2019 – and likely earlier – Defendants were aware that the In-House TDFs underperformed, cost too much, and were poorly managed by LMIMCo. FAC ¶¶ 103-110. There was an obvious fix: common, comparable, off-the-shelf target date funds provided higher returns with lower fees and independent, professional management. FAC ¶ 92. Defendants could have, and should have, switched. FAC ¶ 130. Doing so would have been in the plan participants' interest. But Defendants did not. The reason, the Complaint alleges, is because keeping things in-house benefitted them: "Defendants maintained the In-House TDFs as the default investment funds within the plan" because "the fees paid to LMIMCo funded Defendants' operations." *Id.* They received "millions of dollars in fees they charged retirees which they could use to handsomely compensate LMIMCo executives, whom Lockheed considered and treated as its own." FAC ¶ 102; *see also id.* ¶ 114 (fees "cover[ed]

Defendants' expenses, including executive compensation"). Defendants acted on their "incentive to increase the fees associated with the Plans, because much of that money flowed to LMIMCo." FAC ¶ 111. For this reason, they kept the In-House TDFs (FAC ¶¶ 129-130), kept LMIMCo as the plan manager (FAC ¶¶ 139-141), and paid themselves millions of dollars of unreasonable fees (FAC ¶ 149). In short, Defendants protected their executives at the cost of employees' retirement.

In all these actions, Defendants acted "in their own interest, rather than 'solely in the interest of the participants and beneficiaries.'" FAC ¶¶ 129, 139, 149. In doing so, they "acted with the purpose of benefitting [themselves]." *Kendall*, 2021 WL 1231415, at *11. They strayed from their duty to act with "an eye single to the interests of the participants and beneficiaries." *DiFelice*, 497 F.3d at 419; *see also* FAC ¶ 129.

Defendants do not appear to take issue with much of this legal analysis. Rather, their 12(b)(6) motion quibbles with the facts. They admit that LMIMCo received millions of dollars from keeping the TDFs in house, and that LMIMCo uses these funds for "salaries paid to LMIMCo employees." Mem. 20-21, 22 n.10. But, they say, it is not as many millions as pleaded in the Complaint. Mem. 20-21. And, they say, this money is really just "reimbursement" for "expenses incurred in managing the plans." Mem. 21.

Even accepting that as true – although it's not clear these factual disputes are proper to raise on a 12(b)(6) – the fact remains: Defendants received millions of dollars that they used to pay their own executives as a result of keeping LMIMCo as the fund manager and the TDFs in house. The Complaint asserts that it was this motivation that kept Defendants from switching course when doing so was in the best interest of plan participants. And taking a decision to benefit themselves, and not plan participants, is a quintessential breach of the duty of loyalty.

## C. The Complaint Names the Right Entities

Defendants next change course and suggest that, even if there are breaches of fiduciary

duties, they should largely escape liability because Plaintiffs have "sued the wrong party." Mem. 7. Their view is that Lockheed has given up its fiduciary obligations altogether. And they believe that LMIMCo cannot be liable for its own role, so that no party is responsible for LMIMCo's improper retention as the fund manager, thus leaving Plaintiffs without any party to sue in Count II. Put differently: heads, I win; tails, you lose. If this sounds wrong, that is because it is. Defendants misstate the allegations in the Complaint, ignore critical parts of the plan documents they themselves submitted with their motion to dismiss, and try to sidestep controlling law.

### i. *Lockheed Owed Fiduciary Duties to The Beneficiaries of Its Plans*

Defendants argue that Lockheed is not a fiduciary for the Plans, but acts merely as a settlor, and thus cannot be liable for a breach of duty. Mem. 7-10. But Defendants ignore critical details stated by the Complaint and confirmed by the regulatory filings they themselves attach: Lockheed is not just a settlor; it is also the "Plan Administrator" and a "Named Fiduciary." FAC ¶¶ 29-32. Under Fourth Circuit law, a party is a fiduciary if it "retains or exercises" any discretionary authority or control "respecting management of such plan . . . or disposition of its assets," or "the administration of such plan." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1464-65 (4th Cir. 1996) (quoting 29 U.S.C. § 1002(21)(A)). That standard is easily met here.

First, Defendants' own attachments to their motion to dismiss confirm that Lockheed is not just a settlor but also the "Plan Administrator," as the Complaint alleges. FAC ¶¶ 29-32. Those attachments define "Plan Administrator" as "The Corporation," and define "Corporation" as "Lockheed Martin Corporation." Mem. Ex. B at 8, 18; Mem. Ex. C at 7, 14; Mem. Ex. D at 4, 9.

Second, these attachments, and the Complaint, confirm that Lockheed is a "fiduciary" responsible for the "administration of such plan." *Coyne & Delany Co.*, 98 F.3d at 1465. Defendants' exhibits are explicit: "The Plan Administrator is a Named Fiduciary of the Plan and shall be responsible for administering the Plan." Mem. Ex. B at 108; Mem. Ex. C at 75; Mem. Ex.

D at 46. The Fourth Circuit is clear on this point too: "By the very nature of the position, a plan administrator is a fiduciary with respect to [its] own policy." *Canada Life Assur. Co. v. Est. of Lebowitz*, 185 F.3d 231, 237 (4th Cir. 1999); *accord Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d 882, 899 (E.D. Va. 2025) ("[B]y alleging that Defendant acts as Plan Administrator, Plaintiffs satisfy the initial threshold to plead that Defendant acts as a fiduciary.").

Indeed, the Plan Administrator has a wide variety of responsibility for management and administration of the Plans. *See generally* Mem. Ex. B at 108-109; Mem. Ex. C at 75-76; Mem. Ex. D at 46-47. In particular, Lockheed is responsible for "replac[ing] LMIMCo." FAC ¶¶ 32, 49. It also has discretionary authority to exercise a range of functions relative to the beneficiaries, contributions, and withdrawals, including discretion to establish "rules, fees, and procedures" for plan services and to make determinations relative to apparent investment conflicts. FAC ¶ 32. Lockheed's role goes even further by promising to indemnify LMIMCo executives and employees for liability arising out of their service in management of the Plans. FAC ¶ 32. Why do that? Because LMIMCo was Lockheed's wholly-owned subsidiary, whose affairs Lockheed directed and whose employees Lockheed considered its own.[2] FAC ¶¶ 32, 50.

To evade Lockheed's responsibility, Defendants rely heavily on their factual contention that LMIMCo is granted investment authority. Mem. 8. But when investment responsibilities are allocated to a plan manager (LMIMCo), the Plan Administrator (Lockheed) retains fiduciary obligations to prudently select and monitor the plan manager and the investment options they oversee. "[T]he power (through plan amendment) to appoint, retain and remove plan fiduciaries

---

[2] For example, Lockheed selected and hired the president and Chief Investment Officer of LMIMCo and published a news release reflecting the new LMIMCo chief's pleasure at "joining Lockheed Martin." *Lockheed Martin Names Paul Colonna as President and Chief Investment Officer of Lockheed Martin Investment Management Company* (Dec. 17, 2018), https://perma.cc/9YQD-ZKML (last visited Oct. 13, 2025). Attached as Exhibit 1.

constitutes 'discretionary authority' over the management or administration of a plan within the meaning of §1002(21)(A)." *Coyne & Delany Co.*, 98 F.3d at 1465. Indeed, the Supreme Court has noted that the ERISA itself focused largely on plan administrators to deter future plan mismanagement. *See Mass. Mut Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) ("The crucible of congressional concern was misuse and mismanagement of plan assets *by plan administrators* and … ERISA was designed to prevent these abuses in the future.") (emphasis added). In other words, Lockheed had a fiduciary duty to plan participants by virtue of its ability to remove LMIMCo at any time and replace it with another plan manager (preferably one that was competent and faithful). *See* FAC ¶¶ 49, 140-141.

Lockheed could and should have removed its wholly-owned subsidiary, LMIMCo, as the Plans' manager for its deficient performance, thereby ensuring wise investments for plan beneficiaries. That would have been consistent with the interests of its employees and beneficiaries, but in conflict with Lockheed and LMIMCo's intertwined relationship and the millions in revenue Lockheed was able to use to pay LMIMCo executives, whom it viewed as its own. Defendants' failure to retain a competent plan manager and select appropriate investment options were fiduciary acts in their respective roles as plan sponsor, plan administrator, plan manager, and plan manager's sole owner.

Defendants' contrary arguments rest on inapposite cases. Principally, Defendants cite *Lockheed Corp. v. Spink*, which held that Lockheed did not act as a fiduciary when it amended a defined benefit plan design to increase early retirement benefits for employees. 517 U.S. 882, 890 (1996). But *Spink* drew a distinction between "adopt[ing], modify[ing], or terminat[ing] welfare" of pension plans through non-discretionary and non-fiduciary acts, on the one hand, and "the exercise of discretionary authority over plan management or administration," on the other. *Id.* As

the Fourth Circuit explained in *Coyne & Delany*, after discussing *Spink*, when a plan sponsor retains the authority "to appoint, retain and remove plan fiduciaries," that authority not only constitutes "discretionary authority," but also "carries with it a duty 'to monitor appropriately' those subject to removal." 98 F.3d at 1465. The duty to monitor is at its zenith where, as here, a plan sponsor is "responsible for selecting and retaining their close business associates" to act as a fiduciary. *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984) (defendants could not "abdicate their duties under ERISA" by "giving their lieutenants primary responsibility for the day to day management"); *accord In re MedStar ERISA Litig.*, 2021 WL 391701, at *7.

### ii. Defendants Are Responsible for Retaining LMIMCo Despite Its Poor Performance

Defendants next suggest that *nobody* is liable for Defendants' retention of LMIMCo as the plan manager, because Lockheed is not a fiduciary at all (addressed above) and LMIMCo is not responsible for its "own appointment." Mem. 9-10. But Defendants misunderstand the claims brought against LMIMCo. Plaintiffs do not claim that LMIMCo had discretion over its *own appointment* as manager – though it should have selected a competent, professional manager or TDFs offered by a leading investment manager, rather than persisting with its DIY strategy. *See* FAC ¶¶ 128-130. Plaintiffs' claim in Count Two is not merely for the selection of LMIMCo, but also "*maintaining* LMIMCo as the manager of the Plans." FAC ¶ 140 (emphasis added). The Complaint further alleges that LMIMCo and Lockheed "knowingly participated in each other's breach, knowing that such acts were a breach, [and] enabled each other to commit a breach by failing to lawfully discharge their own fiduciary dutie[s]." FAC ¶ 143. Thus, even if LMIMCo's fiduciary obligations arose "only *after* its appointment," Mem. 10, LMIMCo had a fiduciary obligation at the time it improperly retained the plan manager "after its appointment." *Id.*

What's more, Defendants' strategy seeks to evade responsibility totally: they claim first

that Lockheed has no fiduciary obligation whatsoever and then claim that LMIMCo cannot be "held liable as a co-fiduciary." Mem. 9. But this cannot be: ERISA fiduciaries cannot eliminate liability for their failure to monitor deficient management by simply naming a manager in plan documents and then sticking their heads in the sand. Participants cannot be left at sea with the plan's administrator and manager each pointing the finger at the other, claiming that neither bears responsibility for their mismanagement – especially, as here, where the administrator and manger are a parent corporation and its wholly-owned subsidiary. Rather, they are both liable for their actions because they are both fiduciaries.

## II.     DEFENDANTS ENGAGED IN PROHIBITED TRANSACTIONS

### A.     The Complaint States Plausible Claims

To "supplement[]" ERISA's duty of loyalty, Congress "categorically" outlawed certain actions it deemed "likely to injure the pension plan." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 697 (2025). Specifically, Congress was worried that "persons with a close relationship to a plan" could "us[e] that relationship" in risky ways. *Wood v. Comm'r*, 955 F.2d 908, 910 (4th Cir. 1992). It thus "strictly prohibit[ed] a number of transactions" that it thought could be "highly susceptible to self-dealing." *Feinberg v. T. Rowe Price Grp., Inc.*, No. 17-cv-0427-MJG, 2018 WL 3970470, at *9 (D. Md. Aug. 20, 2018).

These transactions, and the parties subject to the prohibitions, are listed in Section 406 of ERISA, which is codified at 29 U.S.C. § 1106. Subsection (a) applies to transactions between the plan and a "party in interest." It prohibits the "lending of money" and "furnishing of …. services" between those entities and prevents assets of the plan being used "for the benefit of a party in interest." 29 U.S.C. § 1106(a)(1)(B), (C), (D). Subsection (b) applies to transactions between a plan and "fiduciary." It prohibits the fiduciary from dealing with the assets of the plan "in his own interest," "act[ing] in any transaction … adverse to the interests of the plan," and "receiv[ing] any

consideration" from a "party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).

There is no question Defendants engaged in transactions with the Plan. First, Lockheed disclosed that the Plan (through the Master Trust) "owed the Corporation" $5.9 million in 2021, $6.0 million in 2022, and $5.8 million in 2023. FAC ¶ 116. These debts were for "certain expenses paid by the Corporation in providing services to the Plan and certain other plans." *Id.* Second, the Plan (through the Master Trust) paid both Lockheed and LMIMCo millions of dollars in direct compensation for services rendered. FAC ¶ 114.

These transactions are prohibited. As the Complaint explains, both Lockheed and LMIMCo are "fiduciar[ies]" and "parti[es] in interest" prohibited by engaging in transactions that Congress deemed too risky. FAC ¶¶ 155, 163. These transactions trigger three prohibitions in subsection (a) as well as subsection (b). In addition to their general view that Defendants should be exempt from the strictures of § 1106 (addressed in section B below), Defendants provide a few reasons they think each subsection should not qualify.

### i. Defendants Lent Money to the Plans in Violation of § 1106(a)(1)(B)

Lockheed disclosed that the Plans "owed" Lockheed millions of dollars. FAC ¶ 116. That financial relationship runs afoul of the plain text of § 1106(a)(1)(B), which prohibits the "lending of money or other extension of credit" between the Plan and a party in interest.

To avoid liability, Defendants seek to add another requirement to the plain text. They assert that, to be liable, there must also be a particular type of "debtor-creditor relationship" – one "characterized by the transfer or use of assets with an obligation to repay." Mem. 25. But that requirement appears nowhere in the statutory text, which refers simply to the "lending of money" or an "extension of credit." 29 U.S.C. § 1106(a)(1)(B). And although Defendants claim to have found instances of "[c]ourts interpreting" this section to "require[] evidence of a debtor

relationship," they are wrong. Mem. 25-26. In *Januski*, the first case Defendants cite, the court was asked to decide whether a transaction was a loan (as plaintiff contended) or a purchase of stock (as defendant claimed). To resolve this dispute, the court looked to Black's Law Dictionary for the definition of "loan" – leading to the passage Defendants cite defining the word "loan." Mem. 25 (quoting *Januski v. Mortell Co.*, No. 84-cv-3827, 1985 WL 3749, at *11 (N.D. Ill. Nov. 8, 1985)). The court never suggested that the statutory text required there to be a "loan" (a word that does not appear in the text); in this discussion, it was not interpreting the text at all.

Defendants next cite two cases that also offer a definition of the word loan, but have nothing to do with ERISA. *See First Texas Sav. Ass'n v. Reliance Ins. Co.*, 950 F.2d 1171, 1172 (5th Cir. 1992) (contract dispute); *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1276 (8th Cir. 1988) (bankruptcy dispute). And although Defendants cite two letters written by the Department of Labor (Mem. 25), these letters merely offer "the Department's views" on ancillary topics not at issue here, such as whether a "Corporation's obligation to contribute to the Policy Trust" is a prohibited transaction. *DOL Adv. Op. 93-14A* (May 5, 1993). Attached as Exhibit 2.

In any event, there is a debtor relationship here. Lockheed says the Plan "owed" it millions of dollars. FAC ¶ 116. It is hard to see how the Plans, which owed Lockheed money, could be anything other than a debtor to Lockheed.

### ii. Defendants Furnished Services to the Plans in Violation of § 1106(a)(1)(C)

The Plans, through the Master Trust, paid Lockheed and LMIMCo millions of dollars in compensation. FAC ¶ 114. This action ran afoul of § 1106(a)(1)(C), which prohibits the "furnishing of … services … between the plan and a party in interest." In response, Defendants contend that "not every provision of services" gives "rise to liability." Mem. 26. But again: Defendants seek to add additional elements that appear nowhere in the text of the statute. And, in

any event, if it were required to show that the transaction involved "unreasonable compensation" or lacked "proper fiduciary oversight," as Defendants assert (Mem. 26), that requirement is satisfied. The core of Plaintiffs' claim is that Defendants paid themselves for "deficient and disloyal management of each Plan." FAC ¶ 157.

### iii. Defendants Used the Plans' Assets for Their Benefit in Violation of § 1106(a)(1)(D)

Defendants' actions noted above – paying themselves for deficient and disloyal management – similarly ran afoul of ERISA's prohibition on using the Plans' assets for their own benefit. 29 U.S.C. § 1106(a)(1)(D). Defendants do not think the millions of dollars paid are a problem; those funds, they say, are just "routine administrative reimbursements." Mem. 28. But that is not what the Complaint alleges. The Complaint alleges that Defendants did not "jettison LMIMCo and its In-House TDFs" – the action that would have been in plan beneficiaries' interest – because Defendants wanted to continue receiving these payments. FAC ¶ 115. These payments of the Plans' money to Defendants, therefore, were not in the beneficiaries' interest, but instead in the interest of Defendants – the parties in interest. If Defendants see the facts differently, they will have every opportunity to disprove them in discovery.

### iv. Defendants Acted Adversely to the Plans in Violation of § 1106(b)

Section 1106(b) prevents fiduciaries from taking certain actions for their own interest or adverse to the plan. 29 U.S.C. § 1106(b). By making the Plans pay Defendants millions of dollars for disloyal and imprudent management, and by extending credit to the Plans, Defendants violated this prohibition. FAC ¶¶ 164-166.

Defendants' first response relies on their assertion, again, that the expenses were just "reimbursements for LMIMCo's direct expenses" (Mem. 28) – a factual contention inappropriate for this stage of the proceeding. And as to the latter two subsections of § 1106(b) (i.e., subsections

(b)(2) and (b)(3)), Defendants claim that the "plain language" requires that a "third party" be involved. Mem. 29. But the "plain language" only says "party"; "third" is Defendants' addition. 29 U.S.C. § 1106(b)(2), (3). These provisions require three entities: A fiduciary, a party, and the plan. That is satisfied here. All of the transactions involve Lockheed (a fiduciary or the relevant party, depending on the context), LMIMCo (same), and the Plans.

### B. Section 1108(c)(2) Does Not Allow Defendants to Avoid Responsibility

The primary reason Defendants offer to evade liability is another provision of ERISA, which they say exempts their transactions from scrutiny because the transactions amounted to "reasonable compensation for services rendered." Mem. 22-24 (citing ERISA § 408(c)(2), codified at 29 U.S.C. § 1108(c)(2)). But as courts – including the Supreme Court – have made clear, § 1108(c)(2) provides an affirmative defense, for which Defendants bear the burden of proof, that is inappropriate to resolve at the motion to dismiss stage. And in any event, if this Court does reach it, the exemption does not apply based on the allegations in the Complaint.

### *i. Section 1108 (c)(2) Is an Affirmative Defense, Not An Underlying Element of the Claim.*

According to Defendants, Plaintiffs are required to plead more than that a prohibited transaction took place between prohibited parties; Plaintiffs must also plead that such prohibited actions were not provided for in the exemptions listed in 29 U.S.C. § 1108. But as Defendants implicitly acknowledge in their preemptive attempts to distinguish *Cunningham*, 604 U.S. 693, the Supreme Court addressed this issue and made clear that the defenses contained in § 1108 are affirmative defenses which are "entirely the responsibility of the party raising them." *Id.* at 701. Defendants are free to raise these defenses, but not now.

Section 1108 lists a variety of exemptions for fiduciaries from the blanket restrictions imposed by Section 1106. The Supreme Court recently considered one such exemption,

§ 1108(b)(2)(A), which allows for reasonable arrangements for office space and other services if "no more than reasonable compensation is paid therefore." *Id.* at 695. The *Cunningham* defendants argued that a plaintiff must affirmatively plead that § 1108(b)(2)(A) does not apply in its complaint. *Id.* Defendants here likewise claim that a sister provision of the same statute, § 1108(c)(2) creates an additional element that the Plaintiffs must affirmatively plead. Mem. 22-24. But the logic of the Court's decision in *Cunningham* applies to all of § 1108, not just § 1108(b), as the Defendants would hope.

To begin with, the Court itself made clear that its analysis was related to § 1108 in its entirety: "The exemptions set forth in a different part of the statute, § 1108, do not impose additional pleading requirements to make out a § 1106(a)(1) claim." 604 U.S. at 701. The Court relied on the "well-settled general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *Id.* That rule applies with equal force to § 1108(b)(2), just as it does to § 1108(c)(2). Both clearly carve out conduct from § 1106's reach, and therefore both must be asserted and proved by the defendant, not the plaintiff. The Court made crystal clear that it is the structure of the statute as whole, including the structure of § 1106 and § 1108, that gave rise to its conclusion that § 1108 defenses must be affirmatively pled. *See id.* ("The exemptions to § 1106(a) prohibited transactions are enumerated separately in § 1108, and § 1108 recognizes that the substantive "prohibitions" are "provided in section 1106" of the statute.").

In case it wasn't clear enough, the Court made explicit that "plaintiff need only allege the three elements within § 1106(a)(1)(C), notwithstanding the potential applicability of a § 1108 exemption, because an affirmative defense is not something the plaintiff must anticipate and negate in her pleading." *Id.* at 702 (cleaned up). Plaintiffs did just that here, and there is no additional

requirement that Plaintiffs must affirmatively plead that § 1108(c) does not apply.

Defendants make much out of the separate heading for § 1108(c)(2). Mem. 24. First, *Cunningham* did not rely principally on the heading of the statute; it did so only "if there were any remaining doubt." 604 U.S. at 704. The thrust of *Cunningham* was its reliance on the structure of § 1108 in its entirety, which applies here with equal force. Second, *Cunningham* did not focus on the subheading of § 1108(b) ("enumeration of transactions exempted from Section 1106 Prohibitions"); in fact, it did not even mention it. Rather, *Cunningham* focused on the heading for *all* of § 1108, which of course covers both § 1108(b) and 1108(c): "Section 1106's heading is plain: 'Prohibited transactions.' (Boldface deleted.) Section 1108, meanwhile, reads: 'Exemptions from prohibited transactions.' (Boldface deleted.)" *Id*. The Court made crystal clear that "Congress intended for § 1106(a) to create "*per se* prohibitions on transacting with a party in interest." *Id.* That is what occurred here: a transaction that violates the *per se* rule.

Consistent with this analysis, courts in this Circuit and across the country have held that § 1108(c)(2) – the subsection Defendants raise here – is an affirmative defense for which Defendants bear the burden. *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1215-16 (2d Cir. 1987) (concluding the "fiduciary … must prove" the applicability of an exemption, including § 1108(c)(2)); *Brundle v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 644–45 (E.D. Va. 2017) (subsequent history omitted) (referencing the "burden" on the defendant to "satisf[y] … § 1108(c)(2)"); *Berkelhammer v. Automatic Data Processing, Inc.*, No. 20-cv-5696, 2022 WL 3593975, at *13 (D.N.J. Aug. 23, 2022) (describing § 1108(c)(2) as an "affirmative defense"); *Nagy v. CEP Am., LLC*, No. 23-cv-05648, 2024 WL 2808648, at *7 (N.D. Cal. May 30, 2024) (same); *Rozo v. Principal Life Ins. Co*., No. 4:14-cv-00463, 2021 WL 1837539, at *21 (S.D. Iowa Apr. 8, 2021) ("ERISA § 408 (c)(2) . . . provides a 'reasonable compensation' affirmative

defense"), *aff'd*, 48 F.4th 589 (8th Cir. 2022); *Sec'y of Dep't of Lab. v. United Transportation Union*, No. 1:17-cv-923, 2020 WL 1611789, at *12 (N.D. Ohio Mar. 30, 2020) ("The party seeking the benefit of the ERISA § 408 (c)(2) exemption has the burden of proving its applicability."); *In re Beacon Assocs. Litig.*, 818 F. Supp. 2d 697, 711 (S.D.N.Y. 2011) ("The burden of proving that payments . . . are covered by the § 408[(c)(2)] exemption lies squarely with the defendant.").

Defendants may thus contend that they fall within an exception listed in § 1108, but they cannot move to dismiss the complaint on the grounds of their affirmative defense. *See Nagy*, 2024 WL 2808648, at *7 ("an inquiry into the applicability of an affirmative defense is inappropriate for the motion to dismiss stage").

### ii.   In Any Case, Section 1108(c)(2) Does Not Apply

If the Court does reach the question of whether § 1108(c)(2) shields Defendants from liability at this stage of the proceeding, the answer is that it does not. Section 1108(c)(2) provides a safe harbor only for "reasonable compensation." And Plaintiffs have clearly pled that the compensation given for the services was not reasonable. *See* FAC ¶¶ 3, 19, 100, 113.

In any event, even if § 1108(c)(2) did apply, it would not be the elixir Defendants hope. Section 1108(c)(2) is not an exemption for all prohibited transactions. As the Third Circuit held, § 1108(c)(2) "affords [the defendant] no defense to liability for knowingly participating in [a] § 406(b)(3) violation." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 96 (3d Cir. 2012); *see also Berkelhammer*, 2022 WL 3593975, at *13 ("§ 1108(c)(2) provides no defense to § 1106(b)" because "the Third Circuit has held that it does not apply to § 1106(b) claims").

## III.   THE JURY DEMAND IS PROPER

Under the Seventh Amendment, the Constitution guarantees a jury trial for actions involving the determination of legal (as opposed to equitable) rights and remedies. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990). As courts in this Circuit

have recognized, "while the overall ERISA action is equitable in nature, the particular issues involved in that action may be legal." *Lamberty v. Premier Millwork & Lumber Co., Inc.*, 329 F. Supp. 2d 737, 744–45 (E.D. Va. 2004). An action seeking "[c]ompensatory damages" is "the classic form of legal relief." *Id.* at 745 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)); *see also Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 123 (2024) (holding that "the remedy is all but dispositive" in concluding that the Seventh Amendment applied, because "money damages are the prototypical common law remedy"); *Coan v. Kaufman*, 333 F. Supp. 2d 14, 26 (D. Conn. 2004) (subsequent history omitted) (an action for "damages" suffered "as a result of [Defendants'] breaches of their fiduciary duties" is a legal action). And for that reason, this action, which seeks damages for breaches of fiduciary duties, is legal too. *See* FAC, Prayer for Relief, 4. As the Complaint makes clear, however, Plaintiffs "recogniz[e] that a number of courts have found claims under ERISA, and particularly claims brought pursuant to 29 U.S.C. § 1132(a)(3), equitable in nature." FAC at 39 n.4. Recognizing this, "Plaintiffs assert this jury trial demand to preserve their arguments for a jury trial under the Seventh Amendment." *Id.*

## CONCLUSION

Taken as a whole, the Complaint tells a consistent and plausible story of textbook ERISA violations. The Defendants kept their chronically and persistently underperforming, in-house investment funds as the default option for participants, and they told participants these unusual home-grown funds were the "only" investment option they needed for retirement. Then, Defendants refused to switch to outside options because it benefitted them, and they engaged in self-dealing. The Complaint sets forth well-pleaded allegations that establish these breaches of duties. Defendants may see the facts differently, but their chance to try to prove the allegations wrong comes in discovery. This case should proceed.

October 14, 2025

*/s/ Cyril V. Smith*
Cyril V. Smith (Bar No. 07332)
Aaron S.J. Zelinsky (Bar No. 31541)
ZUCKERMAN SPAEDER
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1009
Phone: (410) 949-1145
csmith@zuckerman.com
azelinsky@zuckerman.com

Jason S. Cowart*
ZUCKERMAN SPAEDER
485 Madison Avenue
19th Floor
New York, NY 10022-5862
Phone: (646) 746-8840
JCowart@zuckerman.com

Christopher R. MacColl (Bar No. 31573)
ZUCKERMAN SPAEDER
2100 L Street
Suite 400
Washington, DC 20037-1525
Phone: (202) 778-1849
CMacColl@zuckerman.com

Don Bivens, *admitted pro hac vice*
DON BIVENS PLLC
15169 N Scottsdale Rd Suite 205
Scottsdale, AZ 85254
Don@donbivens.com
Teresita@donbivens.com
(602) 762 2661

* application for admission or direct
appearance forthcoming

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 14th day of October, 2025, I served a copy of the foregoing on all counsel of record via CM/ECF.

*/s/ Cyril V. Smith*
Cyril V. Smith (Bar No. 07332)