# EXHIBIT G




# The Ultimate Upgrade

**How custom TDFs give plan sponsors more control over investment selection and glide path design**

Custom target date funds (TDFs), once available only to mega-sized plans, are increasingly being employed across mega, large, and even mid-sized plans today, as they give plan sponsors greater control over investment selection and glide path design than off-the-shelf (otherwise known as proprietary or pre-packaged) TDFs. The ability to align a target date suite to a plan's unique needs can translate into greater retirement success for participants. Because of this, defined contribution (DC) plan sponsors should consider whether custom TDFs are right for their plans.

Plan sponsors gain two key advantages by going custom:

- Greater control over investment selection, with the goal of offering a **best-in-class investment menu**
- The ability to design a **flexible glide path** that better reflects each plan's participant demographics and investment needs over time.

Here's what plan sponsors should know when considering including customized solutions in their plan.



TDFs play a critical role in DC plans, as they can help participants invest in a professionally managed portfolio tied to their expected retirement age. Their ease of use has led to 93% of large plans offering them, with 83% using them as the qualified default investment alternative (QDIA).[1] Given their significant use as the default, total assets in target date strategies totaled $2.8 trillion by the end of 2020.[2]

With the overwhelming use of target date strategies in DC plans, plan sponsors should determine if off-the-shelf versions are in the best interest of their participants. We believe there are two things plan sponsors should consider in that regard:

- Proprietary TDFs, a specific type of off-the-shelf option, tend to use the underlying investments of just one asset manager, which does not reflect a "best-in-class" investment approach, in our view.
- An off-the-shelf suite of TDFs may not appropriately reflect the singular needs of plans with unique demographics, such as those with a significantly younger or older workforce, plans with higher-income employees, or those that cover employees who also have access to a defined benefit plan.

With less confidence that "one-size-fits-all" TDFs made up of investments from a single investment manager will produce the best retirement outcomes for participants and a desire for greater control, more plan sponsors are turning to custom TDFs. They feel a custom approach, made up of best-in-class investments from multiple asset managers, is better suited to meet changing plan demographics and plan philosophies.

**Going Up: The Rising Use of Custom TDFs in DC Plans[3]**



**25%** of mega plans had custom TDFs in place by the end of 2020.[4]

**15%** Offered in 2020

**16%** Will Offer in 2021

**9%** Offered in 2010

As of October 2020

---

[1] Callan Institute, "2020 Defined Contribution Trends Survey."
[2] Morningstar, "2021 Target-Date Strategy Landscape," March 2021.
[3] Callan Institute, "2021 Defined Contribution Trends Survey."
[4] NEPC, "NEPC 2020 Defined Contribution Progress Report."

## Comparing Off-the-Shelf and Custom TDFs

Off-the-shelf TDFs come primarily in two flavors: the aforementioned proprietary TDFs and pre-packaged options. Neither allows plan fiduciaries to select underlying investments, customize the rebalancing formula, or align to the employer's approach to benefits.

A custom suite allows for greater control, with the flexibility to manage both the glide path and the underlying investments. The custom suite can tap into investment options such as stable value and investment structures such as collective investment trusts (CITs) that are often not accessible in off-the-shelf TDFs.

Despite their perceived simplicity, selecting an appropriate off-the-shelf option can be daunting, as they vary widely in asset allocation, glide path design, risk level, volatility, and target date. It's important for plan fiduciaries to run proper due diligence to ensure an off-the-shelf TDF is the best fit for the plan.

### WHAT'S THE DIFFERENCE?

| Considerations | Off-the-shelf TDFs | | Custom TDFs |
|---|---|---|---|
| | **Proprietary** | **Pre-packaged** | |
| **Investment and glide path flexibility** | ▸ Has only proprietary funds from a single investment manager as part of a bundled recordkeeping arrangement<br>▸ Funds and glide paths are preset | ▸ May have proprietary and non-proprietary funds<br>▸ May or may not be bundled with a recordkeeping arrangement<br>▸ Funds and glide paths are preset | ▸ Increased investment and operational control with a choice of funds inside or outside of a plan's menu<br>▸ Ability to choose best-in-class managers<br>▸ Customized glide paths can reflect plan needs, demographics, and the presence of a defined benefit (DB) plan |
| **Plan size** | May be appropriate for micro and small to mid-sized plans. Frequently bundled with other services | | Typically offered for larger-sized plans, with increasing use by mid-sized plans |
| **Fees** | Standard fees typically embedded in Net Asset Value (NAV). Typically have no minimum investment | | Fees are often à la carte for custody, investment management, and consultant |



# Two Key Advantages of Going Custom



The flexibility of a custom TDF suite resonates with many plan sponsors. Of those offering custom solutions, many cite the ability to obtain best-in-class managers and control over the glide path as their top motivators. Here, we take a deeper dive into each key advantage.

**Top Sponsor Reasons to go Custom[5]**



**72.2%**

Seek to have best-in-class underlying funds



**51.5%**

Prefer to control the glide path

As of October 2019. Multiple responses allowed.

## It's important that plan committees review their current TDF offering to ensure it's the best fit for the plan.

The Department of Labor's (DOL) "Tips for ERISA Plan Fiduciaries" states that plan sponsors should "inquire about whether a custom or non-proprietary target date fund would be a better fit for your plan."[6]

The Defined Contribution Institutional Investment Association (DCIIA) further explains that, "While target date funds offer a simplified solution to participants, they might not address the specific needs of a plan. A one-size-fits-all solution may make investing easy, but it doesn't mean a perfect fit for everyone."

Although it is not formal guidance, plans are encouraged to review the unique characteristics and appropriateness of their respective TDF strategies by:

▸ Analyzing participant demographics, including salary levels, employee turnover rates, contribution rates, contribution withdrawal patterns, and whether other retirement plans are offered.
▸ Assessing existing glide paths for their ability to meet their participants' retirement income needs in an era of increasing longevity.
▸ Reviewing overall asset allocation and investments and documenting those decisions.

---

[5] Callan Institute, "2020 Defined Contribution Trends Survey."
[6] DCIIA, "Considerations for Implementing a Custom Target Date Approach: A Guide for Defined Contribution Plan Sponsors."

**Advantage #1:**
**The Ability to Build and Control a Best-in-Class Investment Menu**

Most off-the-shelf TDFs will not allow plan sponsors to select underlying investments. In comparison, custom target date fund structures can provide more flexibility to tailor the portfolio with best-in-class investments.

This is especially important for larger plan sponsors with a DB plan who may want to use their DB managers in their DC target date lineup. The ability to avoid repetitive due diligence—as they've already reviewed a particular best-in-class strategy in the existing DB lineup—is a clear benefit. Using pre-vetted investment managers across a consolidated DB/DC manager lineup could mean simplified oversight, a common investment philosophy, and better buying leverage, all of which can potentially help generate additional return for participants.

From a fiduciary standpoint, going custom allows plan committees to show that they've taken the steps to get best-in-class investment options, which may not be possible to show for a pre-packaged suite of TDFs from a single manager. The DOL called out this concern, stating: "Some TDF vendors may offer a pre-packaged product which uses only the vendor's proprietary funds as the TDF component investments. Alternatively, a "custom" TDF may offer advantages to your plan participants by giving you the ability to incorporate the plan's existing core funds in the TDF."[7]

Custom TDFs allow plan investment committees the flexibility to swap out investment managers of individual strategies without having to replace the entire fund, as they would have to do in an off-the-shelf TDF suite. This can be especially useful when employing a white label offering made up of single-sleeve investment options.

## Changing Times

While still in the beginning stages, it's expected that an increasing number of large DC plan sponsors will explore offering annuity options within TDFs to participants as a result of the passage of the Setting Every Community Up for Retirement Enhancement (SECURE) Act in 2019.

The legislation gives DC plan sponsors a fiduciary safe harbor for selecting annuity products to offer participants. As long as employers follow all safe harbor steps—including obtaining receipts of written representations—they will have satisfied their fiduciary duties under the Employee Retirement Income Security Act (ERISA).

Source: Plansponsor, "*The Future for Annuities in DC Plans*," February 2021.

TDFs can also evolve over time as the plan's demographics and sponsor's overall benefits strategy change. For example, sponsors can further customize the TDF lineup with new managers and asset classes. Allocations to diversifiers, which include alternative assets like hedge funds and private equity, still make up a small percentage of total assets in most custom TDFs, but can be considered. Last, customization is often employed to create strategic allocations among active and passive strategies for added diversification and potential returns.

Going custom could also provide a better solution to the burgeoning issue of retirement income, providing the flexibility to include in-plan income products that are better aligned with the unique needs of participants who remain in-plan post-retirement.

---

[7] U.S. Dept of Labor, Employee Benefits Security Administration, "Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries," February 2013.

**Advantage #2:**

**The Ability to Create Flexible Glide Paths That Better Align with Each Plan's Participant Demographics**

Plan sponsors have always faced pressure to not only help participants save enough to retire "on time" but also to help them invest appropriately across a wide range of suitable options within the plan. Today, forward-thinking plan sponsors recognize:

- The need to look beyond the accumulation phase to also help participants navigate the income drawdown phase.
- Immediate "full retirement" is evolving to a gradual downshifting for many participants, which changes their investment needs in later years.

Plan sponsors should consider plan designs and investment strategies that reflect these new realities. This is especially true for those plan sponsors looking to create attractive options that encourage employees to stay in the plan post-retirement, which can maximize economies of scale and lower costs for both the plan and its participants.

**Reflecting Participants**

Given the increasing fiduciary scrutiny of plans amid an increasingly multi-generational workforce, sponsors are looking to ensure that their target date offering, which is often used as the default, truly reflects their plan demographics, which are often evolving. Off-the-shelf TDFs—built for the average person based on either the recordkeeping platform or national data—do not address the unique characteristics of a plan's participant profile and investment limitations or strengths. Unique participant considerations such as risk tolerance, required income replacement ratios, expected income during working years, savings rates, out-of-plan assets (including spousal assets), expectations for Social Security income, and access to a pension plan can be factored into custom glide path construction.

Typically, all target date glide paths, whether custom or off-the-shelf, are considered either:

- "To" retirement (the equity allocation stops changing at the target retirement date), or
- "Through" retirement (the series continues to lower the allocation to equities into retirement).

A "to" series does not reflect the reality of longevity risk today. Participants may need to make their retirement savings last 20 years or more. Meanwhile, "through" glide paths may still not have enough of a growth allocation to meet retirement replacement needs. A growing trend is a "flat" glide path, which keeps a specific (often higher) equity landing point at retirement and carries it through at the same percentage to allow for a longer opportunity for growth.

Within these glide path parameters, custom TDFs allow plan committees to create unique glide paths that can be more conservative, more aggressive, and more diversified than those of typical off-the-shelf TDFs, based on their respective workforces and overall benefits offerings.

## Glide Paths Vary Widely

DCIIA's custom TDF survey among 91 plans with $1.2 trillion in total assets (of which $312 billion was in TDF assets) saw wide ranges of allocations within vintages and asset categories at the plan level—indicating that asset allocators and individual plan sponsors had different views of the ideal glide path for each vintage, with asset allocations varying by as much as 30 percentage points.

*"These differing views may indicate that, when both the glide path and the underlying asset classes were constructed, other factors were at play, such as the existence of a DB plan or a plan where specific demographics were being taken into account."*

Source: DCIIA. *Second Custom Target Date Fund Survey,* May 2020.

Examples include:

- DC plans paired with a DB plan take a more aggressive glide path approach by extending the equity allocation even further into retirement, knowing the DB plan will provide a reliable base level of income.
- A company in a focused or niche industry selecting plan investments diversified away from the same industry.

For plans that prefer that participants stay in the plan post-retirement, a custom glide path could better reflect the sponsor's plan philosophy. The ability to control the underlying investment options with a custom suite can be a significant contributor to enhancing retirement income replacement outcomes over the long term.



**Of 56% of sponsors taking some action regarding their TDFs, evaluating the glide path suitability maintained its place as the most prevalent course of action (81%).[8]**

## Fiduciary and Cost Considerations

Under ERISA, plan fiduciaries must act prudently and with the exclusive benefit of participants and beneficiaries in mind. Whether using an off-the-shelf TDF or creating a custom strategy, plan fiduciaries are held to this high standard when selecting and monitoring plan investments. In 2019, the majority (61%) of plans using a custom solution reported that the plan sponsor acts as the investment fiduciary. This is a steady decrease (from 77% and 84% in 2016 and 2015, respectively) as sponsors transfer the investment selection and monitoring responsibilities to partners including investment managers, advisors, consultants, and recordkeepers.[9]

Sponsors considering a custom strategy should conduct a full analysis of the benefits relative to the costs, taking into account several factors, including, but not limited to the:

- **Direct costs** of investment management (including fees for glide path design and management, day-to-day investment management, investment administration, participant communication, and education)
- **Indirect costs** of fiduciary oversight and the monitoring of a TDF series as part of their due diligence
- **Cost savings** from leveraging existing investment options and plan scale. Creating custom target date strategies or using the institutional core strategies the sponsor uses for its DB plan can reduce expenses

Plans that encourage participants to remain invested in the plan even after termination or at retirement, potentially resulting in significant additional assets, could also help to reduce costs by leveraging scale when negotiating investment management fees or other pricing.

Last, using cost-efficient and flexible investment vehicles, such as CITs, can help to reduce costs

---

[8] Callan Institute, "2020 Defined Contribution Trends Survey."
[9] Callan Institute, "2020 Defined Contribution Trends Survey."



According to the DOL, "While an off-the-shelf TDF series that invests in passive funds will most likely be the lowest cost option, it may not be the most appropriate choice for the plan's demographic or reflect the plan sponsors' unique investment beliefs."[10]

and complexity for plans. CITs typically have lower compliance, administration, marketing, and distribution costs than mutual funds, resulting in significant savings. In fact, across strategies that offer both CITs and comparable mutual funds, CIT costs are lower 82% of the time.[11]

## Implementation Best Practices

Understanding what custom target date funds can offer, what adopting them will mean in terms of cost and staff time, and any other operational considerations is an important step in determining if a custom strategy is right for a plan.

The plan's advisor or consultant can help guide the process, which includes performing in-depth participant analysis, designing and modifying the initial and ongoing glide path, determining the number of target date strategies that should be offered, and evaluating both the underlying asset classes and the factors that should trigger rebalancing.

To start, plans should perform in-depth analysis of their participant demographics and behavioral patterns. This may require further segmenting participants—grouping them via active or inactive status or 5-to-10 year age groups, for example. Factors to consider include, but are not limited to, average savings rate, size of account balances, current and future earnings power, and investment sophistication of participants. Newer considerations, such as access to a health savings account or emergency savings account through an employer, should be reviewed as part of a holistic approach to total employee benefits.

Next, discuss, decide, and document the following in consideration of plan's participant characteristics:

▸ **The proper slope of the glide path's asset allocation** in seeking to meet projected retirement income needs. For each age segment, how conservative or aggressive should asset allocations be? Does the asset allocation diversify by incorporating alternative investments, and if so, how?

▸ **The implementation of asset allocation by** class, style (active, passive, or both), strategy, and vehicle type (collective investment trust, separate account, or mutual funds), as well as by investment manager.



For more information on cost-efficient CITs, see our paper, "Collective Power: CITs Energize DC Plans with a Flexible, Cost-Efficient, Customizable Option." Available at https://lazardassetmanagement.com/us/en_us/retirement/dcrising/collective-power

---

[10] U.S. Dept of Labor, Employee Benefits Security Administration, "Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries," February 2013.
[11] Morningstar Inc.

## Summary

Plans of all sizes can benefit from the advantages of custom target date strategies. The ability of sponsors to build and control a best-in-class investment menu with the flexibility to create glide paths that better align with each plan's demographics and investment needs over time can make a difference in participants' retirement success.

Plan sponsors considering a customized approach should partner with their consultants or advisors to adequately review items such as oversight requirements, due diligence, cost, and transparency as they relate to their unique plans and participants. DC

**FOR MORE INFORMATION** please contact your Retirement Plan Advisor or Consultant, or visit us at www.lazardassetmanagement.com.



*DC Rising* is the Lazard Insights Magazine for the new retirement imperative.



### Important Information

Information and opinions presented have been obtained or derived from sources believed by Lazard to be reliable. Lazard makes no representation as to their accuracy or completeness. All opinions expressed herein are as of the published date and are subject to change.

Certain information contained herein constitutes "forward-looking statements" which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "target," "intent," "continue," or "believe," or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, actual events may differ materially from those reflected or contemplated in such forward-looking statements.

This material is for informational purposes only. It is not intended as, and does not constitute, financial advice, fund management services, an offer of financial products or to enter into any contract or investment agreement in respect of any product offered by Lazard Asset Management and shall not be considered as an offer or solicitation with respect to any product, security, or service in any jurisdiction or in any circumstances in which such offer or solicitation is unlawful or unauthorized or otherwise restricted or prohibited. This article is intended for U.S. audiences only.

The article is for general information only and is not intended to provide investment, tax, or legal advice, or recommendations for any particular situation. The article reflects circumstances as of June 2021, and readers should be aware that subsequent developments may have affected the discussion and statements in the article. Please consult with a financial, tax, or legal advisor about your circumstances.

LRX190852                                                                 Published on 23 June 2021